# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------x

| | : | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| **WASHINGTON MUTUAL, INC., <u>et al.</u>,** | : | Case No. 08-12229 (MFW) |
| | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------x

## DECLARATION OF STEWART M. LANDEFELD IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS

I, Stewart M. Landefeld, being fully sworn, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am an Executive Vice President of Washington Mutual, Inc. ("<u>WMI</u>"), formerly a savings and loan holding company incorporated in the State of Washington and headquartered in Seattle. WMI is the parent of (i) WMI Investment Corporation, which is incorporated in Delaware ("<u>WMI Investment</u>," together with WMI, the "<u>Debtors</u>"),[1] and (ii) several other non-banking, non-debtor subsidiaries (the "<u>Non-Debtor Subsidiaries</u>"). Prior to the Commencement Date and the Bank Receivership (both as defined below), WMI also was the direct parent of Washington Mutual Bank ("<u>WMB</u>"), which owned Washington Mutual Bank fsb ("<u>WMBfsb</u>" and together with WMB and their respective banking subsidiaries, the "<u>Banking Subsidiaries</u>" or "<u>WaMu</u>," and WMI, the Non-Debtor Subsidiaries and the Banking Subsidiaries, the "<u>Company</u>").

---

[1]      The Debtors' federal tax identification numbers are: (i) for WMI, 91-1653725; and, (ii) for WMI Investment, 20-5885395.


0812229081002000000000002

2.     I am generally familiar with WMI's day-to-day operations, business, and financial affairs as they existed prior to, and, where applicable, as they continue to exist after September 25, 2008. On September 25, 2008, the Director of the Office of Thrift Supervision ("OTS"), by order number 2008-36, appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver for WMB and advised that the receiver was immediately taking possession of WMB (the "Bank Receivership"). I have been advised that the receiver sold substantially all assets of WMB to JPMorgan Chase Bank, National Association ("JPMorgan Chase") pursuant to an agreement dated September 25, 2008.

3.     I submit this declaration (the "Declaration") to (a) assist the Court and other interested parties in understanding the Bank Receivership and other circumstances that compelled the commencement of these chapter 11 cases and (b) in support of (1) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on September 26, 2008 (the "Commencement Date") and (2) the relief sought in certain motions and applications (the "Pleadings") filed subsequent thereto.

4.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussion with other members of WMI's current or former senior management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the operations of WMI and the retail and commercial banking industry as a whole. While I have made every reasonable effort to ensure that the information contained herein is accurate and complete based upon information that was available at the time of preparation, the subsequent receipt of information may result in material changes to financial data and other information contained herein. If called upon to testify, I

would testify competently to the facts set forth in this Declaration. By resolution of the Board of Directors of WMI, I am authorized to submit this Declaration.

5.     This Declaration is intended to provide an overview of WMI and these chapter 11 cases. Sections I and II of this Declaration provide an overview of WMI's corporate history and organizational structure, and capital structure, as they existed prior to the Bank Receivership and the Commencement Date. Section III describes the circumstances giving rise to the commencement of these chapter 11 cases. Section IV describes the relief that the Debtors seek in their Pleadings.

## I.

## Corporate History and Organizational Structure

6.     On June 6, 1889, a fire blackened the entire central business district of Seattle, engulfing 25 city blocks and destroying nearly everything in its path. Out of "The Great Seattle Fire" arose WMI's predecessor, the Washington National Building Loan and Investment Association (the "Association") to (i) offer stockholders a vehicle for investing and lending and (ii) help Seattle residents rebuild after the fire. The Association made the first monthly-installment home loan on the Pacific Coast on February 10, 1890 in the amount of $700 to a borrower and aspiring homebuilder in Seattle. This amortized home loan proved so popular that, in a short period thereafter, the Association made more than 2,000 similar loans to help build 250 blocks of housing in Seattle.

