# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| ------------------------------------------------------- X | |
| ) | |
| *In re* ) | |
| ) | Chapter 11 |
| WASHINGTON MUTUAL, INC., et al.[1] ) | |
| ) | Case No. 08-12229 (MFW) |
| Debtors. ) | |
| ) | Jointly Administered |
| ) | |
| ------------------------------------------------------- ) | |
| ) | |
| OFFICIAL COMMITTEE OF EQUITY ) | |
| SECURITY HOLDERS, ) | Adversary Proceeding No. 10-50731 (MFW) |
| ) | |
| Plaintiff ) | |
| ) | |
| - against - ) | |
| ) | |
| WASHINGTON MUTUAL, INC., ) | |
| ) | |
| Defendant ) | |
| ------------------------------------------------------- X | |

## OPPOSITION OF DEFENDANT WASHINGTON MUTUAL, INC.
## TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, OR IN
## THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY

---

[1] The Debtors in these Chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are: (i) Washington Mutual, Inc. (3725) and (ii) WMI Investment Corp. (5395). The Debtors are located at 925 Fourth Avenue, Suite 2500, Seattle, Washington 98104.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ................................................................................................................... 5

    A.    The DC Action ................................................................................................. 5

    B.    The Bankruptcy Proceedings ........................................................................... 5

    C.    The Debtors' Progress in the Chapter 11 Cases and the Agreement ............... 6

ARGUMENT ........................................................................................................................ 7

    A.    Standard of Review .......................................................................................... 7

    B.    The Equity Committee Ignores Four Limitations on the Ability to Compel
        a Shareholder Meeting, Which Justify Denial of the Motion .......................... 8

        1.    Commencing the Action on the Eve of the Agreement and the Plan
            is a Clear Abuse of Process ................................................................ 8

        2.    Denial of the Motion Is Proper Because Equity Holders Are Not
            Real Parties in Interest Due to Debtors' Insolvency ........................ 14

            i      The Courts Have Held That Insolvency Is A Fact Issue For
                  Trial ...................................................................................... 14

            ii     This Court Has Already Recognized That, At A Minimum,
                  Fact Issues Exist As To Insolvency ...................................... 14

            iii    Even Assuming the Debtors Were to Prevail On Certain
                  Litigated Claims, The Equity Committee Overstates The
                  Value That Would Flow To Equity Holders .......................... 15

            iv    The Preferred Shareholders Cannot Change Control In Any
                  Event .................................................................................... 16

        3.    Denial Of Plaintiff's Motion Is Consistent with Washington Law ........... 17

        4.    The Court Should Exercise its Equitable Powers to Protect the
            Interests of the Estates .................................................................... 19

    C.    Even if the Court is Inclined to Grant the Motion, the Relief Requested Is
        Unlawful and Must be Modified ..................................................................... 20

| | 1. | The Extraordinary Request for an April 24th Meeting Should Be Denied, and WMI Should Be Given Sufficient Time to Prepare and Comply with SEC Rules | 20 |
| | 2. | Request To Have The Equity Committee's Director Slate Included On Debtors' Proxy Statements Should Be Denied | 22 |
| D. | | Plaintiff's Request for Alternative Relief is Improper, the Automatic Stay Applies, and, In Any Event, the Court Should Stay this Action | 24 |
| | 1. | The Equity Committee's Request for a Ruling on the Applicability of the Automatic Stay Should Be Denied As An Improper Request for an Advisory Opinion | 24 |
| | 2. | The Automatic Stay Applies and the Equity Committee Has Failed to Show Cause For Relief Therefrom | 25 |
| | 3. | If Inapplicable, the Automatic Stay Should be Extended Pursuant to the Exercise of this Court's Equitable Powers | 27 |

# TABLE OF AUTHORITIES

## Cases

*In re A. H. Robins Co.,*
828 F.2d 1023 (4th Cir. 1987) ........................................................................................27

*In re Acequia, Inc.,*
787 F.2d 1352 (9th Cir. 1986) ........................................................................................20

*In re Allegheny Intern. Inc.,*
118 B.R. 282 (Bankr. W.D. Pa. 1990) ...........................................................................19

*In re Allegheny Intern. Inc.,*
1988 WL 212509 (W.D. Pa. 1988) ...................................................................................9

*In re Allied Holdings, Inc.,*
2007 Bankr. LEXIS 1598 (Bankr. N.D. Ga. Apr. 19, 2007) ..........................................22

*American Electronic Components, Inc. v. Agere Systems, Inc.,*
2009 WL 1653867 (3d Cir. 2009)......................................................................................8

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 255 (1986)...................................................................................................7

*Armstrong World Indus., Inc. v. Adams,*
961 F.2d 405 (3d Cir. 1992)............................................................................................25

*Balaber-Strauss v. Town of Harrison (In re Murphy),*
331 B.R. 107 (Bankr. S.D.N.Y. 2005)............................................................................16

*Belcufine v. Aloe,*
112 F.3d 633 (3d Cir. 1997).............................................................................................28

*In re Bicoastal Corp.,*
1989 Bankr. LEXIS 2046 (Bankr. M.D. Fla. 1989) .......................................................25

*Brandt v. Trivest II, Inc (In re Plassein Intl. Corp.),*
Case No. 03-11489 (KG), Adv. Pro. No. 05-51472 (KG), [D.I. 72, 74 & 82] (Bankr. D. Del.
May 5, 2008).....................................................................................................................14

*Buncher Co. v. Official Comm. of Unsecured Creditors of Genfarm Ltd.,*
229 F.3d 245 (3d Cir. 2000).............................................................................................16

*Clabault v. Caribbean Select, Inc.,*
805 A.2d 913 (Del. Ch. 2002)..........................................................................................18

*In re Clamp-All Corp.,*
233 B.R. 198 (Bankr. D. Mass. 1999) .............................................................................10

*Clark v. Modern Group Ltd.,*
  9 F.3d 321 (3d Cir. 1993).................................................................................8

*Coaxial Communications, Inc. v. CAN Financial Corp.,*
  367 A.2d 994 (Del. 1976) ................................................................................13

*Colo. River Water Conservation Dist. v. United States,*
  424 U.S. 800 (U.S. 1976)..................................................................................24

*Connecticut Nat'l Bank v. Germain,*
  503 U.S. 249 (1992)......................................................................................25,26

*In re FSC Corp.,*
  38 B.R. 346 (Bankr. W. D. Pa. 1983) ...............................................................19

*In re Fairmont Communications Corp.,*
  No. 92-B-44861 (slip op.) (Bankr. S.D.N.Y. Mar. 3, 1993) ............................25

*Galli v. New Jersey Meadowlands Comm'n,*
  490 F.3d 265 (3d Cir. 2007).................................................................................7

*In re Gaslight Club, Inc.,*
  782 F.2d 767 (7th Cir. 1986) ............................................................................19

*Gerard v. W.R. Grace & Co. (In re W.R. Grace & Co.),*
  115 Fed. Appx. 565, 570 (3d Cir. 2004)...........................................................27

*In re Guardianship of Johnson,*
  112 Wash. App. 384 (Wash.App. Div. 2,2002) ...............................................18

*Hoxworth v. Blinder, Robinson & Co., Inc.,*
  903 F.2d 186, 204-05 n. 29 (3d Cir. 1990) .......................................................27

*Hugh v. Butler County Family YMCA,*
  418 F.3d 265 (3d Cir. 2005)................................................................................7

*In re I. Burack, Inc.,*
  132 B.R. 814 (Bankr. S.D.N.Y. 1991)...............................................................28

*International Raw Materials, Ltd. v. Stauffer Chem. Co.,*
  978 F.2d 1318, 1327 n. 11 (3d Cir. 1992)..........................................................27

*JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc. et al.,*
  Adv. Proc. No. 09-50551 (MFW)........................................................................5

*In re Johns-Manville Corp.,*
  801 F.2d 60, 65 (2d Cir. 1986) ...............................................................2, 8, 9, 14

*In re Johns-Manville Corp.,*
  66 B.R. 517 (Bankr. S.D.N.Y. 1986).............................................................9, 11

*Johns-Manville Corp. v. Asbestos Litig. Group (In re Johns-Manville Corp.),*
  26 B.R. 420 (Bankr. S.D.N.Y. 1983) *vacated in part,* 41 B.R. 926 (S.D.N.Y. 1984) .........27

*Johnson Forestry Contract, Inc. v. Washington State Dept.*,
   130 Wash. App. 1033, 2005 WL 3113510 (Wash. App. 2005) ............................17

*Lane v. Phila. Newspapers, LLC (In re Phila. Newspapers, LLC)*,
   2010 U.S. Dist. LEXIS 1881 (E.D. Pa. Jan. 11, 2010) ...................................29

*In re Lifeguard Industries, Inc.*,
   37 B.R. 3 (Bankr. S.D. Ohio 1983) ...............................................................19

