# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                           .   Chapter 11
                                 .
WASHINGTON MUTUAL, INC.,         .   Case No. 08-12229(MFW)
et al.,                          .   (Jointly Administered)
                                 .
                                 .   January 28, 2010
                                 .   4:00 p.m.
      Debtors.                   .   (Wilmington)
                                 .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
JPMORGAN CHASE BANK,             .
NATIONAL ASSOCIATION,            .
                                 .
      Plaintiff,                 .
                                 .
      v.                         .   Adv.Proc.No. 09-50551(MFW)
                                 .
WASHINGTON MUTUAL, INC. AND      .
WMI INVESTMENT CORP.,            .
                                 .
      Defendant for all claims   .
                                 .
      -and-                      .
                                 .
FEDERAL DEPOSIT INSURANCE        .
CORPORATION,                     .
      Additional Defendant       .
      for Interpleader claim     .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
WASHINGTON MUTUAL, INC. AND      .
WMI INVESTMENT CORP.,            .
                                 .
      Plaintiffs,                .
                                 .
      v.                         .   Adv.Proc.No. 09-50934(MFW)
                                 .
JPMORGAN CHASE BANK,             .
NATIONAL ASSOCIATION,            .
                                 .
      Defendant.                 .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
```

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              Bill Kosturos, Esq.
                             Jonathan Goulding, Esq.
                             John Maciel, Esq.
                             Alvarez & Marsal, Inc.

                             Brian S. Rosen, Esq.
                             Kelly DiBlasi, Esq.
                             Matthew L. Curro, Esq.
                             Weil, Gotshal & Manges, LLP

                             Erica P. Taggart, Esq.
                             Peter E. Calamari, Esq.
                             David Elsberg, Esq.
                             Benjamin I. Finestone, Esq.
                             Quinn, Emanuel, Urquhart, Oliver
                             & Hedges, LLP

                             Bradford J. Sandler, Esq.
                             Jennifer R. Hoover, Esq.
                             Benesch

                             Neil R. Lapinski, Esq.
                             Andrew G. Mirisis, Esq.
                             Rafael X. Zahralddin, Esq.
                             Elliott Greenleaf

                             Mark D. Collins, Esq.
                             Richards, Layton & Finger, P.A.
For Centerbridge,
et al.:                      Michael B. de Leeuw, Esq.
                             Carl I. Stapen, Esq.
                             Fried, Frank, Harris, Shriver
                             & Jacobson, LLP

For the Equity
Committee:                   Gregory A. Cross, Esq.
                             Jorian L. Rose, Esq.
                             Venable, LLP

| | |
|---|---|
| For JPMorgan Chase: | Stacey R. Friedman, Esq.<br>Joshua J. Fritsch, Esq.<br>Bruce E. Clark, Esq.<br>Sullivan & Cromwell, LLP |
| | Adam G. Landis, Esq.<br>Landis, Rath & Cobb, LLP |
| For the Committee: | David B. Stratton, Esq.<br>Pepper Hamilton, LLP |
| | Robert A. Johnson, Esq.<br>Fred S. Hodara, Esq.<br>Akin, Gump, Strauss, Hauer &<br>Feld, LLP |
| | Paul M. O'Connor, III, Esq.<br>Kasowitz, Benson, Torres<br>& Friedman, LLP |
| | Philip J. Nichols, Esq.<br>Sara Lewis, Esq.<br>White & Case, LLP |
| (No Client Listed): | Andrew J. Mytelka, Esq.<br>James M. Roquemore, Esq.<br>Greer, Herz & Adams, LLP |
| For the U.S. Securities<br>& Exchange Commission: | Kevin Solonsky, Esq.<br>U.S. Securities & Exchange Commission |
| For the Bank<br>Bondholders: | Philip D. Anker, Esq.<br>Wilmer Hale |
| For Dow Jones: | Peg Brickley, Esq.<br>Dow Jones |
| For BlackHorse Capital: | Ian Connor Bifferato, Esq.<br>Bifferato, LLC |
| | David Heroy, Esq.<br>Baker & McKenzie |

For PriceWaterhouse
Coopers & Wells Fargo:    Donna L. Culver, Esq.
                          Morris, Nichols, Arsht & Tunnell, LLP

                          Alexander B. Lees, Esq.
                          Wachtell, Lipton, Rosen & Katz

                          Walter H. Curchack, Esq.
                          Loeb & Loeb, LLP

For Standard & Poors:     Curtis Miller, Esq.
                          Morris, Nichols, Arsht & Tunnell, LLP

For the WMB Noteholder
Group:                    R. Stephen McNeill, Esq.
                          Potter, Anderson & Corroon, LLP

For Toronto-Dominion
Bank & TD Bank, N.A.:     Richard W. Riley, Esq.
                          Duane Morris, LLP

For the Noteholders:      Timothy P. Cairns, Esq.
                          Pachulski, Stang, Ziehl & Jones, LLP

For the US Trustee:       Joseph J. McMahon, Jr., Esq.
                          US Department of Justice

For the Law Debenture:    Daniel A. Lowenthal, Esq.
                          Patterson, Belknap, Webb & Tyler, LLP

For the FDIC(Receiver):   M. Blake Cleary, Esq.
                          Young, Conaway, Stargatt
                          & Taylor, LLP

                          John J. Clarke, Jr., Esq.
                          DLA Piper

VIA TELEPHONE:

For Federal HomeLoan
Bank of San Francisco:    Duane M. Geck, Esq.
                          Severson & Werson

Audio Operator:          Brandon McCarthy

Transcriptionist:        Jennifer Ryan Enslen
                         43 Bay Boulevard
                         Newark, De 19702
                         (302)836-1905

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1           THE CLERK: All rise.  You may be seated.

2           THE COURT: Good afternoon.  Mr. Rosen.

3           MR. ROSEN: Good afternoon, Your Honor.  Brian

4   Rosen, Weil, Gotshal & Manges, together with Matt Curro on

5   behalf of the Debtors, Washington Mutual, Inc. and WMI

6   Investment.  Also with us today, Your Honor, is Mr. Mark

7   Collins from Richards, Layton & Finger, and then for some

8   subsequent matters, we have representatives from Quinn

9   Emanuel who will be taking care of those.

10          THE COURT: Okay.

11          MR. ROSEN: Your Honor, if I could turn to the

12  agenda and to page 7, I think that's where we would start,

13  and move very quickly.  Item number 9, Your Honor, was the

14  Debtors' objection to the proof of claim filed by Wells Fargo

15  Bank.  It's my understanding, although we have not seen it

16  hit the docket yet, that an order has been entered with

17  respect to that.

18          THE COURT: Yes.

19          MR. ROSEN: The 18th omnibus, which is number 10,

20  Your Honor, we know that an order has been received for that

21  one, as well as number 11, which is relief from the Local

22  Rule 3007.  Item number 12, Your Honor, is a motion of the

23  Debtors pursuant to §105 and Bankruptcy Rule 9019 to approve

24  a settlement.  And the parties, although there were no

25  objections that were filed, Your Honor, the parties are

1   making certain modifications to the settlement agreement

2   itself, and we would like to adjourn that matter to the next

3   hearing, which is next week, Your Honor, we believe that's

4   all it will take, to February 5th, when we have a hearing.

5   And at that time, we will be able to present the order with

6   the final agreement. As I said, Your Honor, it's mere

7   ministerial changes to some of the language within the

8   settlement agreement itself, that will be agreed to by all

9   the parties.

10          THE COURT: All right.

11          MR. ROSEN: Your Honor, with that, what I would like

12   to do is skip then, to item number 15, on page 11 of the

13   agenda, which is the 17th omnibus objection. There was one

14   objection that had been filed that was by First American

15   CoreLogic, Inc., and the parties have agreed to adjourn the

16   hearing with respect to the CoreLogic objection and the

17   CoreLogic claim itself. And with respect to the balance of

18   the claims that were objected to, Your Honor, there were no

19   responses by any of the parties. And so Your Honor, we would

20   ask the Court at this time to enter an order approving the

21   17th omnibus objection to the extent of all of the other

22   claims that were covered by that 17th omnibus objection. For

23   the Court's benefit, the omnibus objection dealt with the

24   fact that these claims did not include any detail as to why

25   they should be allowed, and this was an objection on

1   substantive grounds, Your Honor.  And I believe that we have

2   attached - -

3             THE COURT: Okay.

4             MR. ROSEN: I'm sorry?

5             THE COURT: I had no comments on that.

6             MR. ROSEN: Okay.

7             THE COURT: Except with respect to CoreLogic.  So

8   we'll all right on that.