7.     The Company made the first of its acquisitions in the early days of the Great Depression with the purchase of Continental Mutual Savings Bank. In 1983, after decades of continued growth and at a time when many thrifts were folding, the Company acquired Murphy Favre, Inc. ("Murphy"), a full-service securities brokerage firm. Shortly thereafter, the

Company converted from a mutual form of ownership to a capital stock savings bank and its stock issuance raised $72 million. Subsequently, the Company continued to expand and diversify and became the nation's leading bank in originating mortgages. In doing so, the Company acquired, among other institutions, Commercial Capital Bancorp, Dime Bancorp, Inc., PNC Mortgage, Providian Financial Corporation, and several of the Non-Debtor Subsidiaries.

8.      WMI was incorporated in the state of Washington in 1994. WMI Investment is a corporation formed under the laws of Delaware. WMI is registered with, and its securities trade on, the New York Stock Exchange under the symbol "WM."[2] Accordingly, WMI is subject to the informational disclosure requirements of the Securities Exchange Act of 1934, as amended, and files annual, quarterly and current reports and other information with the Securities and Exchange Commission (the "SEC").

9.      As a former savings and loan holding company, WMI was also subject to regulation by the OTS prior to the Bank Receivership and the Commencement Date. WMB and WMBfsb, like all depository institutions with federal thrift charters, were also subject to regulation and examination by the OTS. In addition, WMI's banking and nonbanking subsidiaries were also overseen by various federal and state authorities, including the FDIC and the Comptroller of the Currency of the United States.[3]

10.     WMI's assets consist of its common stock interest in WMB, its interests in its non-banking subsidiaries, and approximately $5 billion of cash that WMI and its non-banking subsidiaries (including WMI Investment) had on deposit at WMB and its other banking

---

[2]      In addition, the securities of certain of WMI's subsidiaries are publicly registered.

[3]      In addition, certain of the Debtors' non-debtor subsidiaries, including, but not limited to WaMu Investments, Inc., are registered with the SEC as broker-dealers, derivatives dealers, and investment advisors. As such, those entities are subject to regulation by the SEC and by self-regulatory organizations, including the Financial Industry Regulatory Authority.

subsidiaries immediately prior to the Bank Receivership. In connection therewith, the Debtors have entered into a standstill agreement, dated September 28, 2008 (the "Standstill") with JPMorgan Chase in an effort to resolve certain issues pertaining to deposits that the Debtors held, prior to the Bank Receivership, in accounts at WMB and WMBfsb.

## II.

## Capital Structure/Significant Indebtedness

*Overview*

11.     As of June 30, 2008, WMI had outstanding principal unsecured indebtedness totaling approximately $7 billion, with $4.1 billion attributable to nine series of senior unsecured notes (the "Senior Notes"),[4] $1.6 billion attributable to three series of subordinated unsecured notes (the "Subordinated Notes"),[5] and $1.15 billion attributable to junior unsecured debentures (the "Junior Subordinated Debentures") in connection with certain trust preferred equity redeemable securities.[6] WMI had also issued $3.5 billion in outstanding

---

[4]     The Senior Notes are obligations of WMI only, and not guaranteed by, or otherwise obligations of, WMI's subsidiaries. The Bank of New York is the indenture trustee pursuant to the indentures for each of the Senior Notes.

[5]     The Subordinated Notes are obligations of WMI only, and are not guaranteed by, or otherwise obligations of, WMI's subsidiaries. Furthermore, the Subordinated Notes are subordinate in right of payment in full of all obligations under the Senior Notes and other senior indebtedness as defined in the indentures for each of the Subordinated Notes. The Bank of New York, as successor to Harris Trust and Saving Bank, is the indenture trustee pursuant to each such indenture.

[6]     The Junior Subordinated Debentures are obligations of WMI only, are not guaranteed by or otherwise obligations of, WMI's subsidiaries. Furthermore, the Junior Subordinated Notes are subordinate in right of payment in full of all obligations under the Senior Notes, the Subordinated Notes and other "Senior Indebtedness" as defined in the indenture for the Junior Subordinated Debenture (the "Junior Subordinated Debenture Indenture"). The Bank of New York is the indenture trustee pursuant to such indenture.