*In re Lionel Corp* ,
   30 B.R. 327 (Bankr. S.D.N.Y. 1983) .............................................................13

*In re Marvel Enter. Group*,
   209 B.R. 832 (D. Del. 1997) .....................................................................8, 26

*In re Marvel Entertainment Group*,
   234 B.R. 21 (D. Del. 1999) ..........................................................................29

*In re Marvel Entertainment Group, Inc.*,
   140 F.3d 463 (3d Cir. 1998) .........................................................................28

*McCartney v. Integra National Bank North*,
   106 F.3d 506 (3d Cir. 1997) ....................................................................25, 28

*In re Mirant Corp.*,
   334 B.R. 800 (Bankr. N.D. Tex. 2005) ..........................................................14

*In re New York Trap Rock Corp* ,
   138 B.R. 420 (Bankr. S.D.N.Y. 1992) ......................................9, 11, 12, 23, 29

*Newcastle Partners, L.P. v. Vesta, Ins. Group, Inc* ,
   887 A.2d 975 (Del. Ch. 2005) .................................................................13, 22

*Pennsylvania Dep't of Pub. Welfare v. Davenport*,
   495 U.S. 552 (1990) ....................................................................................26

*In re Phila. Newspapers, LLC*,
   407 B.R. 606 (E.D. Pa. 2009) ......................................................................29

*In re Potter Instrument Co.*,
   593 F.2d 470 (2d Cir. 1979) .........................................................................20

*Saxon Indus. v. NKFW Partners*,
   488 A.D.2d 1298 (Del. 1984) .......................................................................13

*In re Sonnax Indus., Inc.*,
   907 F.2d 1280 (2d Cir. 1990) .......................................................................26

*Speiser v. Baker*,
   525 A.2d 1001 (Del. Ch. 1987) ....................................................................13

*State v. Montoya*,
   115 Wash. App. 1050, 2003 WL 464075 (Wash. App. 2003) .........................17

*In re Telesphere Communications, Inc.,*
179 Bankr. 544, 553 (Bankr. N.D. Ill. 1994) ............................................................16

*In re Temple Retirement Community, Inc.,*
80 B.R. 367 (Bankr. W.D.Tex. 1987) ...................................................................10

*In re United Press Intern., Inc.,*
60 B.R. 265 (Bankr. D. Dist. Col. 1986) ...............................................................19

*WMI and WMI Investment v. FDIC,*
No. 09-00533 (D.D.C. Mar. 20, 2009) ....................................................................5

*In re W.R. Grace & Co.,*
2007 WL 1129170 (Bankr. D. Del. Apr. 13, 2007) ...............................................26

*Washington Mutual, Inc. et al. v. JPMorgan Chase Bank, N.A.,*
Adv. Proc. No. 09-50934 (MFW) ...........................................................................6

*Whiteboard Plastics Co., Inc v. Chase National Bank of New York City,*
179 F.2d 582 (2d Cir. 1950) ..................................................................................16

*Wild West World, L.L.C. v. Mainland Valuation Servs. (In re Wild West World, L.L.C.),*
2008 Bankr. LEXIS 2964 (Bankr. D. Kan. Oct. 1, 2008) .......................................15

## Statutes

11 U.S.C. 1121 ..................................................................................................10

11 U.S.C. § 362(a)(3) .....................................................................................25, 26

11 U.S.C. § 362(d)(1) ..........................................................................................26

11 U.S.C. § 502(h) ...............................................................................................15

17 C.F.R.§ 240.14a-16 .........................................................................................22

17 C.F.R. § 240.14a-3 ..........................................................................................21

17 C.F.R. § 240.14a-8(i)(8) ..................................................................................23

RCW 11.92.170 ...................................................................................................18

RCW 23B.07.030 .................................................................................................18

RCW 23B.07.050 .................................................................................................21

Washington's RCW 23B.07.030(1) .......................................................................17

## Rules

Fed. R. Civ. P. 56(c) ..............................................................................................7

## Other Authorities

Bankruptcy Amendments and Federal Judgeship Act of 1984,
    Pub. L. No. 98-353, § 441(a)(2), 98 Stat. 333 (1984)................................................26

2 Wash. S.J. 2977-3112 (1989)...........................................................................................17

2008 Columbia Bus. L. Rev. 111, 1114 (2008) ...................................................................23

Model Business Corporations Act section 7.03, Official Comment No. 2 (2005) ...............18

SEC Release No. 34-56135, July 26, 2007...........................................................................21

## PRELIMINARY STATEMENT[2]

Dissatisfied with the official committee status the U.S. Trustee bestowed upon it, by this motion (the "Motion"), the Official Committee of Equity Security Holders (the "Equity Committee") seeks to seize control over Washington Mutual, Inc. ("WMI") (together, with WMI Investment Corp., the "Debtors") to their own advantage and to the detriment of the Debtors' estates, their creditors, and other interested parties. The U.S. Trustee ostensibly formed the Equity Committee so that the interests of WMI's shareholders would have a voice in these chapter 11 cases (the "Chapter 11 Cases"). Now, the Equity Committee seeks to have that voice heard louder than all others.

Just two months after its formation, and after conferring several times with the Debtors and the Official Committee of Unsecured Creditors (the "Creditors' Committee"), and after gaining a clearer view of the economic realities of the Chapter 11 Cases, the Equity Committee has abandoned all pretense of negotiation and commenced this action (the "Action"). In doing so, the Equity Committee seeks to upset the balance envisioned by the Court (and authorized by Congress in the Bankruptcy Code), without regard to the consequences. In view of the fact that the Equity Committee represents an out-of-the-money constituency, its misplaced ambitions threaten to turn the Chapter 11 Cases on their heads and undermine the groundbreaking, yet still fragile, agreement (the "Agreement") among the Debtors, JPMorgan Chase, N.A. ("JPMC"), and the Federal Deposit Insurance Corp. (in its capacity as receiver for Washington Mutual Bank and in its corporate capacity, the "FDIC"). Ultimately, all of this will surely destabilize the process of putting the recently-filed Joint Plan of Affiliated Debtors (the "Plan") to the test of

---

[2] Capitalized terms not immediately defined shall have the meanings ascribed to them below.

1

stakeholders' votes and this Court's evaluation under the standards of section 1129 of the Bankruptcy Code.

The Equity Committee's Motion relies on the mistaken assertion that shareholders have "a 'virtually absolute' right to hold a shareholder meeting to elect directors." (Pl. Mem. at 6). That is false. In the present case, there are four important limitations on the exercise of shareholders' rights during the bankruptcy process: (1) "clear abuse" of process; (2) insolvency of the debtor; (3) Washington law affording the Court discretion as to whether to compel a shareholders' meeting; and (4) the Bankruptcy Code's authorization of curtailment of shareholders' rights when equitable to do so. Each of these constraints provides an independent basis for denial of the Motion.

First, the law is well-settled that, where shareholders exhibit a "willingness to risk rehabilitation altogether in order to win a larger share for equity," *In re Johns-Manville Corp.*, 801 F.2d 60, 65 (2d Cir. 1986) ("*Manville I*"), their actions constitute "clear abuse" and must be denied. That is exactly what the Equity Committee seeks to do here by attempting to seize control of the Debtors and implement new, imprudent "swing for the fences" litigation strategies at this highly critical time in the Chapter 11 Cases when the Debtors have just negotiated the fragile, yet valuable, Agreement and are prosecuting the Plan. That the law safeguards against such wasteful conduct is not surprising. If such a course of conduct were pursued by the Debtors (who must consider and balance the interests of both creditors and shareholders), they would be accused of breaching their fiduciary duties.

Moreover, serious questions abound as to whether the Equity Committee possesses the resources to effectuate a proxy solicitation in any event. The law is clear that such costs must be borne by the shareholders, not by the estate. If the Equity Committee cannot fund these

expenses, this is another reason why the Equity Committee's actions constitute clear abuse, because it would render the putative annual meeting an expensive exercise with no proxy contest and no practical effect. The Court need not go any further. That there exists a genuine issue of fact concerning the Equity Committee's intent (and whether it constitutes a clear abuse of the chapter 11 process) is undeniable. This alone is reason to deny the Motion.

Second, courts recognize an independent basis to deny such tactics where shareholders are out of the money, as is the case here. Evidence has already been submitted to this Court and the existence of genuine disputed issues of fact concerning the Debtors' solvency has been recognized. Additionally, it is significant that the Debtors' common shareholders – the only shareholders with the ability to replace a majority of the board – are an incremental $8.3 billion out of the money behind preferred shareholders whose purported rights are limited to voting an additional two directors to the currently serving nine directors. Thus, even if relief were granted with respect to the preferred shareholders' right to vote, it would not cause a change of control. The Debtors' insolvency is a second reason for denial of the Motion.