9             MR. ROSEN: Okay, Your Honor.  If I could present an

10  order?

11            THE COURT: You may.  Thank you.  All right.  I'll

12  enter that order, then, as unopposed.

13            MR. ROSEN: Thank you, Your Honor.  Your Honor,

14  again, if we could jump a little bit around on the agenda, I

15  would like to move, at this time, to what I believe has

16  brought a lot of people into the room, which is item number

17  16.  Which is the motion of Washington Mutual, Inc. and WMI

18  Investment for an order with respect to the Equity Committee.

19  If that's all right, Your Honor?

20            THE COURT: Yes.  Let's do that.

21            MR. ROSEN: Your Honor, also, if I could approach

22  now to provide the Court with three documents that we're

23  going to seek to introduce.  And these have been provided to

24  counsel in the courtroom.

25            THE COURT: You may.

1             MR. ROSEN: Your Honor, as I indicated, we're here

2    at this time to deal with the motion of the Debtors for an

3    order seeking to disband the recently formed Equity Holders

4    Committee, or in the alternative, to ask the Court to impose

5    a cap on the fees and expenses that could be incurred by that

6    Equity Committee.  We received several responses, Your Honor.

7    The first, as we expected, was from the Equity Committee.

8    And of course, the Equity Committee in their papers said that

9    the Debtors are doing a knock up job with respect to all of

10   their efforts on the litigation.  Such a good job, as a

11   matter of fact, that they are establishing, in the Equity

12   Committee's mind, that there is solvency, and therefore,

13   people need to be represented at this point in time.

14            THE COURT: Well, let me interrupt you for a moment.

15   Are we going to have any testimony or - -

16            MR. ROSEN: Your Honor - -

17            THE COURT:  - - just argument?

18            MR. ROSEN:  - - it is going to be just argument, as

19   far as I know.  The three documents that I provided, I

20   believe, are, will be admitted into evidence on a consensual

21   basis.  And that will go to the asset and liability issue,

22   Your Honor.

23            THE COURT: All right.  Sorry to interrupt.

24            MR. ROSEN: That's quite all right.  Secondly, Your

25   Honor, we received an objection from Black Horse Management,

1   LLC, who also says that the Debtors have done a great job and
2   they believe that there is solvency. But that the solvency
3   that they foresee will not dip down to the common equity
4   level. So they're asking for a reconstitution of the Equity
5   Committee so that it only provides for membership by
6   preferred stockholders. Third we received a joinder by the
7   Creditors Committee to the Debtors' motion itself. And the
8   Creditors Committee, and they will certainly speak for
9   themselves, they focused really on the adequate
10  representation of all parties in interest in these cases.
11  Next, there were two pleadings that were filed by the United
12  States Trustee. The first was an objection to the motion
13  itself, and the second was an objection by the United States
14  Trustee to the request by Black Horse as to the
15  reconstitution of the Committee. Next, Your Honor, there was
16  a response interposed by the Bank Bondholders, and we were
17  very happy to see that the Bank Bondholders agreed with the
18  Debtors with respect to something in this case. And they
19  believe that before anything goes down to the equity holders
20  in this case, that the bank, the creditors of the bank itself
21  have to be paid in full. And it was their view there - -
22          THE COURT: I think they suggested that before
23  anything goes to the Debtors, the creditors and the - -
24          MR. ROSEN: Well - -
25          THE COURT: - - subsidiary have to be paid first.

1          MR. ROSEN: We'll let Mr. Anker speak.  But - -

2          THE COURT: Well, I was - -

3          MR. ROSEN:  - - before he - -

4          THE COURT: I was - -

5          MR. ROSEN:  - - does speak, Your Honor, I would

6     like to just bring up one small point.  And that is, the

7     Court has already entered an order in this case with respect

8     to 2019.  And the imposition of that with respect to what was

9     previously referred to as the senior noteholder group that

10    had been represented by White & Case.  Your Honor, we would

11    just like to point out for the record that as far as we know,

12    there has not been a 2019 statement filed by any of the Bank

13    Bondholders, and we think that based upon the law of the

14    case, that there probably should be one before pleadings are

15    permitted to be filed, or that counsel is permitted to be

16    heard.  Lastly, Your Honor, the next item that was filed was

17    a reply by the Debtors with respect to all of the pleadings

18    that I referred to earlier.  Initially, Your Honor, I would

19    like to point out that it is the Debtors' goal, the Debtors'

20    responsibility, and the Debtors' obligation to look after the

21    interests of all stakeholders.  Creditors and shareholders

22    alike.  And the Debtors, in that regard, have served, and

23    will continue to serve, as the custodian for the whole.  For

24    the entire creditor and shareholder body.  And in a case like

25    this, there is no basis to draw a distinction between

1  creditors and shareholders.  And no distinction, in fact, has
2  been drawn, Your Honor.  The Debtors and the professionals
3  have adhered to a simple mantra throughout this case.  Which
4  is do whatever is necessary to maximize the assets of the
5  Debtors' estates, and to minimize the liabilities that may be
6  allowed against the creditors.  In that regard, Your Honor,
7  the Debtors have liquidated assets, the Debtors have
8  commenced litigation, and they have taken other actions - -
9  excuse me - - to provide for, or to investigate and see
10 whatever claims and causes of actions may exist on behalf of
11 the estate.  Conversely, the Debtors have filed 20 omnibus
12 objections to claims, and they have served miscellaneous
13 others.  And each of those is designed to reduce the
14 magnitude of allowed claims in these Chapter 11 cases.  In
15 doing so, Your Honor, the Debtors have no favorites.  The
16 Debtors merely do what is necessary, and at the end of the
17 day will provide for distributions as are required by the
18 Bankruptcy Code and the underlying contractual documentation
19 that was, that WMI was a party to.  At the same time, Your
20 Honor, the Debtors cannot turn a blind eye to what the
21 economic realities are of these cases.  And as currently
22 presented, the Debtors are insolvent.  But let's look at what
23 we know, Your Honor.  First, we have the latest monthly
24 operating report that was filed with the Court.  And Your
25 Honor, that is marked as Debtors' Exhibit 1 before you.  It

1    represents the Debtors' view as to what the assets and

2    liabilities are as of November 30th, 2009. And it has a

3    balance sheet depicting these assets and liabilities. And

4    Your Honor, I believe that is page 7 of that exhibit, and we

5    also have a blow up there for you, Your Honor, off to the

6    side. And as you can see from the balance sheet, Your Honor,

7    the Debtors reflect assets and liabilities as of November

8    30th, 2009, assets of 6.932 billion and liabilities of 8.294

9    billion respectively. Now everyone, Your Honor, in the

10    pleadings that you've seen, they jump on what they perceive

11    to be that sliver, that $1.3 billion of negative equity, if

12    you will, Your Honor. And they say, Aha! Let's get a $20

13    billion recovery in the litigation that's currently pending,

14    and by the way the Debtors have asserted viable, valid, and

15    knock down winners on all of these claims, and we have

16    solvency. Well Your Honor, unfortunately, it's not that

17    simple on so many levels. First, the number is not truly $20

18    billion, as certainly in this case the Equity Committee

19    contends. The $20 billion, Your Honor, includes $4 billion

20    of deposits. And as reflected on the monthly operating

21    report, which is already before you, Your Honor, the $4

22    billion is factored into the $6.9 billion. So Your Honor,

23    what we're really talking about as . . . (indiscernible) . .