The Junior Subordinated Debentures were issued to a special purpose grantor trust, Washington Mutual Capital Trust 2001( the "Trust"). The Trust, in turn, issued common securities to WMI and preferred securities to third parties (the "Preferred Securities" and together with the common securities, the "Trust Securities") to fund its purchase of the Junior Subordinated Debentures. The Preferred

preferred stock.[7] The following chart details WMI's[8] capital structure and significant

indebtedness as of June 30, 2008:

| Issuance Type | Coupon | Issue Date | Maturity | Principal Outstanding ($mm) | Par at Issuance |
|---|---|---|---|---|---|
| Senior | 4.00% | 10/27/2003 | 1/15/2009 | 805 | 1,000 |
| Senior | Floating | 8/24/2006 | 8/24/2009 | 359 | 500 |
| Senior | 4.200% | 12/20/2004 | 1/15/2010 | 504 | 600 |
| Senior | Floating | 12/20/2004 | 1/15/2010 | 176 | 250 |
| Senior | 5.500% | 8/24/2006 | 8/24/2011 | 361 | 400 |
| Senior | 5.000% | 3/22/2005 | 3/22/2012 | 376 | 400 |
| Senior | Floating | 3/22/2005 | 3/22/2012 | 363 | 450 |
| Senior | Floating | 9/26/2005 | 9/17/2012 | 447 | 500 |
| Senior | 5.250% | 9/26/2005 | 9/15/2017 | 730 | 750 |
| Series K Preferred Stock | Floating | 9/11/2006 | Perpetual | 500 | 500 |
| Series R Convertible Preferred Stock | 7.750% | 12/17/2007 | Perpetual | 3,000 | 3,000 |
| Subordinate | 8.250% | 4/4/2000 | 4/1/2010 | 452 | 500 |
| Subordinate | 4.625% | 3/24/2004 | 4/1/2014 | 732 | 750 |
| Subordinate | 7.250% | 11/1/2007 | 11/1/2017 | 440 | 500 |
| Trust Preferred | 5.375% | 4/30/2001 | 5/1/2041 | 1,150 | 1,150 |

*Preferred Stock*

12.     In April 2008, WMI completed a significant recapitalization, which

resulted in a $7.2 billion capital infusion (the "Capital Raise") by a group of outside investors

---

Securities, together with warrants to purchase common stock of WMI were sold as units, "Trust Preferred Income Equity Redeemable Securities Units" or "PIERS," but each can be traded separately. The Preferred Securities reflect the economics of the Junior Subordinated Debentures. WMI has guaranteed payment of (i) distributions required to be paid on the Trust Securities, (ii) the redemption price of the Trust Securities upon exercise of certain redemption rights by the holders thereof and (iii) the accreted value of the Trust Securities in a liquidation of the trust (or if less, the amount of assets of the trust available in such liquidation for distribution to the holders), in each case, to the extent the Trust has funds legally available for such payments. The guarantee is subordinate in right of payment to all obligations under the Senior Notes and the Subordinated Notes and to other Senior Indebtedness as defined in the Junior Subordinated Debenture Indenture.

[7]     Amounts reflected are principal amounts exclusive of interest.

[8]     Upon information and belief, with limited exception, aside from certain intercompany claims, WMI Investment does not have any outstanding debt as of the date hereof.

(the "Outside Investors") led by TPG Capital (the "TPG Investors"). Pursuant to this transaction, WMI issued 822,857 shares of common stock to the TPG Investors and 175,500,000 shares of common stock to the other Outside Investors at $8.75 per share.[9] As of the close of business on September 19, 2008, WMI had 1,704,961,280 shares of common stock outstanding and 3,000,500 shares of preferred stock outstanding – inclusive of the stock issued in connection with the Capital Raise. Prior to the Capital Raise, WMI issued 2 series of preferred stock, the Series K Perpetual Non-Cumulative Floating Rate Preferred Stock (the "Series K") and the Series R Non-Cumulative Perpetual Convertible Preferred Stock (the "Series R"). On September 18, 2006, the Company issued 20,000,000 depositary shares representing 1/40,000th ownership interest in a share of Series K. There are 500 shares of Series K and 3,000,000 shares of Series R outstanding.