Third, Washington law is clear that courts have wide discretion in determining whether to compel WMI to hold an annual meeting. In view of the critical juncture at which the Chapter 11 Cases rest, the Court should exercise this discretion to ensure that the Debtors are not forced to incur wasteful expenses and endure distractions from seeking to consummate the Agreement and confirm the Plan. Indeed, the Debtors and their advisors would need to devote significant time and expense to preparing the required documents and filings (including audited financial statements), and do so at the worst possible time in the Chapter 11 Cases. The Equity Committee's desire for control cannot justify such a wasteful and potentially disastrous excursion for an out-of-the-money constituency.

Fourth, the Bankruptcy Code affords the Court equitable powers that may be exercised in exactly these instances. Bankruptcy courts have exercised this authority in a variety of ways, including, *inter alia,* allowing responsible officers to vote shares to elect directors, substituting responsible officers for boards of directors, and taking other measures to preserve debtors' businesses. Here, exercise of the Court's equitable powers is appropriate to preserve the prospect of the Chapter 11 Cases' resolution in a timely and efficient fashion, and to protect the interests of creditors and other interested parties.

Denying the Motion will not prejudice the Equity Committee. If the Equity Committee is unhappy with the progress made by the Debtors in these cases, it has recourse. By its appointment, the U.S. Trustee has granted the Equity Committee a meaningful voice in the Chapter 11 Cases. The Equity Committee will have an opportunity to be heard (and object if it so desires) at any hearing to approve a settlement of estate causes of action or to approve the disclosure statement and/or to confirm the Plan. In other words, the Equity Committee has a role in these cases in the manner Congress contemplated when it drafted section 1102.

Alternatively, the Equity Committee has requested relief from the automatic stay to (re-)commence this Action in Washington state court. However, the Equity Committee first commenced this Action and sought summary judgment. Its alternative request for stay relief is not ripe for adjudication. And, the Equity Committee has not attempted to show the requisite "cause" for stay-relief. Having chosen to commence this Action before this Court, the Equity Committee should not be authorized to take this Action elsewhere.

At a minimum, the Debtors should be permitted to obtain discovery into several genuine issues of fact so that they may present evidence at trial demonstrating that (1) the Equity Committee's efforts will severely jeopardize, and are in fact designed to upset, the Debtors'

chapter 11 efforts at this critical juncture, and (2) the Debtors are insolvent. For all of the

foregoing reasons, the Motion should be summarily denied.

## BACKGROUND

In the wake of the seizure and subsequent sale of substantially all of Washington Mutual

Bank's ("WMB") assets, on September 26, 2008 (the "Petition Date"), the Debtors each

commenced the Chapter 11 Cases pursuant to chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code"). Subsequently, a multitude of disputes arose among the Debtors, JPMC

and the FDIC, with each asserting claims for billions of dollars against one or more of the others

in various forums, including multiple litigations in this Court, the District Court for the District

of Delaware, and the District Court for the District of Columbia. The factual background has

been set forth in numerous pleadings with this Court, and is thus described briefly below.

### A.    The DC Action

On September 25, 2008, the Director of the Office of Thrift Supervision placed WMB

into receivership and appointed the FDIC as receiver. On the same day, the FDIC sold

substantially all of WMB's assets to JPMC for $1.88 billion, pursuant to the Purchase and

Assumption Agreement Whole Bank, dated September 25, 2008 ("P&A Agreement"). The

Debtors subsequently filed a proof of claim with the FDIC, which the FDIC denied on January

23, 2009. Debtors filed a Complaint in the DC District Court on March 20, 2009, challenging

the FDIC's disallowance of their initial claims, and asserting additional claims. *WMI and WMI

Investment v. FDIC*, No. 09-00533 (D.D.C. Mar. 20, 2009) (the "DC Action").

### B.    The Bankruptcy Proceedings

In connection with the Chapter 11 Cases, there are two relevant adversary proceedings

pending. First, on March 24, 2009, JPMC filed an action against the Debtors asserting claims to

assorted assets that JPMC allegedly purchased under the P&A Agreement. *JPMorgan Chase*

*Bank, N.A. v. Washington Mutual, Inc. et al.*, Adv. Proc. No. 09-50551 (MFW) (the "JPMC Adversary Proceeding"). On May 29, 2009, Debtors filed an answer and counterclaims asserting, among other things, claims for monetary relief through the avoidance of certain of the Debtors' assets fraudulently or preferentially transferred to JPMC prior to the commencement of the Chapter 11 Cases, as well as claims for assets that the Debtors assert were not the property of WMB and were never transferred to JPMC under the P&A Agreement. The Debtors also filed an action on April 27, 2009 against JPMC seeking to recover approximately $4 billion in the Debtors' deposits (the "Deposits"), which JPMC expressly assumed under the P&A Agreement. *Washington Mutual, Inc. et al. v JPMorgan Chase Bank, N.A.*, Adv. Proc. No. 09-50934 (MFW) (the "Turnover Action," and with the JPMC Adversary Proceeding, the "Adversary Proceedings").

### C. The Debtors' Progress in the Chapter 11 Cases and the Agreement

Since the Petition Date, the Debtors have worked diligently to maximize the value of their estates. The Debtors have served their fiduciary duties well by, *inter alia*, pursuing billions of dollars in claims through complex litigation, and having filed thirty omnibus claims objections to date. In addition, the Debtors, the Creditors' Committee, JPMC, the FDIC and other significant parties in interest have engaged in protracted and hard-fought negotiations seeking to reach a global resolution of the many issues of dispute among the parties. In that vein, after the Equity Committee was formed, the Debtors participated in several conference calls and met in person with the Equity Committee to discuss the pending litigations, and the parties discussed strategy in connection therewith.

On March 12, 2010, these concentrated efforts bore fruit, as the Debtors, the Creditors Committee, JPMC, the FDIC, and several of the Debtors' significant creditor constituencies

reached a global Agreement. This key achievement was announced to the Court.[3] On March 26, 2010, the Debtors filed their Plan, referencing and incorporating the Agreement, and a disclosure statement in connection therewith (the "Disclosure Statement"). The Debtors anticipate seeking Court-approval of the Disclosure Statement as soon as the final terms of the Agreement are documented.

While the Agreement and the Plan have not yet been approved, the Agreement will provide substantial recovery to the Debtors' creditors and avoid lengthy, complex, and costly litigation. As provided for by the Bankruptcy Code, the Debtors' prosecution of the Plan through the confirmation process will provide ample opportunity for the Equity Committee to voice their approval or dissent for the Plan.

## ARGUMENT

### A. Standard of Review

Granting a motion for summary judgment "is proper when the moving party has established that there is no genuine dispute of material fact and that 'the moving party is entitled to judgment as a matter of law.'" *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). A fact is material "if it might affect the outcome of the suit under the governing substantive law." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). On a motion for summary judgment, the court "must view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor." *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). A

---

[3] *See* Tr. 3/12/10 (Debtors' Counsel: "And I am happy to report today that we have a three-way understanding between the Debtors, JPMorgan Chase and the FDIC with respect to all matters.") Shortly thereafter, the three parties sent a joint letter to Judge Sleet's chambers in the United States District Court for the District of Delaware asking that the court stay all pending appeals to preserve the status quo and allow the parties to finalize the Agreement. A copy of this letter is attached hereto as Exhibit A.

7

dispute "is genuine if 'evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct.'" *American Electronic Components, Inc. v. Agere Systems, Inc.*, 2009 WL 1653867, at *2 (3d Cir. 2009) (quoting *Clark v. Modern Group Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)). In this case, as demonstrated below, there are numerous triable issues of fact that go to the core of this dispute, including whether the Action constitutes "clear abuse," the Debtors' insolvency, and whether any recovery could reach WMI's common shareholders, whose claims are junior to over $8 billion in preferred stock. Because these genuine material issues can only be resolved at trial, the Motion should be denied.

### B. The Equity Committee Ignores Four Limitations on the Ability to Compel a Shareholder Meeting, Which Justify Denial of the Motion

The Motion is based on the mistaken assumption that shareholders have a "virtually absolute" right to hold a shareholder meeting to elect directors." (Pl. Mem. at 6). In so arguing, the Equity Committee overlooks four important constraints on the exercise of shareholders' rights that are applicable here: (1) "clear abuse" of process; (2) insolvency of the debtor; (3) Washington law affording the Court discretion as to whether to compel a shareholders' meeting; and (4) the Bankruptcy Code's authorization of curtailment of shareholders' rights when equitable to do so. Each of these constraints provides an independent basis for denial of the Motion and taken together, they provide an overwhelming basis for denial of the Motion.