24    . for relief, is approximately $16 billion. But Your Honor,

25    let's assume for the moment that there is solvency. Then

1   creditors would be entitled to receive post-petition interest

2   on their claims.  And based upon the Debtors' analysis, such

3   amount would be approximately $600 million.  Assuming that

4   the plan went effective and creditors' claims were paid in

5   full no later than June 30th, 2010.

6              THE COURT: And where do you get that figure?

7              MR. ROSEN: Based upon the contractual interest that

8   is set forth, Your Honor, on the respective scheduled debt as

9   well as a Federal judgment rate for general unsecured.

10             THE COURT: So you think I can do that calculation,

11  or take judicial notice of the Federal rate, and multiply it

12  times your liabilities?  Is that - -

13             MR. ROSEN: Your Honor, I am just giving it to you

14  as an example.

15             THE COURT: Okay.

16             MR. ROSEN: Applying that spread, Your Honor, would

17  increase what we know already to be that 1.3 billion spread

18  to about $1.9 billion.  And likewise, Your Honor, as we know,

19  unfortunately, claims will not be paid in full on that date.

20  Either because assets will not be available, or claims will

21  not be reduced to such a level to allow the payment to be

22  made in full.  And the Debtors know that interest will

23  therefore continue to accrue at the approximate amount of $30

24  million per month.  Third, Your Honor, what else doesn't the

25  balance sheet show?  It doesn't reflect any amounts

1  associated with disputed and unliquidated claims. Your

2  Honor, Debtors' Exhibit 2, which you have before you, is the

3  claims register in these Chapter 11 cases. And Your Honor,

4  this claims register was put together by KCC, which is the

5  Court appointed agent. Several things to note, Your Honor.

6  If you go to the last page, and we've taken the liberty of

7  making that number a little bit larger so people could

8  actually see it. You'll see that the total amount of claims

9  filed, and by that I mean, Your Honor, claims filed with a

10  number associated with it, and nothing more than a number, is

11  $104 billion. Now I would call your attention to the fact,

12  Your Honor, that that $104 billion includes a $40 billion

13  Marta claim, as we call it, and a $9.7 billion IRS claim.

14  Both of which, Your Honor, will be objected to as being

15  amended and superceded. So let's reduce that 104 right now

16  to approximately $54 billion. Taking out that $50 billion of

17  excess. The problem, Your Honor, is this chart doesn't even

18  include a number for unliquidated claims. Case in point,

19  Your Honor, Exhibit 3, which we have before you, and it's

20  reflected, Your Honor, on page 28 of the, the large chart, is

21  the FDIC claim that was filed in the case. And the FDIC

22  claim is asserted a liquidated amount of $24 billion, plus an

23  unliquidated portion. And as a result, KCC reflects that

24  claim as totally unliquidated. The point, Your Honor, is

25  that 104 may become 54, but we know that there are a large

1    component of claims that have liquidated pieces that are not

2    even reflected.  So the 54 gets ballooned up yet again.  The

3    claim, Your Honor, that was filed by JPMorgan Chase is

4    similar.  And when I say the claim, Your Honor, JPMorgan

5    Chase filed approximately 30 claims against the estate, some

6    having a liquidated, some having an unliquidated portion,

7    therefore each enlarging the amount of what would be the

8    denominator base of claims in these cases.  And while the

9    Debtors are still in the process of evaluating these claims,

10   Your Honor, we cannot at this time provide any sort of

11   estimate as to what the ultimate recovery would be.  Let's go

12   back to the $16 billion number that we talked about earlier,

13   Your Honor, which was the 20 billion minus the 4 billion

14   which is already included in the monthly operating report.  A

15   lot of people have been focused on those claims, as I said.

16   And they say, You're going to hit a home run, slam dunk,

17   whatever sports analogy you want to use, Your Honor, and

18   therefore all that money is going to come into the estate.

19   But is it really?  I don't think so.  Unfortunately, Your

20   Honor.  We know, Your Honor, that there are approximately

21   $1.9 billion of cash in the receivership.  And that was due

22   to the acquisition by JPMorgan Chase of the bank.  And we

23   know that the receivership probably has some other money, and

24   so conservatively we'll say $100 million for a total of 2

25   billion.  And we know that WMB, based upon everything that

1    we've said, had funded debt of approximately $13.8 billion.

2    And when you add that slam dunk recovery against the WMB

3    receivership for the lawsuit that we have filed, you take the

4    16 billion and the 13.8 of funded debt and you come up with

5    about $29.8 billion of debt.  The problem is, Your Honor, you

6    only have $2 billion of assets to satisfy that.  So

7    therefore, Your Honor, we look at it on the other side and

8    say, We don't see that $16 billion coming back as a recovery,

9    necessarily.  There will be some recovery, Your Honor, but it

10   would be a fraction of that.  Thus Your Honor, any way we

11   look at it, even without adding the disputed claims that we

12   know of, and the unliquidated claims that we don't know of,

13   the Debtors are still insolvent, and we don't, therefore, see

14   any reason for an equity committee to be involved at this

15   time.  But take it on the flip side, Your Honor.  To argue

16   that the Debtors are solvent, the Committee has to assume

17   that we're 100% successful not only on all the litigations,

18   on the recoveries that we are to get, as well as defeating

19   any claims that emanate back against the estate as a result

20   of the victory that we would have achieved in the

21   receivership.  That necessarily when you get a, an avoidance

22   action recovery, there's not a corresponding avoidance action

23   claim back against the estate for payment back into the

24   estate.  It's hard to understand it, Your Honor, but there

25   would be claims.  If there's a breakdown in any of these

1  scenarios, Your Honor, the equity would not recover anything.
2  As far as we can see, there's simply not a scenario under
3  which anyone can conclude that equity has enough of an
4  economic stake in these cases to warrant the continuation of
5  the Equity Committee. But Your Honor, assume for the moment
6  that there might be solvency, then you have to go to the case
7  law, and you have to look at the factors. You have to look
8  at adequate representation. None of the objecting parties
9  have established why an equity committee is necessary to
10  ensure that adequate representation, Your Honor.

11         THE COURT: Well, aren't we beyond that? This is
12  not a motion for appointment of an equity committee. One has
13  been appointed.

14         MR. ROSEN: Your Honor, and that perhaps gets to the
15  issue of what sort of review should be undertaken.

16         THE COURT: Right.

17         MR. ROSEN: The *de novo* or the abuse of discretion
18  standard.

19         THE COURT: Right.

20         MR. ROSEN: And Your Honor, we believe that there is
21  no question. That the *de novo* review should be undertaken.
22  The cases that have been cited by the Equity Committee and
23  the United States Trustee, they go to a determination of this
24  Court being made subsequently on appeal by a District Court.
25  And that's why the abuse of discretion standard is used.

1        THE COURT: But do you point me to any case?

2        MR. ROSEN: The Williams decision, Your Honor.  We

3    believe it's squarely on point.  And in fact, Your Honor, I

4    believe in Williams, the Court explicitly used the de novo

5    standard of review to determine whether committees should be

6    formed after the US Trustee denied an equity holder's request

7    to form it.  So Your Honor, we believe that that is where

8    this Court should go.  And so therefore we need to look back

9    at the requisite factors.