13.     In addition, WMI had additional series of Perpetual Non-cumulative Fixed and Fixed to Floating Rate Preferred Stock in Series I, J, L, M and N (collectively, the "Preferred Stock Series") – none of which were outstanding prior to September 25, 2008. By letter, dated as of that day and immediately prior to the Bank Receivership, however, the OTS directed that certain Trust Securities issued by various trust entities be automatically exchanged for a "depositary share," each representing 1/1000th of a share of preferred stock, as applicable, in one of the Preferred Stock Series. OTS' direction stemmed from the asserted occurrence of an "Exchange Event" defined by the Preferred Stock Series prospectus as, among other things: (i) the undercapitalization of WMB under OTS' "prompt correction action" regulations; or (ii) the OTS, in its sole discretion, directing the exchange in anticipation of WMB becoming

---

[9]     The number of common shares issued includes common shares issued upon conversion of all of the Series T contingent convertible perpetual non cumulative preferred stock initially issued to the TPG Investors and Series S contingent convertible perpetual non cumulative preferred stock initially issued to the Other Investors.

"undercapitalized" or the OTS taking supervisory action limiting the payment of dividends by WMB.

## III.

### Events Leading to the Commencement of these Chapter 11 Cases

14.     As extensively reported in the financial press, in mid-2007, the United States residential mortgage market began to experience serious disruption due to, among other things, (i) credit quality deterioration in a significant portion of originated loans, particularly to non-prime and subprime borrowers, (ii) a residential housing market characterized by a slowing pace of transactions and declining home values, (iv) increased mortgage rates and reduced availability of borrowings, (v) a rising unemployment rate, (vi) increased delinquencies in non-mortgage consumer credit, (vii) illiquid credit markets, and (viii) changes in the regulatory environment. These conditions continued and worsened throughout 2007 and 2008, expanding into the broader U.S. credit markets and resulting in greater volatility, less liquidity, widening of credit spreads, significantly depressed volumes in most equity markets, declining assets values, a lack of transparency, slowed growth in major economies, and declining business and consumer confidence.

15.     In this context, the Company reported decreased earnings and revenue. Until recently, however, the Company had been able to weather the storm in large part due to the Capital Raise and extensive internal restructuring efforts. The Company's proactive measures served to strengthen, at least temporarily, the Company's banking franchise.

16.     The Company's business was highly dependent upon WaMu's insured deposits and was therefore driven by consumer trust and the appearance of, if not actual, stability. Indeed, WaMu's ability to retain its retail deposit base and attract new deposits

depended on various factors such as customer service satisfaction levels, the competitiveness of interest rates offered on deposit products, WaMu's reputation, and depositor perception of WaMu's stability and future prospects. These perceptions were easily influenced by external events, such as instability in the banking industry generally, rating downgrades, rumor and speculation.

17. Recent ratings downgrades fed the speculation and accentuated the Company's problem of perception. On September 11, 2008, Moody's Investor Service ("Moody's") downgraded the long-term deposit and issuer ratings of WMB to Baa3 from Baa2, and the short-term rating to Prime-3 from Prime-2. Moody's also reported a negative outlook. In response, WMB stated that the downgrade was "inconsistent with the company's current financial condition," and that Moody's actions reflected the current uncertainty in the markets generally, rather than a specific evaluation of WMB's business, the strength of its national franchise, and the steps it was taking to return to profitability.

18. On September 15, 2008, Standard & Poor's ("S&P") reduced its counterparty credit rating on WMI to BB-/B from BBB-/A-3, while lowering the rating on WMB to BBB-/A-3 from BBB/A-2, and reported a negative outlook. S&P attributed its actions to worsening market conditions, and not to any material change of WMI's financial condition. Indeed, S&P acknowledged that (i) WMI and WMB's overall liquidity profiles were positioned to withstand the weak credit cycle through the end of 2010 and (ii) WMI conservatively managed its liquidity position. S&P also acknowledged, however, that capital pressures remained high given the expectation for loss in 2008 and possibly in 2009.