#### 1. Commencing the Action on the Eve of the Agreement and the Plan is a Clear Abuse of Process

Case law in this and other circuits makes clear that the right of shareholders to call a meeting must be impaired "if the Equity Committee is guilty of 'clear abuse' in attempting to call one." *Manville I*, 801 F.2d at 64; *see also In re Marvel Enter. Group*, 209 B.R. 832, 838 (D. Del. 1997). The determination "[w]hether the Equity Committee's call for a shareholders' meeting

constitutes clear abuse ... [is a] *triable issue[] of fact*." *Manville I*, 801 F.2d at 69 (emphasis added). Thus, summary judgment in the present case is clearly inappropriate and unavailable.

Of course, clear abuse may exist short of bad faith. In assessing a "call for a shareholders' meeting, to elect a board who will withdraw the plan of reorganization, and whether that call constitutes a clear abuse," the Bankruptcy Court for the Southern District of New York discussed the standard set forth by the Court of Appeals for the Second Circuit:

> [C]lear abuse of the right to call a shareholders meeting is shown by demonstrating that the shareholders have an intent to jeopardize the reorganization (including a "willingness to risk rehabilitation altogether in order to win a larger share for equity"), and by demonstrating that the effect of calling the meeting will be a "real jeopardy to reorganization."

*In re Johns-Manville Corp.*, 66 B.R. 517, 533 (Bankr. S.D.N.Y. 1986) ("*Manville II*") (internal citation omitted). *Accord Marvel*, 209 B.R. at 838 (equating clear abuse with a "willingness to risk rehabilitation altogether in order to win a larger share for equity."). In sum, and in direct contravention of the Equity Committee's misstatement of the controlling principles of law, the right to a shareholder meeting "*is not absolute*, and will be denied if it is found that an election of new directors might result in an unsatisfactory management which might jeopardize the debtor's rehabilitation and the rights of creditors and shareholders, so as to constitute a 'clear abuse.'" *In re New York Trap Rock Corp.*, 138 B.R. 420, 423 (Bankr. S.D.N.Y. 1992) (emphasis added).[4] Timing is particularly relevant: "an attempt to call a shareholder meeting after a plan has been submitted to the bankruptcy court and after confirmation hearings have begun would usually be more disruptive to the proceedings than an earlier attempt would be." *Manville I*, 801 F.2d at 66,

---

[4]  Moreover, in determining what may constitute "clear abuse," courts consider the debtor's cost to be incurred in a proxy fight that would "result[] in the expenditure of large sums of money which the debtor-in-possession can ill afford." *In re Allegheny Intern. Inc.*, 1988 WL 212509, at *4 (W.D. Pa. 1988). As noted, however, the case law establishes that shareholders must pay for the cost of distributing an alternate slate of directors for any meeting.

n.7. "Such an attempt might also indicate bad faith and a willingness to risk jeopardy to rehabilitation." *Id.*

Just as in *Manville II*, the Chapter 11 Cases are at a critical juncture and involve a complex, multi-party settlement. The Debtors are prosecuting the Plan – which the Equity Committee knew would be filed at the end of the Debtors' exclusivity period – and seek to imminently finalize, request Court-approval of, and implement the Agreement through approval of the Disclosure Statement and confirmation of the Plan. Declaration of William Kosturos ¶ 5, attached hereto as Exhibit B. The Debtors, the Creditors Committee, the FDIC, and JPMC have exerted great efforts in negotiating the Agreement, which, if consummated and approved, would bring multiple pending litigation proceedings to an equitable resolution, and provide substantial recovery to creditors of the Chapter 11 Cases. Kosturos Dec. ¶ 5. The Plan incorporates the Agreement, is supported by significant creditor constituencies, and further provides for the emergence of a reorganized debtor, a rarity in recent bankruptcies. Kosturos Dec. ¶ 5. The Equity Committee's attempt to compel a shareholders' meeting in order to replace the board with its own nominees – at this late stage in the Chapter 11 Cases – is a transparent design to disrupt and, in fact, cause the implosion of the Chapter 11 Cases. Rather than allow an orderly plan confirmation process to unfold, the Equity Committee appears willing to delay recoveries for the Debtors' creditors, all in an effort to extract a distribution to out-of-the-money shareholders. This naked grab for power is not a legitimate justification for the relief the Equity Committee seeks.[5]

---

[5] The Equity Committee's actions are particularly troublesome given that Debtors' exclusivity period remains pending pursuant to 11 U.S.C. 1121. The Equity Committee's actions are tantamount to a de facto proposal that shareholders hold-out for an alternative to the Plan. Such suggestions are prohibited. *In re Clamp-All Corp.*, 233 B.R. 198, 207 (Bankr. D. Mass. 1999) (section 1121 embodies "Congress' intention to allow the debtor a reasonable time to obtain confirmation of a plan without the threat of a

The fact that the Agreement has not yet evolved into a final agreement only underscores the need to protect against "clear abuse." In fact, in *Manville II*, the bankruptcy court noted that "the fact that there is a substantial *but fragile* consensus is not one that this court will take lightly." 66 B.R. at 536 (emphasis added). Just as in *Manville II*, the fragile nature of the Agreement only makes the Chapter 11 Cases more susceptible to, and heightens the need for protection against, tactics that constitute clear abuse.

At a minimum, denial of the Equity Committee's Motion is appropriate in order to give the Debtors the "right to a fair hearing" on whether the Equity Committee's actions constitute clear abuse. *Manville I*, 801 F.2d. at 66. In remanding to the bankruptcy court for a hearing on clear abuse, the Second Circuit expressly held that "[w]hether the Equity Committee's call for a shareholders' meeting constitutes clear abuse and whether such a meeting would cause irreparable harm to [the debtor's] reorganization *are triable issues of fact*," requiring a fact-specific, "more elaborate inquiry" at an evidentiary hearing. *Id.* at 69 (emphasis added). Likewise, in *Trap Rock*, the court grounded its denial of a motion to dismiss on the need for an evidentiary hearing to determine whether "the Equity Committee may have a private agenda in seeking an annual shareholders' meeting. ..." 138 B.R. at 424. Similarly, the Debtors should have a reasonable opportunity to discover and develop relevant facts for presentation at an evidentiary hearing.

For example, on remand, the *Manville II* bankruptcy court unearthed facts that it determined to constitute clear abuse, and of a kind likely to be discovered here. The equity

---

competing plan."); *In re Temple Retirement Community, Inc*, 80 B.R. 367, 369 (Bankr. W.D.Tex. 1987) (prohibiting creditors from undermining the Debtors' plan, filed during the exclusivity period, by suggesting that there is "a better alternative just around the bend").

11

constituency was faced with a plan that they believed would "virtually wipe out their entire interest." 66 B.R. at 534. Shareholders understood that no change in "litigation strategy will be effective in improving the position of shareholders to any great extent...[thus,] current shareholders might do well by simply torpedoing the agreement altogether." *Id.* Judge Lifland determined that the decision to seek to nominate a slate of new directors was "the means chosen to achieve the [foregoing] ends." *Id.* The evidence was clear that the shareholders' aim was "a reformulation of the current plan and not merely an election of a new Board of Directors at the shareholders' meeting...." *Id.* at 535.

Here, the Equity Committee has already voiced its opposition to both the Agreement and the Plan. *See* Official Committee of Equity Security Holders of Washington Mutual, Inc. Deliver Statement Regarding Proposed Agreement, PRNewswire, (Mar. 17, 2010) ("The Committee anticipates that the Debtors will seek approval of the Proposed Settlement and its plan of reorganization 60-90 days from [March 26, 2010]. The Committee ... does not support, the Proposed Agreement.... At this time, the Committee intends to object to the Proposed Agreement.").[6] If shareholders use the shareholder meeting to seize control and undo the multilateral consensus it has taken over a year to accomplish through the Plan, it is undeniable that numerous creditor groups would promptly move to terminate exclusivity to pursue the Plan as their own; chaos would ensue. The Equity Committee figures that it has nothing to lose; however, there is no viable alternative plan that the Equity Committee can possibly propose other than implementing new, speculative, and reckless "swing for the fences" litigation

---

[6]  *See* http://www.prnewswire.com/news-releases/official-committee-of-equity-security-holders-of-washington-mutual-inc-deliver-statement-regarding-proposed-settlement-88237597.html.

strategies that would fail under any fiduciary-duty metric.[7] Moreover, such a plan construct has

no realistic chance of success given the risk and sacrifices that creditors would be necessarily

asked to shoulder.[8]

Notably, the Equity Committee does not cite *any* precedent in which a court has short-

circuited this necessary evidentiary process by deciding on *summary judgment, prior to any*

*discovery whatsoever,* whether the shareholder actions at issue constitute clear abuse. *See* Pl.