10        THE COURT: But there is no case that you, the

11    parties can point to where the Trustee has appointed a

12    committee and a motion to disband is being considered by the

13    Court.

14        MR. ROSEN: Your Honor, I believe in our reply – –

15    and I want to find that for Your Honor – – we referred the

16    Court to the Texaco decision.  And there, Your Honor – – and

17    that's on page 7 of our reply.  And for the Court's benefit,

18    the Texaco cite 79BR 560.  In Texaco, the Bankruptcy Court

19    reviewed the decision by the United States Trustee to appoint

20    two committees of unsecured creditors.  And the Court found

21    that two committees were no longer needed and ordered the US

22    Trustee to combine the two into one, effectively disbanding

23    one of the two committees.  And in doing so, the Court

24    specifically noted that the issue of adequate representation,

25    quote, "is determined on a de novo basis, after the

1    administrative task of appointing committees is performed by

2    the United States Trustee." Close quote. The quote went on

3    to hold that, quote, "An abuse of discretion standard does

4    not apply with respect to the United States Trustee's initial

5    exercise of discretion, because the concept of adequate

6    representation is a legal issue which must be resolved

7    judicially." So Your Honor, we would ask the Court to look

8    at those two decisions. With respect to the adequate

9    representation, Your Honor, as I mentioned, nobody is

10   claiming at this point in time that the Debtors are not doing

11   everything that they have said that they would do. And in

12   fact, everybody has lauded the Debtors and their counsel,

13   specifically Quinn Emanuel, for what they have been able to

14   achieve in connection with the litigation that's before this

15   Court and the litigation that was recently stayed in the

16   District of Columbia. Really what it comes down to, Your

17   Honor, is that people are only concerned if we decide to

18   settle this case. Settle this litigation. Not that we're

19   not going to zealously pursue it, but if the Debtors, at the

20   end of the day decide that they believe, based upon whatever

21   factors we take into account, a resolution among the FDIC,

22   JPMorgan, WMI is appropriate to be resolved consensually.

23   And at that point in time, Your Honor, as our papers clearly

24   set it out, that's when the Equity Committee, if at all,

25   should come into being. Because it's that point in time,

1    Your Honor, that people will be unhappy with that resolution.

2    Not that we're proceeding in the litigation right now, but

3    that we've decided to settle at a number that they don't

4    think is appropriate. And therefore, they would argue, Your

5    Honor, that it falls beneath the lowest range in the range of

6    reasonableness. To us, Your Honor, that's the time when

7    someone needs to rear their head. It's not now. We don't

8    need any additional help in litigating Your Honor, because

9    we're doing a pretty good job. And we already have the help

10    of the Creditors Committee in that, in those litigations.

11    People are casting stones at the Debtors, they're casting

12    stones at the Creditors Committee saying they're not, at that

13    point in time, they won't be looking out for the interests of

14    the equity holders. Your Honor, we're doing everything we

15    can to maximize those assets. That was the mantra that we

16    started out with in this presentation, that's the mantra that

17    we're going to carry through to the end of the case. And if

18    in fact the waterfalls that would be presented in this case

19    show that there should be a distribution to flow down south

20    to the preferred holders and the common equity holders, that

21    will be appropriate, that will be contained in the disclosure

22    statement, that will be something that will be put forth in a

23    Chapter 11 plan. But at this juncture, in these cases, we

24    believe that there already is adequate representation of the

25    equity holders. It's also worth noting, Your Honor, that to

1    the extent that an equity holder and ad hoc group of equity
2    holders substantially contributes to these cases, they are
3    statutorily entitled to apply to the Court for compensation.
4    We have never said anything other than that, Your Honor.  We
5    included that in our motion in the first instance.  We stand
6    by that, Your Honor.  Lastly Your Honor, if the Court decides
7    that it's not appropriate at this time to disband that
8    Committee, and we do think that it is, and we ask the Court
9    to do so, we ask the Court to consider capping the fees and
10   expenses of the Equity Committee.  As I just indicated, Your
11   Honor, we think the role of this Committee should not be to
12   get involved in any litigation, but rather should be to have
13   the opportunity to review any settlement if in fact one is
14   ever brought before this Court.  We believe, Your Honor, that
15   the cost, the fees and expenses associated with that would be
16   relatively *de minimis*.  We would certainly work with that
17   Equity Committee to bring them up to speed so that they could
18   understand what the relevant issues are.  And we believe that
19   the appropriate cap, as we set forth in our motion, of $250
20   thousand should be implemented.  Thank you, Your Honor.

21             THE COURT:  Okay.  Thank you.

22             MR. ROSEN:  With that, Your Honor - - excuse me.  I
23   would just ask for the admission of those three exhibits.
24   And I would also note, Your Honor, I failed to mention that
25   we did receive a letter this afternoon.  It hit the docket.

1    It was an independent letter by a shareholder with respect to
2    the motion itself.  Just asking that the Court deny the
3    relief.  And if the Court does not have a copy, I'm happy to
4    hand one up.

5             THE COURT: I don't have a copy, you may hand it up.
6    Thank you.  Okay.

7             MR. HODARA: Good afternoon, Your Honor.  Fred
8    Hodara for the Official Committee of Unsecured Creditors from
9    Akin, Gump, Strauss, Hauer & Feld.  Your Honor, as Mr. Rosen
10   indicated, on behalf of the Creditors Committee, I'm going to
11   focus my comments on the adequate representation issue.  And
12   the manner in which we believe that the existence of adequate
13   representation in this case, coupled with the expense of a
14   creditor, of an additional official committee, in this
15   instance of equity holders, outweighs any perceived need, any
16   conceivable need, for an official committee of equity
17   holders.  The case law which Mr. Rosen touched on we believe
18   is clear, notwithstanding that it exists primarily in the
19   context of equity holders seeking a Court to determine that a
20   committee should be appointed.  It's clear that the
21   representation need not be exclusive, but merely needs to be
22   adequate.  Here we don't have an instance of merely being
23   adequate, we believe that there's circumstances of perfect
24   adequacy, and that's with respect to many different levels.
25   Three to be specific.  The role of the Debtors themselves,

1   which Mr. Rosen articulated very clearly, and Your Honor has
2   seen throughout these cases.  The role of the Board of
3   Directors.  And in this case, unlike many cases, there are
4   still nine members of this Board of Directors, which meet
5   from time to time, and have been active throughout these
6   cases.  And of course, the role of the Creditors Committee.
7   Now in the Edison Brothers case, District Judge Robinson here
8   in Delaware didn't find grounds appropriate for the
9   appointment of the equity committee.  She said there that she
10  could revisit the issue if the shareholders could provide
11  evidence suggesting that management's interests were not
12  aligned with shareholders.  Again, there's no reason that
13  we've seen in this case why one would believe that those
14  interests are not aligned.  No reason to believe that the
15  dual duty of management, and of the Debtors, to equity and to
16  creditors, is not being exerted appropriately.  We all know
17  the plethora of litigation in these cases.  We know how
18  aggressive the Debtor, with the Creditors Committee, has been
19  in pursuing these litigations.  There's no reason to believe
20  that an equity committee would somehow add anything to those
21  litigation efforts.  The role of the Creditors Committee,
22  while obviously not on behalf of equity holders, we think is
23  absolutely relevant to the issue of adequate representation.
24  The Creditors Committee is not only focused on the
25  litigations, but we're focused on the claims process.  The

1   objections, 20 of them that have been filed by the Debtors,
2   and which have been done working hand in hand with the
3   Creditors Committee reviewing those claims, are focused
4   obviously on minimizing the number of claims and the amount
5   of the ultimate claims that have to be paid in this case.
6   That's exactly what equity holders would want to see happen.
7   There can be no inference that somehow this Creditors
8   Committee is being lax in their effort and in their scrutiny
9   of those claims to reduce that claims base. Now in our
10  pleading, we cite to a series of cases that talk about other
11  protections for equity holders who don't get the benefit of
12  an equity committee, and it's not been said, but it's
13  obviously the case that it's not the norm for there to be an
14  appointment of an equity committee. And in these various
15  cases, AMPEX in the Southern District, the Williams case that
16  Mr. Rosen references, the Leap Wireless case in the Southern
17  District, the Courts refer to these other protections that
18  equity holders have. For instance, in the Leap case, the
19  court explained that the equity holders who were seeking a
20  committee still have recourse. They have standing to be
21  heard under 1109(b), and they can be reimbursed for their
22  efforts, if their efforts result in substantial contribution
23  under 503(b)(3)(d). Now in this particular case, we should
24  look at whether these equity holders have the ability to
25  represent themselves. One thing that's come out through the

1   discussions and the papers of the appointment of this Equity
2   Committee is that they not only have been organized, but
3   they've been organized for quite some time. And they've been
4   advocating, it appears, effectively through a law firm. So
5   what they're really doing is trying to shift the expense of
6   that effort to this estate. And we think that's the final
7   point, and very important point, in balancing whether it's
8   appropriate to appoint another official committee in this
9   case. Because the cost, Your Honor, comes in two forms.