19. On September 18, 2008, Fitch Ratings announced that it placed the ratings of WMI, WMB, and related entities, on Rating Watch Evolving.

20.     On September 23, 2008, Moody's issued an additional downgrade of WMI. Moody's announced that it had cut its rating on WMI's preferred stock from B2 to Ca, while simultaneously downgrading the WMB's financial strength rating to E from D+. Moody's 'E' rating pins WMI as a company with (i) very modest intrinsic financial strength, (ii) a higher likelihood of getting outside support or eventual need for outside assistance, and (iii) an unstable operating environment and materially deficient financials.

21.     On September 24, 2008, S&P issued an additional downgrade of WMI from BB-/B to CCC/C, eight levels below investment grade. S&P affirmed, however, its earlier BBB-/A-3 rating of WMB because of the breadth of its retail franchise.

22.     These downgrades fed the pervasive speculation that began to circulate in the market that WaMu's operations were unstable. Although WaMu tried to stem the tide through press releases and market assurances of stability and adaptability, the wave of external events brought an intense amount of public focus on WaMu and its ability to withstand the latest economic crisis. Compounded with the reality of the information age, rumors and speculation and the mass media's coverage of WaMu's alleged capital and liquidity issues resulted in millions of people around the world watching and panicking. This cycle became a self-fulfilling prophecy – sparking days of significant deposit withdrawals as WaMu's depositors reacted to having their faith in financial institutions shaken.

23.     In the midst of these downgrades, the FDIC assigned WaMu a supervisory rating of overall condition – commonly referred to as a CAMELS rating – of four, the second lowest rating on a scale of one to five.[10] To qualify for primary credit from the Federal Reserve

---

[10]     Upon information and belief, the components of a bank's condition that factor into its CAMELS rating include: (C) Capital Adequacy; (A) Asset Quality; (M) Management; (E) Earnings; (L) Liquidity; and (S) Sensitivity to market risk (since 1997).

Bank's Discount Window (the "Discount Window"), a depository institution must be able to demonstrate that it is in sound financial condition. To this end, the Federal Reserve Bank performs ongoing reviews of an institution's condition using the CAMELS rating and capitalization data. An institution assigned a composite CAMELS rating of four is ineligible to receive primary credit from the Discount Window unless an ongoing examination or other supplemental information indicates adequate capitalization and improvement sufficient to be deemed "sound."

24. During this ongoing process, the OTS and the FDIC strongly signaled that WMI should pursue a sale or merger transaction with a stronger financial institution. Among others, WMI drew interest from potential suitors such as Citigroup Inc., JPMorgan Chase, Wells Fargo & Co., Toronto-Dominion Bank, and Banco Santander SA of Spain. To facilitate a sale, the TPG Investors agreed to waive a provision requiring WMI to pay/issue up to $1.5 billion in cash or common stock (i) if WMI issued or sold more than $500 million of common stock or other equity-linked securities (such as securities that are convertible into, exchangeable or exercisable for, or otherwise linked to the common stock) or (ii) upon a fundamental change in WMI's ownership (such as a consolidation, merger, liquidation, or sale of all, or substantially all, of WMI's assets) – where the effective price of the sale or fundamental change is for less than $8.75 per share. As noted by the press, the waiver constituted the removal of a major obstacle to a sale.

25. Despite the waiver, WMI's sale negotiations proved unsuccessful. On September 23, 2008, WMI informed the OTS, the FDIC and the Board of Governors of the Federal Reserve System (the "FED") of other strategic alternatives under consideration including, among other things, (i) debt for equity swaps, (ii) equity for equity swaps, and (iii)

divestiture plans. Each of the alternatives were intended to increase WMI's capital and liquidity levels. While the Debtors were pursuing these alternatives, the OTS initiated the Bank Receivership on September 25, 2008 and, upon information and belief, the receiver sold substantially all assets of WMB to JPMorgan Chase pursuant to an agreement dated the same day.