Mem. at 6 (citing *Saxon Indus. v. NKFW Partners*, 488 A.D.2d 1298 (Del. 1984) (right to hold

shareholder meeting decided after trial); *Newcastle Partners, L.P. v. Vesta, Ins. Group, Inc.*, 887

A.2d 975, 977 (Del. Ch. 2005), *aff'd*, 906 A.2d 807 (Del. 2005) (same)).[9]

---

[7]   As discussed more fully below, the case law is clear that the Equity Committee's request that the Debtors' estates incur the costs for distributing proxy materials for the Equity Committee's slate of proposed directors is improper. *See Trap Rock*, 138 B.R. at 424 ("In the event that the Equity Committee succeeds on the merits, and an annual meeting is directed, counsel for the Equity Committee may not be compensated for any services performed beyond the adversary proceeding in connection with the shareholders' meeting. All shareholder costs and expenses with respect to [the debtor's] annual meeting must be borne by the shareholders themselves."). Unless the Equity Committee is able to demonstrate to the Court that it has the independent resources to cover the costs for distribution of a proxy statement, this Action is revealed to be nothing more than a vehicle to waste the estates' resources that poses "real jeopardy to reorganization prospects." *Manville*, 801 F.2d at 67.

[8]   *See Manville*, 66 B.R. at 535 (finding that the Equity Committee was seeking, "in utter disregard of the devastating consequences of its conduct," to "achieve a substantial change in the plan of reorganization more favorable to Equity than to those constituencies higher up on the ladder of distributive rights.") In addition, the court found that "[t]he prospects of any potential coalition forming around some new or competing plan is less than dismal." *Id.* at 536.

[9]   The Equity Committee cites *Coaxial Communications, Inc. v. CAN Financial Corp.*, 367 A.2d 994 (Del. 1976), and *Speiser v. Baker*, 525 A.2d 1001 (Del. Ch. 1987), in support of its Motion. However, these Delaware cases do not mention, much less determine, whether conduct constitutes, clear abuse or bad faith. The Equity Committee's reliance on *In re Lionel Corp.*, 30 B.R. 327 (Bankr. S.D.N.Y. 1983), is equally misplaced. *Lionel* only held that the defendant did not satisfy the stringent standards for obtaining a preliminary injunction to enjoin a state court proceeding seeking to compel a shareholder meeting. In declining to enjoin the state court action, *Lionel* never determined whether, *in fact*, such a meeting should be compelled. Any statements by the court in support of the shareholders were thus mere *dicta*. In any case, since the Equity Committee selected to bring its Action in this Court, enjoinment of a state court action is not now at issue, and *Lionel* is inapplicable to whether clear abuse should be evaluated at trial.

In short, whether the Equity Committee's actions constitute clear abuse is an obvious

issue of material fact in genuine dispute, and therefore summary judgment should be denied.

> ## 2. Denial of the Motion Is Proper Because Equity Holders Are Not Real Parties in Interest Due to Debtors' Insolvency

> ### i The Courts Have Held That Insolvency Is A Fact Issue For Trial

There are additional issues of fact that require denial of the Motion, including factual

issues concerning the Debtors' insolvency. The Court of Appeals for the Second Circuit in

*Manville I* recognized that "denial of the right to call a meeting would likely be proper" if the

debtor "were determined to be insolvent ... because the shareholders would no longer be real

parties in interest." 810 F.2d at 65, n.6; *see also, e.g., In re Mirant Corp.*, 334 B.R. 800, 807

(Bankr. N.D. Tex. 2005) (referencing the court's prior conclusion that a hearing to determine the

debtors' enterprise value was a logical and preferable predicate to immediately allowing

"shareholders, who might or might not ultimately be determined to have an economic interest in

[the debtors'] value," to have a meeting and replace management). The courts have also

recognized that, as a rule, "determinations of solvency and insolvency are fact intensive by

nature. Accordingly, summary judgment [on the question of insolvency] is not appropriate."

*Brandt v. Trivest II, Inc (In re Plassein Intl. Corp.)*, Case No. 03-11489 (KG), Adv. Pro. No. 05-

51472 (KG), [D.I. 72, 74 & 82] (Bankr. D. Del. May 5, 2008) (internal citation omitted).

> ### ii This Court Has Already Recognized That, At A Minimum, Fact Issues Exist As To Insolvency

Here, there is no doubt that the Debtors' insolvency is, at a minimum, a triable issue of

fact making summary judgment improper.

In support of the Debtors' Motion for an Order (A) Disbanding Such Committee or (B)

Limiting the Fees and Expenses Which May be Incurred by Such Committee ("Motion to

Disband" [D.I. 2132]), the Debtors submitted evidence to the Court that their estates were

currently burdened with liabilities of $8.294 billion plus an additional $50 billion of claims (not

including unliquidated claims). The Debtors incorporate in this motion the same evidence

concerning insolvency that they previously put into the record on the Motion To Disband.[10]

When this Court previously considered the evidence submitted by the Equity Committee and by

the Debtors, this Court recognized that "*[t]here is clearly evidence both ways as to the*

*insolvency of the Debtor*." *See* Tr. 1/28/10 at 59:7-8 (emphasis added). The Equity Committee

has submitted nothing new on this Motion to overcome that conclusion. For this reason alone,

the Motion must be denied.

> ### iii      *Even Assuming the Debtors Were to Prevail On Certain Litigated Claims, The Equity Committee Overstates The Value That Would Flow To Equity Holders*

Moreover, in a flawed attempt to demonstrate that equity holders are an in-the-money

constituency, the Equity Committee drastically overstates the value of the Debtors' causes of

action vis-a-vis equity holders. Even assuming *arguendo* that the Debtors procured total

victories on certain of their claims, it would not mean that a penny goes to equity holders. For

example, the Equity Committee has previously stated that "recovery of only the liquidated

amounts sought by the Debtors in the Pending Litigation will result in recovery for the equity

holders."[11] But at least $10.651 billion of the claims the Equity Committee referenced are

avoidance actions that will not yield any recovery whatsoever to equity holders.

Prevailing on such claims would likely give rise to resulting unsecured claims against the

Debtors' estates that would increase the amount of existing claims *that come ahead of equity* in

---

[10]  *See* Tr. 1/28/10 at 9:19-22 ("The three documents that I provided, I believe, are, will be admitted into evidence on a consensual basis. And that will go to the asset and liability issue, Your Honor."). A copy of the transcript is attached hereto as Exhibit C. The Debtors incorporate such evidence herein and re-submit it to the Court. Maciel Dec. ¶ 5.

[11]  *See* Opposition of the Equity Committee to the Motion to Disband at 3 [D.I. 2185].

the same amount as the judgment. *See* 11 U.S.C. § 502(h); *see also Wild West World, L.L.C. v. Mainland Valuation Servs. (In re Wild West World, L.L.C.),* 2008 Bankr. LEXIS 2964, *11 (Bankr. D. Kan. Oct. 1, 2008) (noting that defendant/transferee in successful constructive fraudulent transfer action is left with an allowable unsecured claim against the debtor's estate); *In re Telesphere Communications, Inc.,* 179 Bankr. 544, 553 (Bankr. N.D. Ill. 1994) ("Avoidance of a preference results in a return of transferred property to the estate, but may also result in the defendant asserting a claim that otherwise would have been satisfied by the transferred property"). Thus, notwithstanding the considerable dollar amounts that the Equity Committee highlights, prevailing on these claims would not yield value to equity.[12]

Finally, beyond the $8.294 billion in liabilities, there are approximately $7.5 billion in preferred shares outstanding ahead of common shareholders. Declaration of John Maciel ¶ 6, attached hereto as Exhibit D. Moreover, there are more than $835.6 million in unpaid dividends on preferred shares that would need to be paid before any common shareholder recovery. Maciel Dec. ¶ 6. Thus, the common equity holders, who stand behind more than $8.3 billion in preferred equity interests, clearly should not be permitted to call a meeting or vote for directors at any such meeting.

> iv    *The Preferred Shareholders Cannot Change Control In Any Event*

---

[12]    Moreover, avoidance actions are to be maintained for the benefit of creditors, not the debtor. *See Buncher Co. v. Official Comm. of Unsecured Creditors of Genfarm Ltd.,* 229 F.3d 245, 250 (3d Cir. 2000) ("The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away."); *Whiteboard Plastics Co., Inc. v. Chase National Bank of New York City,* 179 F.2d 582, 584 (2d Cir. 1950) (court denied avoidance of a lien finding it was "not in the interest of the general creditors," concluding that the debtor sought avoidance "purely for its own benefit"). Thus, even assuming that section 502(h) were inapplicable, avoidance actions may not recover value for equity. *Balaber-Strauss v. Town of Harrison (In re Murphy),* 331 B.R. 107, 126 (Bankr. S.D.N.Y. 2005) (holding that trustee has the right to avoid transfer as fraudulent "but only to the extent necessary to satisfy allowed prepetition and administrative creditor claims, i.e., those legally harmed by the transfer.")