10  There's the obvious out of pocket expense of another official
11  committee, clearly with a law firm, it appears two law firms,
12  as most of us seem to have. Perhaps there'll be a third, as
13  most of us, or at least the Debtors have had with respect to
14  the litigation. In fact, I think at last count the Debtors,
15  and this is not a criticism, have 19 professional firms in
16  all retained, because of the nature of the litigations all
17  over the country, as well as the need for financial advice.
18  And so is this Equity Committee going to seek a financial
19  advisor? So we have that kind of cost. The obvious out of
20  pocket expense. But then we have the cost that we would
21  expect if an equity committee is allowed to stand here of
22  delay. And of the burden that this Equity Committee, being
23  funded, if they are deemed to be official, and are not
24  capped, straight out of the estate, will put on all of the
25  parties by demanding to get up to speed on every last thing

1    that has happened in this case, everything that's pending.

2    And then, and this is the most difficult part for, from a

3    creditor's perspective, presumably holding things up, trying

4    to extract what can only be considered a gift, unless we are

5    successful in all of the litigation. Now it's the hope of

6    the Creditors Committee that the estate will be successful in

7    all of the litigations, and that we'll all be showered with

8    compensation beyond expectations, and that there could be

9    value for the equity. But as Mr. Rosen indicated, that would

10   require success up and down the line. That effort is being

11   made in spades by the Debtor and by the Creditors Committee.

12   To inject another party just for the sake of piling on and

13   pursuing that, which is the only thing we think it would be

14   for, is going to delay the process. And what we don't want

15   is for our creditors' money to be used to ultimately hold us

16   up to try to extract something in the end of the day for the

17   equity holders. So for those reasons, Your Honor, we believe

18   that this is not the case, this is not the time, for

19   appointment of an equity committee.

20            THE COURT: Thank you.

21            MR. ANKER: Good afternoon, Your Honor.  I'll be

22   brief.  Philip Anker, filed the papers on behalf of the bank

23   bondholders.  We have filed a 2019 statement.  We have had

24   other members join our group and we will amend promptly to

25   add them.

1          THE COURT: When did you file that?

2          MR. ANKER: Several months ago. I can look it up.

3    I don't have the exact date, Your Honor. I can look it up in

4    the - -

5          THE COURT: In compliance with my order?

6          MR. ANKER: It was filed before the order, Your

7    Honor. It was filed before the order.

8          THE COURT: Did it disclose what was required?

9          MR. ANKER: It disclosed consistent with what the

10   WMI noteholders did at the time. We have not amended since

11   your order, Your Honor, nor have the WMI noteholders. They

12   have taken an appeal from that decision. The filing did pre-

13   date it. But I wanted to simply correct the record that

14   there was no filing. Your Honor, let me just make a couple

15   of remarks briefly. I don't stand up here to discuss the law

16   with you. I appreciate there isn't a lot of law in this

17   area, and I understand the Court may feel its hands are tied.

18   But I do want to correct a couple of statements of fact,

19   frankly, that in our own pleading weren't quite accurate. I

20   stated, or we stated in our pleading, that the total amount

21   of the WMB bond debt was about $13 billion. It's actually

22   closer, and this is without interest, Your Honor, of any

23   kind, to 14 billion. There's 6.1 of the senior bank debt,

24   7.6 billion of the junior debt. I suggested in our pleading

25   that the junior bonds were trading at pennies on the dollar,

1   the senior bonds at 45¢ on the dollar. We attached an

2   exhibit. And again, I wasn't quite right. The junior bonds

3   are trading at less then 1 penny on the dollar. I stand up

4   with trepidation. There are many - -

5          THE COURT: Well am I to take judicial notice of

6   that fact? What evidence do I have of that?

7          MR. ANKER: There is a, Your Honor, I don't think

8   that the Equity Committee will dispute. Attached as Exhibit

9   A to our pleading is a copy of a Bloomberg - -

10         THE COURT: I remember it.

11         MR. ANKER: - - and it does show that. WMB juniors,

12   I'm referring to. I thought I was clear, but Mr. Rosen wants

13   me to clarify. Your Honor, obviously if you want an

14   affidavit of authenticity, we can put that in front of you.

15   Let me just underscore a couple of points Mr. Rosen made on

16   the numbers here. And point out to you one thing the Debtor

17   has said. The Debtor, obviously, has a claim to the deposit.

18   If it wins that claim, and there's no setoff, and there's no

19   argument, if Your Honor rules all their way, it's $4 billion

20   and change. The senior bonds at WMI are greater than that

21   amount. What else is there? There are claims against the

22   receivership estate. And Mr. Rosen has noted those. He has

23   noted that the receivership estate has in this case claims of

24   even a greater amount. But let's say that at the end of the

25   day, they succeed in their litigation, those claims are

1   allowed, the claims of the receivership estate are

2   disallowed. As Mr. Rosen notes, and I hope the comment

3   didn't get lost in the translation, that's a claim against a

4   receivership estate that right now is holding $1.9 billion,

5   the proceeds paid by JPMorgan Chase, pursuant to the purchase

6   and assumption agreement, and has against it $13.8 billion in

7   liability already. That claim, if there were a net claim

8   allowed for WMI, is a pennies on the dollar claim. There is

9   much talk in this case about the tax asset. We'll be back

10  before Your Honor relatively soon on an objection that was

11  filed to claims that my clients filed in this case. But

12  attached to that was a declaration filed by WMI of Mr. Brauer

13  (phonetic). And he notes there, and I quote, "Where WMB

14  would have been entitled to a refund on a separate company

15  basis, then under the tax sharing agreement, WMB would be

16  owed the, that amount by WMI." And so even under their view

17  of the tax sharing agreement, which is that they have the

18  right to file the tax returns and the money in the first

19  instance flows into the WMI estate, even under their view,

20  which is not the view of JPMorgan Chase, not the view of the

21  FDIC, not the view of the bank bondholders, all of whom think

22  the property right remained on the WMB side, or if the asset

23  has been sold, to JPMorgan Chase. But whoever it is - -

24              THE COURT: We don't have to get into the merits of

25  all that.

1     MR. ANKER: But the point is that even the Debtor
2     concedes, even the Debtor concedes - -

3          THE COURT: All right.

4          MR. ANKER:  - - there would be a claim back, and
5     that claim would obviously come ahead of equity. Your Honor,
6     I want to underscore one other point, which we hint at at the
7     pleadings, and I want to be circumspect in what I say.
8     Obviously, the hope of a lot of parties here is that we don't
9     go through nuclear war and litigate until, for years, and
10    years, and years. But rather, that ultimately there is a
11    resolution that helps, or at least satisfies all
12    constituencies. JPMorgan Chase, the FDIC, the WMB
13    bondholders, the WMI creditors, at least at some level, and
14    the WMI Debtor. That process obviously hasn't, today,
15    produced a settlement yet. It will only get that much harder
16    if equity is at the table, because there's just not enough
17    money to go around. Your Honor, I wish there were a prospect
18    that WMI equity could get something, because that would mean
19    not only would my creditors, the senior bank bondholders, my
20    clients, be paid in full, but so too would the juniors. I
21    wish it were true. I have no beef against the people in this
22    courtroom. But simply that is not the economic reality of
23    the world in which we find ourselves. Thank you, Your Honor.
24         THE COURT: Thank you.

25         MR. CROSS: Greg Cross on behalf of the Official

1  Committee of Equity Security Holders from Venable.  Your

2  Honor, before I begin, I have two slides I'd like to hand up.

3  Both are trading slides, and they've been shared with the

4  Debtor.  I'd ask that the Court take judicial notice of them.

5         THE COURT: All right.  Any objection?  All right.

6  You may hand them up.

7         MR. CROSS: I'd also like to ask the Court to take

8  judicial notice of the Exhibits that are attached to our

9  opposition, which are all publicly available trading slides

10  and information from Google.