26.    After the Bank Receivership, the Debtors filed these chapter 11 cases to preserve their assets and maximize the value of their estates for the benefit of their creditors.

## IV.

### Summary of Pending Pleadings

27.    The Debtors are filing, for the Court's approval, a number of pleadings, which the Debtors believe are necessary to enable them to operate in chapter 11 with minimal disruption and loss of productivity. The Debtors respectfully ask that the relief requested in each of the pleadings be granted as they are a critical element in stabilizing and facilitating the Debtors' operations during the pendency of these chapter 11 cases. A description of the relief requested and the facts supporting each of the pleadings is set forth below.

### Motion of Debtors' for Order Directing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure

28.    The Debtors seek, pursuant to Rule 1015(b) of the Bankruptcy Rules, the joint administration of their chapter 11 cases for procedural purposes only. Joint administration will obviate the need for duplicative notices, motions, applications, and orders and thereby save time and expense for the Debtors and their estates.

29.    The rights of the Debtors' creditors will not be adversely affected by the proposed joint administration of these cases, and, in fact, will be enhanced by the reduction in costs resulting from the joint administration. The Court will also be relieved of the burden of

entering duplicative orders and maintaining redundant files. Finally, supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee for the District of Delaware will be simplified.

30.     I believe that joint administration of the Debtors' chapter 11 cases is in the best interests of the Debtors, their estates, and all parties in interest, and should be granted.

### Motion of Debtors for (I) a Waiver of the Requirement for Filing List of Creditors and an Extension of Time to File a List of Creditors, and (II) Authority to Establish Procedures for Notifying Creditors of Commencement of Debtors' Chapter 11 Cases

31.     The Debtors request, pursuant to sections 105(a), 342(a), and 521(a)(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a), 2002(a), (f), and (l), and Rule 1007-2 of the Local Rules (collectively, the "Notice Rules"), (I) a waiver of the requirement to file their List of Creditors (as defined below) on the Commencement Date and an extension of time to file their List of Creditors, and (II) authority to implement certain procedures (the "Procedures") for notifying creditors of the commencement of the Debtors' chapter 11 cases and of the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code.

32.     I am informed by counsel that a debtor must file with its chapter 11 petition a list containing the name and address of each of its creditors (the "List of Creditors"). I am also aware that this Court has the authority to grant an extension pursuant to Bankruptcy Rule 1007(a)(4). Prior to the Commencement Date, the Debtors began gathering the information necessary to generate a complete list of their creditors for filing with the Court, but the Bank Receivership disrupted this process by limiting the Debtors' access to their employees and their books and records. The Debtors expect to work with the FDIC, JPMorgan Chase, and other parties to gain access to the information necessary to complete their List of Creditors. The

Debtors will also continue their independent efforts to obtain the requisite information, but anticipate that this will require additional time under the current circumstances.

33. Moreover, the Debtors intend to file a motion to retain and employ a notice and claims agent (the "<u>Notice and Claims Agent</u>") in their chapter 11 cases, and the Debtors will furnish the List of Creditors, as soon as it is available and on a rolling basis, to the Notice and Claims Agent so that the Notice and Claims Agent may undertake the mailing of the notice of commencement to all the Debtors' creditors.

34. Because (i) it will take time to assemble the List of Creditors under the current circumstances and (ii) once retained, the Notice and Claims Agent will send the notice of commencement to all the Debtors' creditors set forth on the List of Creditors on a rolling basis, the Debtors request that this Court waive the Notice Rules and provide the Debtors with a sixty (60) day extension to file their List of Creditors without prejudice to further extension, if necessary, upon a motion to the Court.