Additionally, there is no practical reason to afford even the preferred shareholders the right to vote. Under WMI's Articles of Incorporation, the preferred shareholders' voting rights are limited to the power to "elect two directors in addition to the directors then in office."[13] Articles of Incorporation § 8, Voting Rights. Thus, even if the Motion were granted with respect to the preferred shareholders, and they, voting as a single class, elected two new directors in addition to the currently serving nine directors, there would be no change of control.[14]

As this Court has already acknowledged, at a minimum, a genuine disputed issue of fact exists as to Debtors' insolvency. This is a second reason that requires the Motion be denied.

### 3.   *Denial Of Plaintiff's Motion Is Consistent with Washington Law*

Washington law affords the Court discretion to determine whether it should grant or deny a shareholder request to compel an annual meeting. Washington's RCW 23B.07.030(1) states that "the superior court ... *may*, after notice to the corporation, summarily order a [shareholder] meeting to be held." (emphasis added). In Washington, as elsewhere, courts interpret a statute based upon "the plain meaning of words used in a statute." *Johnson Forestry Contract, Inc. v Washington State Dept.*, 130 Wash. App. 1033, 2005 WL 3113510, at *4 (Wash. App. 2005) (citation and quotation omitted); *State v. Montoya*, 115 Wash. App. 1050, 2003 WL 464075, at *3 (Wash. App. 2003) (looking first to the plain meaning, and noting that "[a] nontechnical statutory term may be given its dictionary meaning") (citation omitted)). Reiterating that the statute should be read according to its plain meaning, the legislative history of Section 7.030 removes any doubt, explaining that the "court has discretion ... since the language of the statute

---

[13]   *See* Articles of Amendment to Articles of Incorporation,"Series R, Dec. 17, 2007, § 15 Articles of Amendment to Articles of Incorporation," Series K, Sept. 14, 2006, § 8, attached hereto as Exhibit E.

[14]   In addition to further establishing just how "underwater" common shareholders are, this is further indicia that the Action constitutes clear abuse of the Chapter 11 Cases.

is that the court *'may* summarily order' that a meeting be held." Comments, Washington

Business Corporation Act, 2 Wash. S.J. 2977-3112 (1989) (emphasis in original.). *See also*

Model Business Corporations Act section 7.03, Official Comment No. 2 (2005) ("The court has

discretion under section 7.03 since the language of the statute is that the court "may summarily

order" that a meeting be held."). Thus, under Washington law the court's authority to compel a

shareholders' meeting is indisputably discretionary. [15]

Although the Debtors are aware of no Washington case interpreting this provision, in

*Clabault v. Caribbean Select, Inc.*, 805 A.2d 913 (Del. Ch. 2002), the Delaware Chancery Court

interpreted "may" in a Delaware statute analogous to RCW 23B.07.030, and concluded that "the

conditional language of the statute supports the conclusion that the decision regarding whether or

not to order an annual meeting pursuant to [the Washington analog] is discretionary." *Id.* at 918.

"The use of the terms *'may* summarily order' in the statute obviously reposes a discretion in the

Court to be exercised in light of the existing circumstances." *Id.* (emphasis in the original).

Accordingly, the *Clabault* court refused to order the shareholder meeting of the former debtor

corporation due to the shareholders' bad intent even though the statutory elements for prima facie

relief were met. *Id.*

The existing circumstances of the Chapter 11 Cases, including the willingness exhibited

by the Equity Committee to jeopardize the Debtors' reorganization in order to extract a recovery

for equity and the fact that the Debtors are insolvent, call this Court to exercise the discretion

---

[15]    In a case of first impression interpreting Washington statute RCW 11.92.170, which provides that
"the court may order the transfer of property" of an incapacitated person to a guardian, the Washington
Appellate division upheld the lower court's choice to exercise it discretion and refrain from ordering a
transfer, holding that " 'may,' in its ordinary and usual meaning, conveys the idea of choice, option or
discretion ... [and the] general rule of statutory construction has long been that the word 'may' when used
in a statute or ordinance is permissive and operates to confer discretion." *In re Guardianship of Johnson,*
112 Wash.App. 384, 387 (Wash.App. Div. 2,2002)

Washington law expressly affords to deny the Motion and avoid the unnecessary expense and potential disastrous effects that the Equity Committee's Action is designed to effectuate.

### 4. The Court Should Exercise its Equitable Powers to Protect the Interests of the Estates

Courts have found that "the shareholders' right to control a Chapter 11 debtor-in-possession is not without limitations under the Bankruptcy Code." *In re Lifeguard Industries, Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (denying majority shareholder the right to "install a new [inexperienced] management slate"; ordering the board "not to interfere with the day-to-day operations of the corporation.") Specifically, section 105 of the Bankruptcy Code codifies the Court's equitable powers, empowering the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *In re Gaslight Club, Inc.*, 782 F.2d 767, 770 (7th Cir. 1986) (noting that the "case law demonstrates that the court has considerable authority to interfere with the management of a debtor corporation in order to protect the creditors' interests") (citation omitted). Courts may use their equitable powers to "assure the orderly conduct of the reorganization proceedings ... to prevent activities which would delay or thwart efforts to reorganize the debtor ... and to block actions which tend to defeat or impair its jurisdiction." *In re Allegheny Intern. Inc.*, 118 B.R. 282, 303 (Bankr. W.D. Pa. 1990) (citations omitted).

Courts have exercised this authority in a variety of ways, including abolishing boards of directors, allowing responsible officers to vote shares to elect directors, substituting responsible officers for boards of directors, and taking other measures to preserve debtors' businesses.[16]

---

[16] *In re Gaslight Club, Inc.*, 782 F.2d 767, 770-72 (7th Cir. 1986) (replacing the majority shareholder/president of debtor with a "responsible officer" to exercise debtor-in-possession powers); *In re United Press Intern., Inc.*, 60 B.R. 265, 274 (Bankr. D. Dist. Col. 1986) (abolishing the debtor's board of directors and authorizing its management to file a plan); *In re FSC Corp.*, 38 B.R. 346 (Bankr. W.D.

Here, fairness demands that any final judgment in the Action be delayed pending the Plan's confirmation process, or at the very least, until holding an evidentiary hearing concerning the Debtors' solvency and the Equity Committee's intentions. *See In re Acequia, Inc.*, 787 F.2d 1352, 1362 (9th Cir. 1986) (upholding denial of shareholder voting rights during pendency of the reorganization plan "so as to preserve the prospects of reorganization and protect the interests of creditors, shareholders and interested parties"); *In re Potter Instrument Co.*, 593 F.2d 470 (2d Cir. 1979) (holding that bankruptcy court was justified in denying the majority shareholder's petition, under the corporate bylaws, for a special meeting to elect new directors because "such an election might result in unsatisfactory management and would probably jeopardize both [the Debtor's] rehabilitation and the rights of creditors and stockholders.").

### C. Even if the Court is Inclined to Grant the Motion, the Relief Requested Is Unlawful and Must be Modified

#### 1. *The Extraordinary Request for an April 24th Meeting Should Be Denied, and WMI Should Be Given Sufficient Time to Prepare and Comply with SEC Rules*

Should the Court compel an annual meeting, WMI will require time for reasonable preparation, including time to comply with federal securities laws requiring public companies to prepare audited annual financial statements, as well as a proxy statement, and disseminate those documents to shareholders prior to the annual meeting. Under rules promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), an issuer of securities registered under Section 12 of the Exchange Act that solicits proxy votes from its shareholders must make available to each shareholding household a copy of its preliminary or definitive proxy statement

---

Pa. 1983) (upholding the authority of the court-appointed "responsible officer" to conduct the affairs of the debtor corporation, including voting parent-owned shares for the appointment of directors of subsidiaries); *Lifeguard Industries, Inc.*, 37 B.R. 3 (Bankr. Ohio 1983) (court used its authority to block a new slate of directors from appointing new management or from taking any action to interfere with the operations of the debtor.).

according to the requirements of Schedule 14A under the Exchange Act (the "<u>Proxy Statement</u>"),

audited balance sheets for the two most recent fiscal years, and audited statements of income and

cash flows for each of the three most recent fiscal years (the "<u>Annual Reports</u>"). 17 C.F.R. §

240.14a-3.

Mindful of preserving the limited assets of their estates, and after notifying the U.S.