11         THE COURT: Any objections?

12         UNIDENTIFIED SPEAKER: No, Your Honor.

13         THE COURT: All right.  I will take judicial notice

14  of that.

15         MR. CROSS: Your Honor, §1102 vests with the Trustee

16  the discretion to appoint additional committees.

17         THE COURT: The US Trustee.

18         MR. CROSS: The US Trustee, correct.  It vests with

19  the Court the power to expand that representation or to alter

20  the representation if it deems that the representation is

21  inadequate.  It does not vest with the Court the power to

22  constrict representation by disbanding committees.  And

23  notwithstanding what the Debtor said, they've not cited a

24  single case in their papers which stands for that

25  proposition.  The Texaco case isn't that case.  The Texaco

1 case is a case of two unsecured creditors committees where

2 the Court was reallocating the representation into one

3 effectively. Saying that there was no longer a need for two

4 separate committees which were advocated to the Court because

5 there was a perceived conflict. The in re: New Life case is

6 the only case that's directly on point. In that case, the

7 Court concluded that it lacked authority and power to disband

8 the committee. Now there are cases that have said it's an

9 abuse of discretion standard. I frankly think, though, the

10 New Life case is the correct standard. All of the papers

11 that are in front of you, all of the tests that have been

12 advanced are under (a)(2). They are entities, they are

13 individuals coming to the Court asking for the creation of an

14 unsecured committee, an additional unsecured committee, or an

15 equity committee, and they are trying to satisfy the

16 standards for the Court's de novo review and creation of

17 additional representation. There are no cases which speak to

18 how you evaluate whether the Trustee appropriately exercised

19 his discretion. At a minimum, he should be afforded an abuse

20 of discretion standard. But I would argue that the Court

21 lacks any authority to disband the Committee. We have,

22 however, addressed each of the four factors, and believe that

23 had we come here, and the Trustee turned us down, we would

24 have a compelling argument for the creation of an equity

25 committee, addressing each of the five factors, actually.

1   And there are only two that are relevant.  This is obviously
2   a widely traded stock.  It's obviously a complex case.
3   Nobody disputes that.  So there are only three issues.  Is
4   this Debtor hopelessly insolvent?  Is the equity adequately
5   represented?  And what's the cost/benefit analysis of adding
6   an equity committee to this case?  Now with respect to
7   hopeless insolvency, in the papers, no one takes the
8   position, other than the bondholders for WMB, other than that
9   they are hopeless, that this case is hopelessly insolvent.
10  They say, there's no proof of solvency, but they don't argue
11  that the estate is hopelessly insolvent.  And in fact, the
12  Debtors said in their discussions before you, I don't know.
13  I don't know what the claims are going to be, what the
14  recoveries will be, and I don't know what the claims, the
15  validity of the claims that are pending will be.  You have in
16  front of you a motion to extend exclusivity, and the Debtors
17  justification for extending exclusivity is that the Debtor
18  has an inability at this time to assess the assets and
19  liabilities of this estate.  Yet the Debtor bears the burden
20  of coming before you and showing that the estate is
21  hopelessly insolvent.  They can't make both statements.  And
22  in the statement before you just moments ago, they conceded
23  that they can't.  That they don't know.  The Unsecured
24  Creditors Committee really doesn't address the point.  They
25  argue just adequacy of representation.  The bondholders say,

1    It's got to be hopelessly insolvent, because I'm going to win

2    every single argument at the WMB level.  Nothing is going to

3    flow to WMI.  And gee, my noteholders are trading at

4    fractions of cents on the dollar.  Well frankly, if you look

5    at the noteholders at the WMI level, which were the two

6    sheets that I gave you, the WMI noteholders think they're

7    going to do a lot better than WMB.  The senior notes at the

8    WMI level, are trading, have traded in the past month at

9    above 100¢ on the dollar.  The junior noteholders are trading

10   at 50¢ on the dollar.  The stock, the common, and the

11   preferred shares show $500 million of equity value in these

12   cases.  In the normal case, $500 million would be a

13   staggering sum.  It's only – –

14            THE COURT:  Not in this case.  But – –

15            MR. CROSS:  Not in this case.  And 500 million in

16   and of itself would warrant the creation of an equity

17   committee.  It's only in a case where we're tossing billions

18   here and billions there, without any specificity, where all

19   parties admit that there are years of litigation ahead, that

20   they say equity shouldn't have a voice.  There has been no

21   satisfying of a burden by the Debtor that the estate is

22   hopelessly insolvent.  The second test is, Is equity

23   adequately represented?  The unsecured creditors, and the

24   Debtor, argue, We're doing a great job.  They may be or they

25   may not be.  I don't know.  I'm going to presume that they

1  are. That doesn't mean that equity has a seat at the table,
2  or a voice. And it doesn't mean that they have the type of
3  fiduciary duties that the equity should enjoy. The unsecured
4  creditors have no fiduciary duty to the equity. The
5  unsecured creditors make the argument in their motion, it's
6  just litigation. We're doing a good job in the litigation,
7  so why does equity need to participate? But you know,
8  actions speak louder than words. When the Debtors were
9  litigating the cases, in both adversary proceedings in the DC
10  action, the unsecureds joined. They actually filed a motion
11  to intervene in the DC action. Why is it that the Debtor is
12  not adequately representing their interests in those
13  litigations? Why is it that the unsecureds need to
14  participate? What is the justification for that expenditure,
15  and why wouldn't equity be afforded the same opportunity. It
16  should be identical. And the reason equity needs
17  representation here is precisely why everyone in the room is
18  fighting so hard to keep us out. Settlement will be more
19  complicated only if they're settling with the equity's money.
20  If these cases are truly insolvent, if there is no hope of
21  recovery, any objection I lodge is going to be overruled.
22  Any efforts to extend the period is going to be overruled.
23  We've all been in cases where unsecureds get nothing. They
24  object to a settlement. It's approved. That shouldn't be
25  the fear. The fear is, as the bondholders acknowledge, Hey

1   we can cut a deal if it's just WMI, WMB, and the FDIC. But

2   if we've got to include equity, and they're really looking

3   out for that last dollar, it will be much more difficult.

4   Now what are the relative costs? This Debtor has more than

5   $800 million in liquid assets. By any measure, we're talking

6   about billions of dollars at stake. The Debtor has 19 sets

7   of professionals, but adding one more is the straw that

8   breaks the camel's back? We can't afford a few million

9   dollars so that equity actually has a voice? The equity owns

10  this company. The costs of adding a committee are *de*

11  *minimis*. And the reasonableness of those costs are going to

12  be subject to your review. I mean, I have to come in and

13  defend whatever those charges are. Were they reasonable,

14  weren't they reasonable. We don't just run up the meter.

15  We're already spent 63 million, $65 million on professionals

16  in this case. And I think to the Debtors' point, it's the

17  perfect time to create an equity committee. There is no way,

18  in fact it's laughable, to say that equity could come in at

19  the twelfth hour and review a settlement and make any

20  educated judgment. At this juncture, I hope, for 65 million,

21  much of the spade work has been done. We should enjoy the

22  benefit of that spade work and be able to make a

23  knowledgeable and intelligent decision and recommendation to

24  the Court of our view and assessment of the litigation. Now

25  what are the benefits? You know, I listened to the State of

1   the Union last night.  The President is accusing all the

2   financial institutions of causing the financial calamity that

3   we presently are experiencing.  Saying that the government

4   mishandled it.  The Debtor is arguing that one of the largest

5   financial institutions in the United States caused the

6   problems that it has, and is suing the government to recover

7   funds that it says were wrongfully taken.  I brought with me

8   nine binders of these books.  There were 35 hundred

9   shareholders who wrote the Trustee independently, who

10  organized themselves through a website, asking for the

11  creation of an equity committee.  19% of the preferred

12  holders asked for the creation of an equity committee.  More

13  than 100 million shares asked for the creation of an equity

14  committee.  They asked for a voice.  They asked for an

15  opportunity to be heard.  And I think Black Horse, the case

16  that Black Horse attached to their pleading from Judge

17  Robinson was instructive.  I mean, the Judge there said,

18  There are circumstances where the process is as important as

19  the ultimate outcome of the case.  The integrity of the

20  bankruptcy process rests in large measure on the committee

21  structure, a statutory creation that ensures presentation to

22  the Court of views adverse to, or at least different from

23  those of the Debtor.  In this case, if equity is denied

24  representation with billions of dollars at stake, and all of

25  the allegations of malfeasance, for the relatively

1    insignificant costs that would be incurred to give them that
2    voice, there's no settlement, there's no outcome that will
3    have any validity for the people who are sitting in this
4    courtroom or the 35 hundred people who wrote their, wrote to
5    the Trustee asking for representation. I mean, for that
6    reason, the Trustee made the right decision. The Trustee
7    decided they needed a voice in these cases, and that was an
8    appropriate exercise of discretion that should be supported
9    by the Court. Thank you.