**Motion of Debtors Pursuant to Bankruptcy Rules 1007(c) and 2002(d) and Local Rule 1007-1(b) for (I) an Extension of the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Final Affairs and (II) a Waiver of the Requirements to File the Equity List and Provide Notice to Equity Security Holders**

35. The Debtors request, pursuant to section 521 of the Bankruptcy Code and Rule 1007(c) of the Bankruptcy Rules and Rule 1007-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), (i) an extension of time to file its (a) schedules of assets and liabilities; (b) schedules of current income and expenditures; (c) schedules of executory contracts and unexpired leases; and (d) statement of financial affairs (collectively, the "<u>Schedules and</u>

SOFAs"), and (ii) a waiver of requirements to file lists of equity security holders and provide notice of order for relief to equity security holders.

36.     Due to the exigent circumstances under which the Debtors' commenced their chapter 11 cases and the demands on the limited resources available to the Debtors at this time, the Debtors anticipate that they will be unable to complete their Schedules in the mere thirty (30) days provided by the Bankruptcy Rules. To prepare the Schedules, the Debtors must compile information from their books, records, and other sources relating to their assets, contracts, and creditors. Assembling the necessary information will be a significant task for the Debtors, especially in light of the Bank Receivership and its disruption to the Debtors' business operations. Indeed, the Debtors believe that many of their books and records may be in the possession of the FDIC or JPMorgan Chase and retrieving such information will take additional time. The Debtors have also lost a number of employees to JPMorgan Chase.

37.     In view of the amount of work entailed in completing the Schedules and the competing demands on the Debtors' remaining employees to compile and distill the relevant information following the Bank Receivership and assisting with the transition to chapter 11, it would be very difficult for the Debtors to properly and accurately complete the Schedules within the thirty-day time period imposed under the Bankruptcy Rules.

38.     Therefore, the Debtors are requesting a ninety (90) day extension of the applicable time period. Moreover, the Debtors submit that preparing a list of equity security holders with last known addresses and sending notice to all parties on the list will be expensive and time consuming given the volume of equity security holders in these cases. The Debtors further submit that if it becomes necessary for such equity security holders to file proofs of

interest, they will be provided with notice of the bar date and then will have an opportunity to assert their interests.

39.     Accordingly, I respectfully submit that in light of (i) the large amount of information that must be assembled and compiled, (ii) the significant amount of employee time that must be devoted to the task of completing the Schedules and SOFAs, (iii) the limited number of employees available to the Debtors, post-Bank Receivership, and (iv) the many pressing items that must be addressed at the inception of these cases, the Debtors respectfully submit that ample cause exists for the Court to (a) grant the requested extension for filing their Schedules and SOFAs, and (b) waive the requirement to file the lists of equity security holders and the requirement to send notice of the order for relief to all equity security holders.

### Motion of Debtors for (I) Authorization (A) to Maintain Existing Bank Accounts and Business Forms, and (II) for an Extension of Time to Comply with Section 345(b) of the Bankruptcy Code

40.     The Debtors request, pursuant to sections 105(a), 363(c), and 345(b) of the Bankruptcy Code, entry of an order authorizing (I) the Debtors to (a) maintain existing bank accounts (the "Bank Accounts") and business forms, and (II) a sixty-day extension of time for the Debtors to comply, if necessary, with section 345 of the Bankruptcy Code.

41.     I am informed by counsel that the Office of the United States Trustee's "Operating Guidelines and Financial Reporting Requirements Required in All Cases Under Chapter 11" mandate the closure of the Debtors' prepetition bank accounts, the opening of new accounts, and the immediate printing of new checks with a "Debtors in Possession" designation on them. At this time, it would be difficult for the Debtors to comply with these guidelines because it would cause even further disruption and confusion in light of the Bank Receivership

and the need to confirm the status of certain bank accounts previously maintained by the Debtors at WMB and WMBfsb.

42.    The Debtors believe, therefore, that their transition to chapter 11 will be smoother and more orderly, with minimum disruption and harm to their operations, if the Bank Accounts are left in a status quo and continued following the Commencement Date with the same account numbers; provided, however, that checks issued or dated prior to the Commencement Date will not be honored by WMI, absent a prior order of this Court.[11]  By preserving continuity and avoiding the disruption and delay to the Debtors' collection and disbursement procedures that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest will be best served.  Accordingly, the Debtors respectfully request authority to maintain the Bank Accounts in the ordinary course of business.