Securities and Exchange Commission (the "<u>SEC</u>") of their intent to do so immediately following

commencement of the Chapter 11 Cases, WMI, with the acquiescence of the SEC, has not

prepared or filed audited financial statements since the Petition Date, and has not retained an

auditor. Kosturos Dec. ¶ 15.[17] WMI therefore would be required to compile and have audited

annual reports for the 2008 and 2009 fiscal years. The Equity Committee's request that the

meeting be held on April 24, 2010 (Proposed Order at 2), is thus entirely untenable and requires

WMI to violate federal securities laws.[18] In addition to the minimum ten-day notice required by

Washington statute, *see* RCW 23B.07.050, WMI estimates that it would require at least 180 days

to prepare audited financial statements for 2008 and 2009.[19] Kosturos Dec. ¶ 15. Separately,

WMI estimates it would require at least 60 days to prepare a proxy statement. Kosturos Dec. ¶

15. In order to avoid the substantial cost of distributing hard-copies of the proxy to all

shareholders,[20] upon completion of the proxy statement, WMI must provide notice of the Internet

---

[17] The SEC Staff's Legal Bulletin No. 2 expressly contemplates the use of such "modified Exchange Act reporting" during the pendency of chapter 11 bankruptcy proceedings. Accordingly, the Debtors' decision not to prepare and file 10-Ks and 10-Qs during the Chapter 11 Cases is unremarkable.

[18] The Equity Committee acknowledges as much, complaining that the Debtors have "violated" the law by not holding a shareholder meeting. (*See* Pl. Mem. at 4 n.5.)

[19] The 180-day period is a good faith estimate. WMI cannot guarantee that it will be able to procure audited financial statements in this period.

[20] Associated Data Processing, which is the largest distributor of proxy materials in the U.S., estimates that during the 2006 proxy season the cost of printing and mailing a proxy statement, on average, was

availability of the statement to all shareholders at least 40 calendar days prior to the annual meeting date, *see* 17 C.F.R.§ 240.14a-16. Kosturos Dec. ¶ 15.

In recognition of this federal law, other courts have allowed for a reasonable delay of an annual meeting in order to permit issuers in arrears on production of audited financials sufficient time to comply with the SEC proxy rules. *See e.g., In re Allied Holdings, Inc.*, 2007 Bankr. LEXIS 1598 (Bankr. N.D. Ga. Apr. 19, 2007) (denying motion to compel debtor to hold a shareholders' meeting to the extent debtor would be required to do so without complying with applicable federal securities regulations); *see also Newcastle Partners*, 887 A.2d at 977 (affording company 90 days to comply with securities laws).

So that WMI may comply with federal securities laws, if the Court were somehow inclined to grant the Motion, WMI should be afforded at least 180 days to procure audited financial statements for 2008 and 2009 to be issued with the requisite proxy statements.

### 2. Request To Have The Equity Committee's Director Slate Included On Debtors' Proxy Statements Should Be Denied

Indicating it is either unable or unprepared to assume the cost of its insurgent proxy battle, the Equity Committee asks this Court to require WMI to include the Equity Committee's hand-picked slate of board nominees on WMI's "meeting notice, proxy materials, including proxies (if any), and on the agenda of the annual meeting." (Proposed Order at 2j). This extraordinary request violates well-settled law: (1) companies are not required to include dissident candidates in their proxy materials and (2) companies are not required to fund the costs of a contested board election.

---

$5.64 per copy. 72 F.R. 42222-01, 42231, SEC Release No. 34-56135 (17 CFR PART 240, Final Rule, July 26, 2007).

Federal securities law provides WMI an indisputable statutory right to refuse to include a dissident slate of shareholder nominees for director in its own proxy materials. Under paragraph (i)(8) of rule 14a-8 of the Exchange Act, a company may exclude from its own proxy statement any shareholder proposal that "relates to a nomination or an election for membership on the company's board of directors or analogous governing body or a procedure for such nomination or election." 17 C.F.R. § 240.14a-8(i)(8).[21]

While shifting the financial burden would be beneficial to the Equity Committee, it simply has no legal support in any context. It is the shareholders themselves, not the Debtors' estates, who must bear the costs associated with a contested election. *See Trap Rock*, 138 B.R. at 424 ("In the event that the Equity Committee succeeds on the merits, and an annual meeting is directed, counsel for the Equity Committee may not be compensated for any services performed beyond the adversary proceeding in connection with the shareholders' meeting. All shareholder costs and expenses with respect to [the debtor's] annual meeting must be borne by the shareholders themselves").[22] The Equity Committee offers no authority for its unsupportable request, slipped into its proposed order and unreferenced in its brief.

---

[21] *See also* Thomas Lee Hazen, 3 TREATISE ON THE LAW OF SECURITIES REGULATION 273 (6th ed. 1995) ("The broadly stated rule provides that a proposal may be excluded if it 'relates to an election for membership on the company's board of directors or analogous governing body '"); *id.* at 281 ("Management may exclude shareholder proposals relating to a specific election and the nominees running for office ....").  Indeed, "in November 2007 the SEC reaffirmed its longstanding position that companies may exclude from their proxy materials any Rule 14a-8 proposals (whether binding or precatory) that relate to 'shareholder access' – a procedure allowing shareholders to place the names of their board nominees directly on the company's proxy card." 1721 PLI/Corp 241, "Inching Towards A New Proxy Environment: Recent Developments" 247 & n.6 (February 18, 2009).

[22] *See also* 1791 PLI/Corp 299, "Regulatory Reform and Developments in the Areas of Proxy" (February 17, 2010) ("A shareholder may prepare and distribute its own proxy materials, obtaining a list of shareholders from the issuer ... *all at the shareholders' cost*") (emphasis added); Blake Smith, "Proxy Access and the Internet Age: Using Electronic Shareholder Forums to Improve Corporate Governance," 2008 Columbia Bus. L. Rev. 111, 1114 (2008) ("The SEC rules enumerate thirteen categories of shareholder proposals that a corporation may elect to exclude from its proxy materials," including "a

In short, there is simply no legal support for the dramatic cost-shifting of an insurgent proxy contest that the Equity Committee demands. After trial, if the Equity Committee is successful in replacing WMI's board, it will always be able to file an application to this Court to have its expenses allowed as administrative claims pursuant to section 503(b)(3)(D) of the Bankruptcy Code. Particularly given the fact that shareholders are out of the money, the estates should not be forced to include the Equity Committee's slate on their proxy and should not be forced to bear the costs of the Equity Committee's proxy campaign. For this reason, too, the relief requested in the Motion should be denied.[23]

**D.    Plaintiff's Request for Alternative Relief is Improper, the Automatic Stay Applies, and, In Any Event, the Court Should Stay this Action**

*1.    The Equity Committee's Request for a Ruling on the Applicability of the Automatic Stay Should Be Denied As An Improper Request for an Advisory Opinion*

Although it commenced this Action, the Equity Committee has alternatively asked this court, "to determine the automatic stay is not applicable or grant relief from the automatic stay to commence an action in Washington State court." (Pl. Memo. at 1). Having filed its Motion requesting summary judgment here, this Court has a "virtually unflagging obligation" to exercise

---

shareholder proposal 'if the proposal related to ... an election for membership on the company's board of directors or analogous governing body.'")

[23]    Again without briefing or discussion, the Equity Committee has asked the Court to alter the quorum requirement for taking action at a shareholder meeting as defined in WMI's Bylaws to "direct that the votes represented at the meeting constitute a quorum." Proposed Order at 2.f.[1] Quorums are generally altered if there is concern that a large shareholder may frustrate a shareholder meeting by refusing to attend. *See* Model Business Corporations Act, section 7.03, Official Comment No. 4 (2005) (reasoning that quorum altering is designed to "prevent[] a holder of the majority of the votes (who may not desire that a meeting be held) from frustrating the court-ordered meeting by not attending to prevent the existence of a quorum.") The Equity Committee has stated no such cause. Rather, by pursuing this requested relief, the Equity Committee seeks to effectively empower itself with the power to unilaterally direct the Debtors' course. Such a concentration of power is inappropriate and beyond the contemplation of the U.S. Trustee or this Court in refusing to disband the Equity Committee. Waiver of quorum is therefore neither necessary nor appropriate, and the request should be denied.

the jurisdiction given it. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (U.S. 1976). The Equity Committee's request for stay relief is made in the alternative – there is no real case or controversy for the Court to resolve prior to ruling on summary judgment. Evincing the fact that it's request for a ruling on the automatic stay is not ripe, the Equity Committee's "briefing" is limited to one sentence found in the introductory and conclusion paragraphs of its brief, asserting in conclusory fashion that, "[i]n the alternative, the Court should determine that the automatic stay does not apply or grant relief from the automatic stay such that Plaintiffs may seek such relief in Washington." (Pl. Mem. at 8). This is an improper request for an advisory opinion that should be rejected. *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 410 (3d Cir. 1992) ("The ripeness doctrine stems from the requirements of Article III of the U.S. Constitution, which prohibits federal courts from issuing advisory opinions.").