10            THE COURT: Thank you.

11            MR. BIFFERATO: Good afternoon, Your Honor.

12            THE COURT: Good afternoon.

13            MR. BIFFERATO: Connor Bifferato on behalf of Black
14   Horse Capital. With me in the courtroom today, Your Honor,
15   is David Heroy of Baker & McKenzie. I have filed a motion
16   for admission *pro hac*, Your Honor. At this time, I'd ask
17   that Mr. Heroy be permitted to address the Court.

18            THE COURT: He will be heard.

19            MR. BIFFERATO: Thank you, Your Honor.

20            MR. HEROY: Thank you and good afternoon, Your
21   Honor. David Heroy from Baker & McKenzie on behalf of Black
22   Horse Capital. Black Horse is a holder in the preferred
23   issuances in this case. It's a holder in both what's known
24   as the hybrid preferreds and the regular preferreds, and I'll
25   circle back to that when I conclude. But hopefully I'll be

1    as brief as possible given the length of the argument so far,
2    and the time of the day.

3              THE COURT: Okay.

4              MR. HEROY: But let me first start with two items
5    that directly address issues that first Your Honor raised,
6    and secondly were mentioned in argument prior to my speaking.
7    Abuse of discretion.  Do we have a case where a court, a
8    reviewing court in the first instance, either a Bankruptcy
9    Court or a District Court in the years when District Courts
10   were hearing bankruptcies in the first instance, reviewed the
11   United States Trustee's decision to appoint a committee and
12   review it with a disbandment motion?  Well that case, is
13   attached to my, the pleading we filed, Your Honor.  And
14   that's the decision by former Chief Judge Robinson in the
15   Imperial Sugar case, known as Imperial Distributing.  And Mr.
16   Hodara knows this case well, because that was his motion on
17   behalf of an unsecured creditors committee to disband an
18   equity committee represented by me.  And there, Chief Judge
19   Robinson, then Chief Judge, decided at page 3 of the
20   decision, it's an abuse of discretion standard.  And she
21   denied the motion.  And I just thought that I should point
22   that out, although it's not directly relevant to our
23   particular relief we're seeking today, I think it directly
24   answers Your Honor's question on that point.

25             THE COURT: Thank you.

1          MR. HEROY: Secondly, the notion of adequate

2    representation of equity by an unsecured creditors committee.

3    I can't get into my argument before at least mentioning that,

4    because that issue also was brought up in the Imperial

5    Distributing case, as Mr. Hodara knows, and the fact is, as a

6    matter of law, the only fiduciary duties owed by a creditors

7    committee are to the class of creditors it represents.

8    That's axiomatic, it's black letter law under the Bankruptcy

9    Code.   Now in terms of the pleading we filed in the case, I

10   believe that Mr. Rosen accurately set forth what our position

11   is.   We're a holder in the preferred issues.   The preferred

12   issues are approximately $7.5 billion that stand between the

13   unsecured creditors return of Washington Mutual, the parent

14   company, and the common shareholders, who are largely

15   representing and dominating the Equity Committee that's been

16   appointed.   Our position is in the middle ground between what

17   is being urged by the Debtors in the various creditor groups

18   on the one hand, and by the US Trustee and the Equity

19   Committee on the other.

20          THE COURT: Well, do you agree that the abuse of

21   discretion standard applies to a motion or request to

22   reconstitute the committee?

23          MR. HEROY: Absolutely, Your Honor.

24          THE COURT: Okay.

25          MR. HEROY: It has to, I believe.

1           THE COURT: Okay.

2           MR. HEROY: And secondly, we agree that all of the

3   data indicates, and again, this is not an evidentiary

4   hearing, but all the data indicates that the common stock is

5   hopelessly insolvent. We do not disagree with the Debtors'

6   allegations in that regard, but we're not supplying Your

7   Honor with any further evidence or proof, etcetera, because

8   obviously we do not have the same access to this information

9   as do the creditor groups and the Debtors. So we agree as to

10  hopelessly insolvent, we agree as to the abuse of discretion

11  standard. Where we disagree is that we believe that this is

12  the perfect case for this Court to address whether

13  §1102(a)(4) of the Bankruptcy Code should be applied. And

14  the reason we asked for this is that we believe that since

15  the common is out of the money, and is hopelessly insolvent,

16  first of all the best justification for an equity committee,

17  is for it to be a preferred equity committee, and secondly,

18  to the extent common is on the committee, it's another

19  different interest and we would adopt the Debtors' interest

20  in that, arguments in that regard. Now §1102(a)(4) of the

21  Bankruptcy Code is relatively new. It was enacted to give

22  the Bankruptcy Courts this power precisely in the amendments

23  in 2005. There have only been two reported decisions that

24  even mention §1102(a)(4), neither one of them decided this

25  question. It was mentioned in the Pilgrim's Pride case, from

1   the Northern District of Texas. And it was mentioned in a
2   case called Kings River in 2007. But neither court addressed
3   this specific question. We do not know of any authority,
4   either published or unpublished, within the District of
5   Delaware or the 3ʳᵈ Circuit on this point. So we believe,
6   really, it's a question of first instance. Now why do I say
7   it's the perfect case for this? I think it's the perfect
8   case for this, Your Honor, because there is hopeless
9   insolvency as to one junior class, but not as to the other.
10  In the terminology that's commonly used in many of these
11  cases, investors look at the capital structure of an
12  insolvent business to determine which security is the fulcrum
13  security. The one that's just below the group that perhaps
14  is going to get paid in full but isn't going to get so much.
15  I don't think there's been a single dispute, a single
16  disagreement heard today, Your Honor, that the preferred is
17  the fulcrum security here. There is certainly a lot of
18  sympathy for 35 hundred shareholders who might be hopelessly
19  insolvent, but there's been no dispute on the numbers. That
20  the 7.5 billion of preferred come ahead of the shareholders.
21  Or that that is the fulcrum security. So what we have, Your
22  Honor, from the facts that have been put forth, and again,
23  it's not an evidentiary hearing, but we have some other
24  details that were in our motion that I would just like to
25  repeat and emphasize to the Court. Because the notion that

1   the creditors at the bank level, the debt is trading very low
2   means there shouldn't be an equity committee is, as we all
3   know, not really relevant in the absence of consolidation or
4   inter-corporate claims. What's really relevant is what's the
5   debt at the legal entity that we're talking about who's here
6   in this Court as a Chapter 11 Debtor. And there, the most
7   junior class of creditors, as we've alleged in our motion,
8   and I do, did not hear any response that's inconsistent with
9   it, trading 75, or I was told this morning, 79¢ on the
10  dollar. As we all know, that indicates an expectation of a
11  nearly full recovery. Secondly, based upon many of the
12  analyses and we included one in our papers, the indication is
13  that given the good job that Weil, Gotshal & Manges is doing,
14  and all the other lawyers, and the Creditors Committee, and
15  everybody else, in maximizing the estate, we believe the
16  recovery may be close to full. What does that mean for
17  adequate representation, which is really the legal question
18  before this Court? Let's first turn to Mr. Rosen's argument
19  the Debtor is adequately representing it. Well, with respect
20  to the maximization of the value of the assets in the estate,
21  I can't disagree with Mr. Rosen. They're trying, they're
22  maximizing the value of the estate. But Your Honor, we all
23  know that that is only one half of the bankruptcy equation.