43.    In addition to mandating the closure of all bank accounts, I am informed by counsel that the United States Trustee Guidelines require the immediate printing of new checks with the label "Debtor in Possession," and Rule 2015-2(a) of the Local Rules mandate that the Debtors, upon exhausting their existing check stock, order new ones with the "Debtor in Possession" label.  To minimize expenses, the Debtors further request that they be authorized to continue to use their correspondence and business forms, including, but not limited to, purchase orders, multicopy checks, letterhead, envelopes, promotional materials, and other business forms (collectively, the "Business Forms"), substantially in the forms existing immediately before the Commencement Date, without reference to their status as debtors in possession.  The Debtors propose that in the event they need to purchase new Business Forms during the pendency of the

---

[11]    Importantly, the Debtors' request for authority to designate, maintain and continue using any and all existing bank accounts is subject to the Standstill.

chapter 11 cases, such forms will include a legend referring to the Debtors' status as debtors in possession.

44.     Moreover, the Debtors propose to engage in discussions with the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") to determine what modifications to their Bank Accounts and current investment practices, if any, would be appropriate under the circumstances.  The Debtors believe that their current investment practices will provide the protection contemplated by section 345(b) of the Bankruptcy Code during the extension period.  Based on, among other things, the FDIC's post-Bank Receivership reports, the Debtors believe that remaining cash on deposit in their Bank Accounts at WMB and WMBfsb are now held by JPMorgan Chase and, therefore, funds in excess of the amounts insured by the FDIC are not at risk.  Similarly, there is no question that the Debtors' funds in excess of the amounts insured by the FDIC, located at Bank of America and Bank of New York Mellon accounts are also not at risk, as Bank of America and Bank of New York Mellon are, like JPMorgan Chase, among the most highly-rated banking institutions in the country.  The Debtors will therefore seek approval of these institutions as "Authorized Bank Depositories" by the Office of the United States Trustee for the District of Delaware, to the extent they are not already so designated.

45.     Particularly in light of the Standstill, the extension period will provide the Debtors with an opportunity to work with JPMorgan Chase to review the status of the deposits previously held by WMB and WMBfsb.  The Debtors, therefore, are requesting a sixty-day extension (or such additional time to which the U.S. Trustee may agree) of the time period in which to either come into compliance with section 345(b) of the Bankruptcy Code.

46.    I believe that the foregoing relief is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate, and manage their assets in chapter 11 without disruption.

### Motion of Debtors Pursuant to Sections 331 and 105(a) of the Bankruptcy Code for Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals

47.    The Debtors request, pursuant to section 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a), entry of an order establishing procedures for the compensation and reimbursement of attorneys and other professionals whose retentions are approved by this Court pursuant to section 327 or 1103 of the Bankruptcy Code on a monthly basis, on terms that satisfy the requirements of Local Bankruptcy Rule 2016-2. Such an order will streamline the professional compensation process and enable the Court and all other parties to monitor more effectively the professional fees incurred in these chapter 11 cases.

48.    The Debtors' chapter 11 cases present a number of complex issues that, together with the day-to-day administration of the chapter 11 cases, must be addressed by the Debtors' limited staff and resources. In addition, it is anticipated that several professionals will be involved. Absent streamlined compensation procedures, the professional fee application and review process could be exceptionally burdensome on the Debtors, the professionals, the Court, and other parties.

49.    I believe that the authority to enter into the proposed interim compensation procedures for the Debtors' professionals is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate, and effectively reorganize, their business in chapter 11 without disruption.

50. I respectfully request that the Court grant all relief requested in the pleadings and such and other further relief as may be just.

WASHINGTON MUTUAL, INC.

By: _Stewart M Landefeld_

Name: Stewart M. Landefeld
Title: Executive Vice President
Dated: October 1, 2008