### 2. *The Automatic Stay Applies and the Equity Committee Has Failed to Show Cause For Relief Therefrom*

The automatic stay offers debtors a "breathing spell" by stopping *all actions* asserted against them, permitting debtors the time and resources necessary to formulate a plan for reorganization or rehabilitation, and repayment of creditors. *See McCartney v. Integra National Bank North*, 106 F.3d 506, 509 (3d Cir. 1997). The plain text of section 362(a)(3) provides for the automatic stay of "any act . . . to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Here, the Equity Committee seeks to replace the Debtors' board of directors in order to garner "control" and dominion over the management of *all* the estates' assets. Thus, the plain language of the automatic stay instructs that the Equity Committee's action is indeed stayed. *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Courts have found that attempts by stakeholders to exercise their rights to elect directors to a debtor in possession's board constitute attempts "to exercise control over property of the

estate." *See, e.g., In re Fairmont Communications Corp.*, No. 92-B-44861 (slip op.)

(Bankr. S.D.N.Y. Mar. 3, 1993); *In re Bicoastal Corp.*, 1989 Bankr. LEXIS 2046 (Bankr. M.D.

Fla. 1989). Although these decisions are based in part upon the shareholders' joint status as

creditors, the language of the statute does not call for an assessment of what the "act ... to

exercise control over property of the estate" arises out of or for what it is motivated. Rather, the

Bankruptcy Code stays automatically "*any* act" and applies to "*all* entities." 11 U.S.C.

§ 362(a)(3) (emphasis added).[24]

Assuming *arguendo* the automatic stay applies, the Equity Committee does not make a

single argument in support of its request to lift the automatic stay and thus, by definition, falls far

short of establishing "cause." 11 U.S.C. § 362(d)(1). As discussed above, the Equity

Committee's "briefing" is limited to one conclusory sentence in its brief. It cannot be said that

the Equity Committee has satisfied its "heavy and possibly insurmountable burden of proving

that the balance of hardships tips significantly in favor of granting relief." *In re W.R. Grace &

Co.*, 2007 WL 1129170, at *2 (Bankr. D. Del. Apr. 13, 2007) (the party seeking relief from

automatic stay bears the burden). Failure by the Equity Committee to carry its burden alone

---

[24] In *In re Marvel Entertainment Group, Inc.*, 209 B.R. 832 (D. Del. 1997), a decision that is not binding authority on this Court, the court found that "the automatic stay provisions of the Bankruptcy Code are not implicated by the exercise of shareholders' corporate governance rights." *Id.* at 838. However, the key "exercise control" language of section 362(a)(3) was not in the Bankruptcy Code until it was added by the 1984 Amendment to the Bankruptcy Code. *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, § 441(a)(2), 98 Stat. 333 (1984). As a result, this language was not applicable in *any* of the cases cited by *Marvel*, including *Manville*, 801 F.2d at 60. Thus, *Marvel's* finding was based entirely upon cases that had not considered the Bankruptcy Code as currently effective. *Marvel* did conclude that the "exercise control" language was inapplicable based upon its assessment of legislative intent, determining that "if Congress had intended such a marked departure from well-established law, the legislative history of the 1984 amendment would contain some indication of that intention." *Marvel*, 209 B.R. at 838. However, the Supreme Court has stated that "statutory interpretation begins with the language of the statute itself," *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 557-58 (1990), and "time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Germain*, 503 U.S. at 253-54.

"requires a denial of the requested relief." *Id.*; *see also, e.g., In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990) ("If the movant fails to make an initial showing of cause... the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection.").

The Equity Committee has waived any argument that it may show cause for stay-relief. "A moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief." *See International Raw Materials, Ltd. v. Stauffer Chem. Co.*, 978 F.2d 1318, 1327 n. 11 (3d Cir. 1992) (refusing to consider an issue raised for the first time in a reply brief); *see also Hoxworth v. Blinder, Robinson & Co., In*c., 903 F.2d 186, 204-05 n. 29 (3d Cir. 1990). The stay should remain in full force and effect and the Action should not proceed.

### 3. *If Inapplicable, the Automatic Stay Should be Extended Pursuant to the Exercise of this Court's Equitable Powers*

Even if this Court were to find that the automatic stay were not applicable in the first instance, it should extend the stay using its power under section 105 of the Bankruptcy Code and enjoin further prosecution of this Action in any forum. The Third Circuit has endorsed the extension of the automatic stay where such litigation "could interfere with the reorganization of the debtor, or would interfere with, deplete or adversely affect property of the estates or which would frustrate the statutory scheme of chapter 11 or diminish the debtor's ability to formulate a plan of reorganization." *Gerard v. W.R. Grace & Co. (In re W.R. Grace & Co.)*, 115 Fed. Appx. 565, 570 (3d Cir. 2004) (*citing In re A. H. Robins Co.*, 828 F.2d 1023, 1026 (4th Cir. 1987) (staying action against debtor's insurer because action "will put a substantial burden on [the debtor and] it will detract from the reorganization process") and *Johns-Manville Corp. v. Asbestos Litig. Group (In re Johns-Manville Corp.)*, 26 B.R. 420, 436 (Bankr. S.D.N.Y. 1983)

*vacated in part*, 41 B.R. 926 (S.D.N.Y. 1984) (extending the automatic stay under § 362 pursuant to § 105(a) against non-debtors)) (internal citation omitted).[25]  While these grounds alone are sufficient to demand extension of the stay, the Debtors have a right to enhanced protection from the interference and distraction of outside litigation during the exclusivity period. *See In re I Burack, Inc.*, 132 B.R. 814, 817 -818 (Bankr. S.D.N.Y. 1991) ("It is generally recognized that during the exclusivity period ... [a] claimholder should not be permitted to pursue litigation against the debtor in another court unless extraordinary circumstances are shown.") (internal citation omitted).

Moreover, the Third Circuit has held that the automatic stay may be extended where "unusual circumstances" exist, including where the action will have an adverse impact on the debtor's ability to accomplish reorganization. *See McCartney v. Integra Nat'l Bank North,* 106 F.3d 506, 509-10 (3d Cir. 1997). Here, for all the reasons adopted by the Third Circuit, there can be no question that unusual circumstances exist that justify extending the automatic stay. Beyond simply threatening to "interfere with the reorganization" of the Debtors, if the Action were allowed to proceed, the Equity Committee will seek to replace the Debtors' board of directors and almost certainly withdraw support of the Plan and Agreement, risking everything accomplished to date in the Chapter 11 Cases. The value that the Plan and Agreement provide to be recovered for the benefit of the Debtors' estates would be depleted and replaced with a "swing for the fences" litigation strategy that very likely will only further deplete value and delay distributions to creditors. At best, if the Action were to proceed, the Equity Committee would no doubt attempt to extract a recovery for shareholders, notwithstanding that creditors will not be

---

[25]  *See also Belcufine v. Aloe*, 112 F.3d 633, 637 n.5 (3d Cir. 1997) (stating that the *Robbins* rationale for extending the automatic stay "has since been adopted by this Circuit").

paid in full, thus frustrating the statutory scheme of chapter 11. *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3d Cir. 1998) provides a clear example of the adverse impact the Action threatens to impose on the Chapter 11 Cases. After certain bondholders foreclosed upon common stock and removed and replaced the Marvel board, the chapter 11 case spiraled out of control. There were ever-escalating litigations and disputes, and an overarching "lack of confidence all creditors had in the [new board's] ability to act as fiduciaries." *Id.* at 473. Less than six months after the new board took control, the district court withdrew the reference and ordered the appointment of a chapter 11 trustee to replace the board, and the Third Circuit affirmed. *Id.* at 467-69, 478. It took the chapter 11 trustee another seven expensive months to stabilize Marvel and confirm a plan of reorganization. *See In re Marvel Entertainment Group*, 234 B.R. 21, 23 (D. Del. 1999).

Additionally, as of April 7, 2010, in its Answer to the Equity Committee's Complaint, the Debtors will have asserted a counterclaim, requesting that the Court enjoin further prosecution of this Action – in any forum – pursuant to its inherent power under section 105 of the Bankruptcy Code (the "Counterclaim"). Such authority has been exercised in similar circumstances in the past and is fully appropriate here. *See Trap Rock*, 138 B.R. at 424 (court enjoined prosecution of an action to compel a shareholder meeting in any forum other than in the bankruptcy court); *see also In re Phila. Newspapers, LLC*, 407 B.R. 606, 618 (E.D. Pa. 2009) (affirming bankruptcy court's grant of injunction enjoining suit against non-debtors); *Lane v. Phila. Newspapers, LLC (In re Phila. Newspapers, LLC)*, 2010 U.S. Dist. LEXIS 1881, *15 (E.D. Pa. Jan. 11, 2010) (same). In view of the fact that this Court will, presumably, adjudicate the Debtors' Counterclaim -- a core proceeding over which a Washington state court would have no

jurisdiction -- judicial economy alone precludes authorizing the Equity Committee to take up this Action in state court.

## CONCLUSION

For the reasons stated, the Motion should be denied.

Dated: April 7, 2010
Wilmington, Delaware

_/s/ Mark D. Collins_

Mark D. Collins (No. 2981)
Chun I. Jang (No. 4790)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-- and --

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007