24  The other half is who gets what out of that value that's
25  maximized. And that's where the equity, the preferred equity

1    in this case, is not being represented. And it's not being
2    represented in two ways. First of all, there's no entity
3    that has fiduciary duties solely to the preferred
4    shareholders who can act on behalf of the preferred in this
5    case, and secondly, within the preferred group, there's a
6    separate class of 4 billion in preferred that's subject to
7    one of the counts in the law suit that's been brought against
8    JPMorgan Chase and the FDIC, that may have slightly superior
9    rights to some of the collateral that this law suit also
10   seeks to recover. So within that 7.5 billion of preferred,
11   we've got additional rights of preferred, and they are not
12   being represented as to how much they might get out of this
13   pie that's being maximized. And I think, Your Honor, that
14   that really describes in detail what the nature of the
15   inadequate representation here is today. So Your Honor, as
16   we sit here, the relief that we're asking for is that this
17   Court apply 1102(a)(4) to reconstitute the committee so as to
18   be a preferred committee in recognition of the hopelessly
19   insolvent argument, but to preserve representation for the
20   equity. In the event that the recovery exceeds all that, an
21   order can be entered, or the US Trustee can monitor the
22   situation, either to enlarge the committee later, or to
23   appoint common members to it. That possibility is always
24   open. But at this time, with the preferred sitting on top of
25   the common for $7.5 billion, the preferred is really, as the

1    US Trustee has indicated, has some members on a committee,

2    the preferred is really not adequately represented.

3             THE COURT: What is the constituency of the

4    Committee? How many preferreds? How many common?

5             MR. HEROY: Your Honor, the US Trustee addressed

6    that briefly in its pleading, and I'm sure he's going to

7    address it. He said, well, it was said in the pleading that

8    four of the members hold preferreds. But again, the two

9    issues there are we don't know what preferreds. Because Your

10    Honor, it's, the labels are difficult in this case. There is

11    a class of preferred stock that's really debt. I was not

12    including that class in my definition of preferreds, but we

13    don't know whether those preferred issues, which are called

14    trust preferreds, are held by committee members or not.

15    Secondly, there's the disparity between the hybrid preferreds

16    and the real preferreds. And we do not believe that the

17    hybrid preferreds are represented at all, or at the most by

18    one member. But Your Honor, this goes to the objection that

19    the US Trustee filed, which is really the only objection to

20    the relief that we seek. The US Trustee first said it's an

21    abuse of discretion standard. Same question as the Court.

22    We agree. Secondly, as to the fact that preferred is

23    adequately represented because some members hold some

24    preferred, we do not know that to be the case. We've been

25    told otherwise, but of course, the facts are the facts, Your

1    Honor, and ultimately we believe the US Trustee and the

2    Committee representative can provide the Court with the

3    accurate facts. The final argument that the US Trustee made

4    with respect to the relief that we seek is he made a

5    procedural argument. That we're really asking for separate

6    relief, which should be brought by a separate motion, notice,

7    and a hearing, etcetera. Your Honor, we would just argue

8    that after a thorough review of the Local Rules, we believe

9    that filing a pleading in the form of an objection that

10   merely asks for different relief of the same nature sought by

11   the Debtor in its original pleading, does not require a

12   separate motion. But of course, we would be pleased to file

13   a separate motion should this Court require us to do so.

14             THE COURT: Thank you.

15             MR. HEROY: Now Your Honor, just a couple, just one

16   other point with respect to the fee cap argument. And this

17   is also another legal issue, that although it doesn't

18   directly relate to the relief we're seeking, I was involved

19   in the controlling 3rd Circuit precedent on that subject,

20   which is the Federal Mogul case at 348F.3d 390. And there

21   the 3rd Circuit reversed a decision by visiting Judge Newsome

22   as to the financial advisors to an equity committee, and

23   stated that although the Court had the power to impose a cap,

24   it could only be done based on a sufficient record,

25   evidentiary hearing as to the reasons for the cap. And in

1  terms of the actual business reasons for a cap, I believe

2  that those would be the subject of an evidentiary hearing,

3  and should not be controlled by merely representations of

4  counsel as then the author of the opinion, then Circuit Judge

5  Alito, now Mr. Justice Alito, said, The statements of counsel

6  shouldn't, shouldn't supply the record in that regard. So

7  Your Honor, in conclusion, as complicated as this case is,

8  and believe me as a newcomer to the case, it's extremely

9  complicated with a lot of parties, all I can submit to the

10  Court is we think that this is a fairly straightforward

11  question that we're raising. And that is that since the

12  existence of an equity committee is before the Court today,

13  on the abuse of discretion standard, whether this Court

14  should either grant the motion to disband, deny it, or

15  perhaps exercise its powers under §1102(a)(4), to

16  reconstitute it so that it, so that it consists of the

17  representatives of the class who are definitely not

18  hopelessly insolvent. And that's the relief we urge for this

19  Court. And thank you very much.

20          THE COURT: Thank you. Well am I going to hear from

21  the United States Trustee?

22          MR. CROSS: I'm just going to give a factual

23  statement, so that you can know.

24          THE COURT: Okay.

25          MR. CROSS: The Committee is composed of seven

1    members, six of whom are preferred shareholders.  None of
2    them hold the hybrid preferred.  None of them hold real debt
3    preferred.  We only have one committee member that owns just
4    common.

5                THE COURT:  Wait.  Tell me that again.  I'm sorry.
6                MR. CROSS:  Six of the seven committee members own
7    preferred shares.  Preferred R and Preferred K.  None of the
8    committee members own hybrid preferred.  None of the
9    Committee members own what was characterized as the real debt
10   preferred.

11               THE COURT:  Thank you.

12               MR. CROSS:  The US Trustee wanted me to point out.
13   Some of the six also own common shares.

14               THE COURT:  I see.

15               MR. McMAHON:  Your Honor, good evening.  Joseph
16   McMahon for the acting United States Trustee.  Your Honor,
17   the acting US Trustee acted well within her discretion in
18   appointing the Equity Committee.  And let's start there with
19   the standard of review.  This is very simple, in our view.
20   And it's gotten muddled by parties across the aisle from our
21   office in connection with this contested matter, but let me
22   put it simply.  1102(a)(1) gives our office the authority to
23   appoint additional committees of creditors and equity
24   security holders in addition to the standard official
25   committee of unsecured creditors.  1102(a)(2) gives a party

1  in interest a right to come to this Court to seek an
2  appointment of an official committee, if it's necessary to
3  ensure adequate representation of whatever class is sought to
4  be represented by such committee. Creditors or equity
5  security holders, again. The two cases that the, I'll call
6  them the disbanding parties harp on in support of their
7  request for a disbandment are either, A, factually
8  inapposite, or two, frankly just premised upon fallacious
9  reasoning. With respect to factually inapposite, Your Honor,
10 I will turn to the Williams case. Williams Communications.
11 What's different about that? Well, the party there came to
12 the US Trustee's Office, the US Trustee's Office decides not
13 to appoint a committee. So party comes to court under, not
14 under 1102(a)(1), our section, comes to court under
15 1102(a)(2), and seeks an appointment of such an official
16 committee from the court. So again, it's the 1102(a)(1)
17 1102(a)(2) distinction we make in our papers. It's very
18 simple. C'est la vie. With respect to the Texaco decision,
19 Your Honor, I would respectfully disagree with the Court's
20 reasoning there. On page 566 the Court seems to confuse what
21 §1102(a)(2) means insofar as review of US Trustee action
22 under 1102(a)(1). And let me read from the opinion. "There
23 is no requirement under §1102(a)(2) that an interested party
24 must first submit such a request" - - meaning a request for
25 appointment of an official committee - - "to the United