1   States Trustee." And here's where the jump is, Your Honor,
2   for my editorial. "Therefore, whether or not such a request
3   was first submitted to the United States Trustee, the Court
4   must arrive at its own judgement. Although the Court may
5   consider reasons advanced by the United States Trustee in the
6   event that such a request was previously submitted to the
7   United States Trustee." In other words, the fact that
8   1102(a)(2) exists as it's phrased, means that the Court has
9   carte blanche authority to, and excuse the sports analogy,
10  Monday morning quarter back the US Trustee's decision,
11  affirmative decisions to appoint a committee or otherwise
12  under 1102(a)(1). And with that, Your Honor, we couldn't
13  disagree more. In paragraph 6 of our response to the motion
14  to disband, we articulate what abuse of discretion means.
15  And to quote from that without citing to the cases, "Abuse of
16  discretion will be found if a decision maker acted in an
17  irrational, arbitrary, or capricious manner clearly contrary
18  to reason, and not justified by the evidence. A decision is
19  not arbitrary and capricious unless it is based on an
20  erroneous conclusion of law, a record devoid of evidence on
21  which the decision maker could rationally have based its
22  decision, or is otherwise patently unreasonable, arbitrary,
23  or fanciful." And turning now, Your Honor, to a general
24  observation with respect to what has transpired here today.
25  What you have heard amongst the parties on the one hand

1    supporting the Debtors' disbandment request, and on the other
2    hand supporting the United States Trustee's decision, is a
3    debate.  Essentially.  It has not been a, any, frankly, as I
4    sit here, accusation that the US Trustee acted arbitrarily or
5    capriciously.  Rather, it's been a debate about whether or
6    not under these circumstances, the home run scenarios
7    advanced by the Debtors mean that we should have acted,
8    whether the cost concerns raised by the Debtors, the
9    Committee, warrant complete disbandment of the Committee.
10   But we submit that the critical inquiry, Your Honor, is not
11   so much what these parties would have done in light of these
12   circumstances so much as whether our office acted, again, in
13   an arbitrary, capricious manner, abused its discretion.  And
14   turning to, primarily Your Honor, the Equity Committee's
15   presentation, the factual portion of it, we submit that it's
16   clear that what this decision was was not an abuse of
17   discretion.  It can be debated.  It certainly was here today.
18   Insofar as the parties having different views of whether or
19   not the, our office should have taken this action.  But Your
20   Honor, we are resolute.  We firmly believed that the equity
21   security holders, some of which are in the courtroom today,
22   should have a voice in this proceeding, and we share the
23   Equity Committee's view that the relative costs, viewed in
24   light of the fact that this is, I believe, the largest bank
25   failure in US history, the fact that there is a solvency

1 dispute at the, insofar as the upper levels of equity are

2 concerned. All of these facts weigh in favor of the exercise

3 of discretion that the US Trustee took. And therefore, we

4 ask this Court to find that the US Trustee did not abuse her

5 discretion in forming the Committee. I want to turn,

6 specifically, to Black Horse Capital Management's, this

7 request for a reconstitution.

8           THE COURT: Okay.

9           MR. McMAHON: In light of the factual statement that

10 Equity Committee counsel made with respect to the

11 constitution of the Committee, I'm just struggling, Your

12 Honor, with what I'm supposed to say in response. Six of the

13 seven members of the Committee hold preferred shares. I

14 didn't hear one argument made by counsel to Black Horse that

15 such a circumstance meant that, you know, his client's

16 interest was inadequately represented by this Committee.

17 Therefore, in the absence of, you know, such an argument, I,

18 you know, would respectfully request that this Court decline

19 Black Horse's request for relief. Unless the Court has any

20 questions for me with respect to either the motion to disband

21 or the reconstitution request, I would turn the podium over.

22           THE COURT: No. No questions. Thank you.

23           MR. McMAHON: Thank you.

24           THE COURT: Any replies?

25           MR. ROSEN: Yes, Your Honor. Very limited. Again

1  Your Honor, Brian Rosen, Weil, Gotshal & Manges on behalf of
2  the Debtors' estates. First Your Honor, I can't think of a
3  better advocate for our cause than Mr. McMahon, because the
4  cases he cites I believe that he just misinterprets them.
5  And I ask the Court to look at the Williams decision and the
6  Texaco decision. The cases he refers to, Your Honor, deal
7  with the composition of a committee, not as to the actual
8  formation of it. And the cases do cite and go to the de novo
9  and not the abuse of discretion standard. I appreciate that
10 he cited, Your Honor, what abuse of discretion means, but
11 that's not what is really at issue here. Your Honor, with
12 respect to Mr. Heroy's comments, and I accept that he is new
13 to the party, as he put it. But I don't think he understood
14 the math. Because when he came up with what he perceived to
15 be the fulcrum security, I think he got it wrong. He did
16 talk about $7½ billion of preferred stock, Your Honor. If
17 Your Honor would look at either the big board over there, or
18 page 7 of Exhibit 1, you'll see that we reflect a preferred
19 stock number of approximately $3.392 billion. You get to the
20 $7½ billion, Your Honor, if in fact the Debtors lose the
21 litigation with respect to the Retrust Preferred, as it's
22 referred to. And then that $4 billion all of a sudden
23 becomes a preferred stock instrument of the Debtors. But at
24 the same time, Your Honor, if you were to look at that page
25 7, you would see that there is a number of approximately $16

1   billion of retained earnings. That number would balloon up
2   by an additional 4 and you would have $4 billion more of
3   insolvency. So to accept Mr. Heroy's comment of 7½, you have
4   to assume Your Honor, that there's a loss in the litigation
5   and $4 billion worth of value is lost from the estate. Your
6   Honor, any way we look at it, we perceive the fulcrum
7   security to be the junior subordinated debt. We have, we
8   know we have, Your Honor, approximately $6.9 billion of
9   assets. If we were lucky enough to win the litigation, we
10  might have an increase of that, based upon our recovery from
11  the receivership. We know we currently have debt, Your
12  Honor, of 8.3 billion with 104 billion or at least $54
13  billion worth of disputed claims. We know that there are
14  untold amounts of unliquidated claims. I don't understand
15  how we can argue at this point in time that a fulcrum
16  security is the preferred stock. I am happy to finally learn
17  who is actually on this Committee. Previously we knew the
18  names, Your Honor. We asked Mr. McMahon what the composition
19  of the holdings were two weeks ago, he refused to even reply
20  to us. We asked the proposed counsel, and they were unable
21  to provide us with any answers at this time, either. So
22  we're happy to hear, Your Honor, that there are R and K
23  Preferred shareholders, but as we reflected, those are
24  trading at 7 and 9¢, I believe, respectively, Your Honor.
25  Clearly they believe that they are not going to seek a

1  recovery here. In opposition to what the so-called 71%
2  holder is, or trading one is, therefore he assumes he gets
3  100¢. I don't know how you make up that 29¢, Your Honor. We
4  believe that there's an insolvency here, Your Honor. We
5  believe everything that, about the adequate representation,
6  and we believe that we are going to do and continue to do
7  what we can to maximize the value and minimize the
8  liabilities. And if at the end of the day there is something
9  that were to trickle down to preferred and to common, that
10  would be a wonderful result, Your Honor. But at this point
11  in time, we do not see it.

12      MR. HEROY: Your Honor, may I just add one comment
13  about the facts?

14      THE COURT: Yes.

15      MR. HEROY: Both as related by counsel to the
16  Committee and as to Mr. Rosen. First of all, the difference
17  between the 7.5 and the 3.5 is the 4 billion of hybrids that
18  I mentioned earlier. And Mr., again, although I am new, I
19  think I do know enough to know that if you're successful,
20  those hybrids would share, pro rata, in a pool of home equity
21  loans that have a face value of 5 billion and are worth God
22  knows what. But certainly a significant amount of money. So
23  that the hybrid preferreds do have that extra incremental
24  value potential that I mentioned earlier and are entitled to
25  representation in this case. And then secondly, with respect

1  to the membership of the Committee currently, I just wanted
2  to add that from our perspective, when we filed the motion,
3  we were told that only one member held preferred. When the
4  US Trustee filed its papers a few days ago, that was up to
5  four holding preferred, after they read our papers. And now
6  they have six holders of preferred. I don't know what the
7  amounts are. Whether it's material, or significant, or
8  trading, but I think put together with Mr. Rosen's statement
9  about his inability to obtain information about the holdings
10  of the Equity Committee members, that perhaps a
11  reconstitution under 1102(a)(4) so as to include preferred,
12  might be appropriate. Thank you, Your Honor.

13          MR. McMAHON: Two very quick points, Your Honor.
14  With respect to the point made by counsel to Black Horse, our
15  papers in paragraph 6 said that a majority of the Equity
16  Committee's representatives hold preferred shares. I don't
17  see where we're getting the number four. Six of seven is a
18  majority. With respect to Debtors' counsels' point about,
19  you know, the Committee composition, I will say that, you
20  know, frankly while we appreciate Equity Committee's
21  counsel's presentation with respect to the composition of the
22  Committee, for today's purposes, Your Honor, it's only
23  relevant insofar as we're discussing Black Horse's piece.
24  Meaning that with respect to the disbandment request, it's
25  neither relevant nor reasonably calculated to lead to

1    discoverable or admissible evidence.   Thanks.

2         THE COURT: Thank you.  Well, let me issue my
3    ruling.  First on the appropriate standard.  I'm not sure the
4    United States Trustee is suggesting that the Court has no
5    power to review, but the US Trustee suggests that 1102(a)(2)
6    gives the United States Trustee authority to appoint
7    additional committees.  And I'll quote the language, because
8    I think it is significant as, excuse me, 1102(a)(1), as the
9    United States Trustee deems appropriate.  The Committee
10   argues that the Court has no power, therefore, to review that
11   appointment by the US Trustee.  And there is at least one
12   case that does suggest that.  The New Life Fellowship case.
13   But I disagree.  I think that to suggest that the Court has
14   no power to review that appointment, particularly where there
15   might be changed circumstances that affect that, I think the
16   Williams and the Texaco cases suggest that the Court does
17   have the power to review it.  While I don't agree with the
18   standard they suggest, I think that clearly the Court has to
19   have some power to review the US Trustee's decision in that
20   regard.  I think the standard of review, however, is not *de*
21   *novo*.  Clearly Congress did suggest that in the first
22   instance it would be the United States Trustee to make that
23   decision, and I think that if I have the power to review it,
24   it's clearly not within my power to substitute my judgment
25   for that of the United States Trustee.  So I do agree with

1  the Imperial decision and the Edison decision that it's an
2  abuse of discretion.  Whether reviewing under (a)(1) or the
3  other provisions of §1102.  I think that in this instance, we
4  all know what the standard is for abuse of discretion.
5  Whether the United States Trustee acted irrationally,
6  capriciously, or arbitrarily.  And I, quite frankly, cannot
7  find that on the record before me.  There is clearly evidence
8  both ways as to the insolvency of the Debtor.  And if the
9  Debtors' pleadings filed in this case are accepted, I think
10  the Debtor believes that it is not hopelessly insolvent.
11  That it has legitimate claims against others that would
12  result in there being sufficient funds in this estate to pay
13  all creditors in full.  I don't have to find that the Debtor
14  is going to win those.  I think the standard is not to make a
15  final determination as to whether the Debtor is insolvent,
16  just whether I can determine that the Debtor is hopelessly
17  insolvent.  And again, on this record, I cannot find that.  I
18  think the evidence that the debt and equity in this case are
19  still trading, at any number, establishes that at least the
20  market thinks that the Debtor is not hopelessly insolvent.
21  With respect to whether there's adequate protection of the
22  interests of the Equity Committee, excuse me, the equity
23  holders, which is the other prong of a determination of
24  whether or not the decision was inappropriate.  I think that
25  certainly falls in favor of the equity.  While the Debtor

1    clearly is representing all constituents in this case, and
2    fulfilling its fiduciary duty, I think that the fact that we
3    have §1102 in the Code makes it clear that there are
4    instances where other parties have a right to be, have a
5    right to have a place at the table. And the US Trustee has
6    made a determination that the equity should be present, and I
7    don't think they're wrong. Even if I were reviewing this
8    under a *de novo* review. I think that at this point it is
9    appropriate to have the equity represented in this case.
10   With respect to Black Horse Capital's request that I
11   reconstitute it, I won't make them go through the motions of
12   filing a separate motion, because I think that under this
13   case, I think there's certainly sufficient representation of
14   the preferreds on the existing Equity Committee, that no
15   reconstitution need be done. So I don't think they've met
16   the 1102(a)(4) standard, even had they filed a motion. So I
17   will deny the Debtors' motion and I will deny Black Horse
18   Capital's - -

19             MR. ROSEN: Your Honor?

20             THE COURT: - - request in its response.

21             MR. ROSEN: Your Honor, not that I'm glutton here,
22   but we did file alternative relief.

23             THE COURT: Ah. Thank you. I do have comments on
24   that. With respect to the issue of capping the fees, I've
25   been instructed that I can't cap fees without a full

1  evidentiary hearing, and I'm not, I am not prepared today to
2  impose a cap under the Federal Mogul case. But I think it's
3  clear that I do have the power to monitor the case, and that
4  power can be exercised in two ways. First with respect to
5  any retention applications that are filed by the Equity
6  Committee. And if professionals are appointed, my power to
7  review the fee applications, I think gives me sufficient
8  power to assure that, I'll use a colloquialism, they don't
9  run amuck. I think the parties certainly have heard the
10  arguments as to what the role of the Equity Committee is in
11  this case, and I have not heard anything from counsel for the
12  Equity Committee that they don't understand their role here.
13  So with that said, I will not grant the alternative relief of
14  capping the fees. But will exercise my authority with
15  respect to retention applications and fee applications. All
16  right. The Debtor will get me a form of order?

17        MR. ROSEN: We will, Your Honor.

18        THE COURT: Okay.

19        MR. ROSEN: Your Honor, I know that there are many
20  people in the courtroom who came for this motion just now.
21  Perhaps - -

22        THE COURT: Let's take a short break and then we'll
23  go on with the remainder of the agenda.

24        MR. ROSEN: Thank you, Your Honor.

25        (Whereupon at 5:33 p.m. a recess was taken in the

1    hearing in this matter.)

2         (Whereupon at 5:49 p.m. the hearing in this matter

3    reconvened and the following proceedings were had:)

4              THE CLERK: All rise.  Please be seated.

5              THE COURT: Okay.

6              MR. ROSEN: Your Honor, there are two items that are

7    left on the agenda for this afternoon.  I would ask, Your

8    Honor, because we have some third parties that we might be

9    able to excuse, that we take them, perhaps, out of order as

10   they are reflected on the agenda.

11             THE COURT: Okay.

12             MR. ROSEN: And if we could, Your Honor, take the

13   Debtors' motion first with respect to Rule 2004.

14             THE COURT: What number is that?

15             MR. ROSEN: I believe it's item number 14 on the

16   agenda.

17             THE COURT: Okay.

18             MR. ROSEN: And I will turn the podium over to Quinn

19   Emanuel.

20             MS. TAGGART: Good afternoon, Your Honor.  Erica

21   Taggart with Quinn Emanuel on behalf of the Debtors.  In this

22   motion, Debtors seek an order authorizing the Court to issue

23   subpoenas for documents and testimony for certain third

24   parties in connection with the same Rule 2004 investigation

25   the Court has already approved.  Specifically our

1    investigation into potential business tort claims against

2    JPMorgan.  Before I turn to the substance, there was a filing

3    that Debtors made related to this earlier today, and my guess

4    is it hasn't come up to Your Honor yet.  If I may approach?

5              THE COURT:  What is it?

6              MS. TAGGART:  We did a revision to the proposed

7    order.  More specifically, in response to some third parties,

8    we wanted to make it clear that the Court today would only be

9    issuing the subpoenas and that those parties could still

10   object to the specific requests in the normal course, and it

11   sets out a very standard schedule for it will be 30 days to

12   give objections and responses and some timing for production.

13             THE COURT:  All right.  It wasn't included.  It was

14   mentioned on the amended agenda, but I didn't get it.

15             MS. TAGGART:  May I approach to give you copies?

16             THE COURT:  You may.  Thank you.

17             MS. TAGGART:  And that, Your Honor, the first one is

18   a clean proposed order, and the other one shows the red line

19   from the previous proposed order.

20             THE COURT:  All right.  Since you've withdrawn this

21   as to some of the third parties, do you want to tell me who

22   you're still seeking this relief against?

23             MS. TAGGART:  Yes.  I believe still in are primarily

24   the FDIC, both in its receiver and corporate capacity.  There

25   are a few others that have objected primarily only to

1  preserve their right to make objections in the future. And
2  then the SEC and David Horn have objected on the basis that
3  they do not have any relevant documents. I'll also note that
4  in their objection, S&P and the Federal HomeLoan Bank of San
5  Francisco said that they joined in the FDIC's objections.
6  But Your Honor is correct that most of the entities and
7  individuals that we originally sought have been resolved
8  through some meet and confer process and a voluntary
9  production.

10           THE COURT: Okay.

11           MS. TAGGART: So turning to the substance of the
12  motion, as Your Honor may recall in June, 2009, Your Honor
13  granted Debtors' request for a 2004 investigation of JPMorgan
14  Chase about potential business torts whereby JPMorgan
15  attempted to drive down the value of Washington Mutual to
16  enable it to acquire Washington Mutual Bank's assets out of
17  receivership at a fire sale price. Since that time, JPMorgan
18  has produced numerous documents. It has not completed its
19  production, including it has not produced a number of
20  documents related to its correspondence with third parties.
21  And I think that was subject to a confidentiality order. And
22  we have not done depositions. Nevertheless, from the
23  documents that have been produced, it is clear that JPMorgan
24  had correspondence with a number of third party entities
25  about Washington Mutual that are relevant to investigating

1   these potential claims.  Those entities including rating
2   agencies and many regulators.  Although our initial motion
3   was directed at 20 entities and individuals, as I mentioned,
4   most of them no longer object to the issuance of subpoenas,
5   although they have reserved the right to say that specific
6   requests are too burdensome or too broad.  Specifically,
7   there are five entities that have reached agreement after
8   filing the motion at, that they will produce some narrowed
9   subset of documents.  Those include the Federal Reserve, the
10  Department of Treasury, Moodys, and others.  Three entities
11  reserve their rights to object to production, but do not
12  object to the issuance of subpoenas, which is all that we
13  were requesting today.  Those include Wells Fargo and TD
14  Bank.  Five entities did not object in any way to the motion,
15  including Banco Santander and Goldman Sachs.  And it's worth
16  noting that there were another ten entities that reached
17  agreement with the Debtors even before we filed the motion,
18  and they have agreed to voluntary production as requested in
19  full to the extent they have those documents.  So let me turn
20  to the remaining objections.  I think two of them should be
21  somewhat quickly disposed of.  Those are the objections from
22  the SEC and a lobbyist named David Horn.  Both of those
23  parties objected on the basis that they don't have any
24  relevant documents.  I would suggest that this is the sort of
25  objection that can take place after the subpoena is issued.

1  We will work with those entities, and if in fact they have no
2  responsive documents, they will not have to produce any
3  documents.  The main objection that was filed was by the
4  FDIC.  They filed both in their corporate and receiver
5  capacity.  But most of the substantive objections were in the
6  receivership's objection.  And as I noted, two parties, S&P
7  and FHLB San Francisco joined in those objections.  The FDIC
8  really makes four object, reasons to object, and I'd like to
9  briefly address each of them.  The first is FDIC says that
10 this discovery is so related to the DC case that discovery
11 should be taken in that DC case rather than in this 2004
12 investigation.  And with all due respect, this issue in
13 particular has already been addressed by Your Honor in
14 connection with the initial request for the 2004
15 investigation, because JPMorgan at the time made that very
16 same argument.  And in the Court's order granting the Rule
17 2004 discovery, the Court held that the business tort claims
18 that were being investigated were sufficiently distinct from
19 the DC action that discovery should go forward here.  And in
20 particular, it's the Court's June 24th opinion, at page 17,
21 note 14, that has a paragraph explaining the distinctions.
22 But I'll just quote two sentences where the Court says, "The
23 Debtors seek to discover evidence regarding JPM's alleged
24 malfeasance prior to the seizure and sale of WMB."  And
25 later, "The requested 2004 examination does not seek

1  discovery evidence related to the hypothetical liquidation
2  analysis that is implicated in the dissipation and takings
3  causes of action asserted in the DC action." So the Court
4  has already determined in going forward with this 2004
5  investigation that this is the right place for that to be.
6  Furthermore, even setting aside the fact that the claims in
7  DC are distinct, it's worth noting that that case is stayed.
8  And so it is not an avenue of discovery right now. And in
9  particular, as the Bankruptcy Court held in in re:
10  International Fibercom, Inc., that's at 283B.R. 290, the
11  pending proceeding rule that sometimes makes discovery not go
12  forward in a 2004 action and instead in a pending proceeding
13  doesn't apply when another proceeding is stayed. The second
14  argument that the FDIC makes is that it is an unnecessary
15  burden. And in particular for Federal regulatory agencies,
16  because it takes away from their important regulatory job.
17  Now to the extent that the FDIC is making an objection to any
18  specific request that it is too burdened to comply with, that
19  is the sort of objection that can be addressed after the
20  subpoenas are issued. And as we have with many of the other
21  parties, we can try to reach the appropriate compromise that
22  gets to the most relevant evidence in an attempt to reduce
23  the burden. But as far as the general proposition that there
24  should not be discovery against the FDIC because they are a
25  regulator, that is not a proper basis not to issue the

1    subpoena here.  For one thing, 2004 examinations are
2    routinely expanded to third parties, and especially ones that
3    have a very close connection to the Debtor, and that might
4    have evidence that's related to the Debtors' estate.  This
5    discovery is especially appropriate for the FDIC.  After all,
6    the potential business tort claims that are under
7    investigation concern whether JPMorgan used its confidential
8    information about Washington Mutual to receive an unfair
9    preference in the FDIC's own bid process for Washington
10   Mutual.  We also have significant evidence from even the
11   documents so far produced that the FDIC does have relevant
12   information.  Those documents show that JPMorgan has been in
13   correspondence with the FDIC as early as the Spring of 2008,
14   before it engaged in negotiations with Washington Mutual,
15   where it received the confidential information.  And all the
16   way up leading to the bid process.  Those documents include
17   correspondence prior to the bid process going public, and
18   also include information where the FDIC modified its standard
19   indemnification agreement for this very case, to provide
20   additional indemnity to JPMorgan for potential claims that
21   WMI might bring against it for violating WMI's
22   confidentiality agreement.  Thus the FDIC is at the heart of
23   the potential claims against JPMorgan, and so the relevance
24   of its discovery outweighs the burden here.  Also, there is a
25   practical reason that we believe the FDIC might not have the,

1  a burden that it might otherwise have. And that is, as the
2  FDIC-Corporate explains in its objection, it's currently
3  responding to a Congressional subpoena from the permanent
4  subcommittee on investigations. And as part of that, it is
5  collecting documents which we believe are an even broader
6  group of documents relating to Washington Mutual. And it is
7  our belief that the documents we request are mostly in a
8  subset of what is gathered in that production. So it is our
9  hope that the burden that is generally associated with
10 searching and collecting those documents, might largely have
11 been done, at least for the FDIC-Corporate. The third
12 argument that FDIC makes is that the Debtors should just go
13 ahead and file their business tort claims. And begin a case
14 right now. Or intervene in the pending American National
15 case, which is dealing with these business torts. But the
16 whole point of 2004 investigations, and as Your Honor found
17 in allowing this investigation, was for Debtors to
18 investigate the facts before, to see if those facts support
19 the theories that were outlined in the American National
20 complaint. Debtors don't have to decide whether to pursue
21 claims because other litigants have asserted them, and the
22 2004 mechanism is the way to look at those facts and
23 determine whether those claims exist. Also, Debtors are
24 entitled to continue their investigation before filing those
25 claims. And that investigation has not concluded. It

1 hasn't, just from what is already authorized, we have not yet
2 taken depositions of JPMorgan, and they have not produced a
3 number of documents with correspondence with third parties.
4 There's obviously documents coming in now from all the third
5 parties who agreed voluntarily to produce in response to
6 these requests. So Debtors are doing exactly what Rule 2004
7 contemplated. It's conducting an investigation into
8 potential claims before it has to make the decision whether
9 those facts support an actual lawsuit. The final argument
10 that the FDIC makes is that, and this was more on the FDIC-
11 Corporate, that the Debtors should first exhaust
12 administrative procedures. Now the Debtors have already
13 filed the appropriate administrative procedures. And there's
14 been over a month and a half since that happened. Without
15 the FDIC giving any formal response to those, or indicating
16 in any way that it would produce documents in response to
17 them. So as a practical matter, we have fulfilled the FOIA
18 requirements and the regulation requirements that are set out
19 in the cases referred to as the Tuey (phonetic) requests.
20 But to the extent that they are going to produce those
21 documents at some time in the future, there's no harm in
22 issuing the subpoenas and they will be fulfilled for both.
23 But there's no reason to wait until there is a more official
24 rejection. Especially since in the case of FOIA, the timing
25 that they were supposed to comply has already elapsed.

1    Moreover, administrative regulations do not take the place of

2    the Federal Rules guiding discovery in civil cases, and this

3    was set out in, for example, the Exxon Shipping Co. case at

4    34F.3d 774, saying that District Courts should apply the

5    Federal Rules of Discovery when deciding on discovery

6    requests made against government agencies. And this is also

7    referred to in the CFR regulations which will talk about, for

8    example 12 CFR 309.5, how classification of records from

9    disclosures should not be construed as authority to withhold

10   the record if it's otherwise subject to a directive or order

11   from any court of competent jurisdiction. So that is not a

12   reason why the subpoena should not issue here. Thus, in

13   conclusion, Debtors ask this Court to issue the subpoenas for

14   the few remaining entities so it can obtain the discovery it

15   needs to assess the potential tort claims against JPMorgan.

16   Those entities will continue to have the right to object to

17   the specific requests in the normal course, and we'll work

18   with them on the proper scope. But the subpoenas are proper,

19   and they're necessary for a full investigation that's

20   permitted under Rule 2004. Thank you.

21            THE COURT: Any replies?

22            MR. CLARKE: Good evening, Your Honor. John Clarke

23   from DLA Piper, representing the FDIC as receiver. As the

24   court undoubtedly is aware, we don't represent the FDIC in

25   its corporate capacity, but I do want to just make one

1   factual point that I do think deserves a response from Ms.
2   Taggart's comments.  Which is that I think Ms. Taggart
3   asserted that the FDIC in its corporate capacity had given no
4   indication as to whether it would be willing to produce
5   documents in response to the Debtors' Tuey request.  And
6   whether or not there has been a response to the Debtors' Tuey
7   request.  I found that factual assertion somewhat surprising,
8   since I'm aware of ongoing discussions between FDIC in its
9   corporate capacity and Ms. Taggart and her partners about
10  documents that the FDIC-Corporate might be willing to
11  produce.  Having clarified that, I have only a few comments
12  to make in response to the motion.  First, the Debtors have
13  never addressed the balancing test that Courts have
14  recognized for whether or not an order should be issued
15  allowing examination under Rule 2004.  That balancing test is
16  an appropriate subject of examination here, because the
17  Debtors repeatedly acknowledge that the discovery that they
18  are seeking, and Ms. Taggart said it again today, does not
19  relate to potential claims against the third parties that
20  they're seeking discovery from.  Including the FDIC receiver.
21  It relates to claims against JPMorgan Chase.  If there are
22  such claims.  Now that balancing test, Your Honor, requires
23  that the party seeking the discovery so that the discovery is
24  necessary to the establishment of the moving party's claim,
25  and to show that denial of production of the requested

1 discovery would cause undue hardship. Neither showing has

2 been made with respect to the FDIC-Receiver here. The

3 Debtors have made no effort in their motion to show that

4 there is any discovery that the FDIC receiver could produce,

5 in response to these proposed requests, that would materially

6 add to their proposed business tort claim and breach of

7 contract claim against JPMorgan. They already have 30

8 thousand pages of documents from JPMorgan. The plaintiffs in

9 the American National case have been litigating their claims,

10 which are the predicate for this motion for a year having not

11 even had that 30 thousand pages of documents. The Debtor

12 said today that they have successfully negotiated the

13 production of various documents from other third parties,

14 which includes the Office of Thrift Supervision, the Federal

15 Reserve Board of Governors, the US Department of the

16 Treasury. In fact the only people left, pretty much, are the

17 two people that the Debtors are actively in litigation with,

18 Federal Deposit Insurance Corporation as receiver, and the

19 Federal Deposit Insurance Corporation in its corporate

20 capacity. Against both of whom the Debtors have a pending

21 case in the United States District Court for the District of

22 Columbia. Now Ms. Taggart said, Well, but the case is

23 stayed. It's the Debtors who asked for that stay, Your

24 Honor. And they were granted it. The Debtors brought that

25 case, and then they asked the District Court to stay that

1  case so they could come litigate issues in this case.  Judge
2  Collier in her stay decision, the Court has undoubtedly seen
3  it, recognized that there are issues in that case over which
4  that Court has exclusive jurisdiction, but expressed concerns
5  about judicial comity, and decided to stay the case while
6  these proceedings were pending.  That does not give the
7  Debtors license to immediately turn around, and in the form
8  of a Rule 2004 request seek discovery related to the case
9  that they stayed from the very party that they're purporting
10 to sue there.  The International Fibercom case that Ms.
11 Taggart pointed the Court to was not on anything like the
12 similar facts.  The case involved a motion to take Rule 2004
13 discovery by a subrogee of a debtor against a party that was
14 in litigation separately.  But it was also in bankruptcy, so
15 it had an automatic stay.  And in those circumstances, the
16 Court said, Well, since there's an automatic stay in that
17 other litigation, we'll let you do the Rule 2004 discovery in
18 this case.  That's nothing like this case where the Debtors
19 started a case against our client, and then asked the Court
20 to stay that case.  And then came back to this Court and
21 tried to conduct discovery against us here.  With respect to
22 relatedness, Your Honor.  We read your, the Court's decision
23 on June 24ᵗʰ differently than the Debtor.  We recognized in
24 our objection that the Court mentioned in a footnote the
25 relatedness point.  However, my reading of the decision, and

1    I know there's one person in the court who knows the right
2    answer, and I defer to that. But my reading of the decision
3    is that that foot note is dicta. Because on the preceding
4    page, the Court said, Relatedness is not relevant, because
5    JPMorgan is not a party to that case. And therefore, I
6    can't, I can't deny Rule 2004 discovery merely on the basis
7    that JPMorgan has sought to intervene in that case. Now a
8    lot of stuff has happened since June 24th, undoubtedly, in
9    this litigation. One of the things that happened is since
10   then Judge Collier did allow JPMorgan to intervene in that
11   case. But at the time of the June 24th decision, that
12   decision had not been made yet. And JPMorgan was a proposed
13   intervener at that time only. And that was the basis for the
14   Court's determination on the relatedness point. Now there is
15   the footnote about relatedness. And the Court made the
16   observation that it made. However, the Debtors arguments in
17   this, in the DC case since this Court's decision, demonstrate
18   that the claims they are seeking to pursue against the FDIC
19   there are exactly the same subject as they're seeking Rule
20   2004 discovery from the FDIC here. In an argument on
21   November 4th with respect to motions to dismiss certain of
22   their claims in the DC case, Mr. Rosen's partner told Judge
23   Collier, quote, "You can't have a situation where the
24   government decides, because it would like to see improvement
25   to the balance sheet of an acquiring institution, that they

1   simply hand over the keys to the failed bank and say, You

2   know what?  You guys take it.  We don't have to worry about

3   it, because we're immune from lawsuit.  Nobody will sue us

4   for breach of any duty to maximize the value of those assets.

5   Depositors will get satisfied.  They'll bolster the balance

6   sheet of the acquiring bank, and everyone who's left behind,

7   the creditors and shareholders of the failed bank, they don't

8   have any remedy except to file their proof of claim through

9   the administrative process, etcetera."  Your Honor, the

10  claims in Washington, and the Rule 2004 discovery here are

11  the same.  They might be crafted carefully with this argument

12  in mind, but they are undoubtedly overlapping.  And this

13  Court, itself, recognized on June 24th that Rule 2004 is not

14  appropriate where a Debtor would get - - let me see if I can

15  find the exact wording so I don't state it wrong.  Where the

16  party requesting a Rule 2004 examination could benefit their

17  pending litigation outside of the Bankruptcy Court against

18  the proposed Rule 2004 examinee.  That's what this Court said

19  on June 24th, quoting in re: Enron Corp., 281B.R. 836.

20  Unquestionably, this discovery could benefit the Debtors.

21  And they should go through the normal party discovery process

22  with us.  If that process is a problem because they got a

23  stay of their case, that's a strategic decision that the

24  Debtor made.  The Debtors made.  The FDIC should not bear the

25  burden of that.  And I'd like to make one more point, which

1    is that less than 36 hours ago, I was on the phone with

2    Debtors' counsel discussing our objections and responses to

3    their party discovery request in these adversary proceedings.

4    In this court.  Which ask for the same materials.  And we

5    were in the middle of discussing what we will give, and what

6    we think is inappropriate because it relates to DC, and how

7    we can narrow the scope of those requests, and hopefully

8    we'll be able to come to some agreement on that.  But

9    granting this Rule 2004 motion with respect to the FDIC is

10   not the way to go.  We're parties, we'll do party discovery

11   with all the rights and obligations that accompany that.  So

12   therefore, Your Honor, we object to the motion.

13            THE COURT: Thank you.

14            MR. GECK (Telephonic): Your Honor, Duane Geck for

15   the Federal HomeLoan Bank of San Francisco.  Please advise

16   when you'd like to receive telephone appearances.

17            THE COURT: All right.  I'll hear from you.  Do you

18   wish to be heard on the motion?

19            MR. GECK (Telephonic): Yes I do, Your Honor.

20   Again, Duane Geck for the Federal HomeLoan Bank of San

21   Francisco.  One, first one clarifier.  The Federal HomeLoan

22   Bank of San Francisco did not file a joinder with the FDIC

23   receiver as identified by Ms. Taggart before.

24            THE COURT: Okay.

25            MR. GECK (Telephonic): The Federal HomeLoan Bank is

1    a lender that makes loans to its member banks.  Washington

2    Mutual Bank of Henderson, Nevada was a member bank and a

3    borrower form the Federal HomeLoan Bank of San Francisco.

4    The Federal HomeLoan Bank of San Francisco is a third party

5    with no stake in this proceeding.  It has no relationship

6    with the Debtor entities, it has no claim in the Bankruptcy

7    case, it's not a creditor.  The Federal HomeLoan Bank of San

8    Francisco files its response simply because it is concerned

9    with the breadth of the subpoena requested.  The Debtor filed

10   the motion for its 2004 examination because it's

11   investigating, as we understand it, JPMorgan Chase's alleged

12   malfeasance prior to the seizure and sale of Washington

13   Mutual Bank.  Nonetheless, the Debtor seeks documents from

14   the Federal HomeLoan Bank of San Francisco far beyond this

15   purpose.  Including all documents concerning Washington

16   Mutual Bank's participation as a member bank.  And all

17   documents concerning the Federal HomeLoan Bank's of San

18   Francisco's decision to lend or not lend funds to Washington

19   Mutual Bank.  Now these objections to breadth may be

20   addressed at a later point in time, but given the

21   overwhelming breadth of them for a unrelated third party, the

22   Federal HomeLoan Bank of San Francisco felt compelled to

23   bring these issues to the Court's attention at this early

24   stage.  Thank you, Your Honor.

25               THE COURT: Thank you.  Anybody else wish to be

1  heard? Yes.

2      MR. SOLONSKY: Kevin Solonsky on behalf of the

3  Securities & Exchange Commission. I'll be very brief. And I

4  just have three points here. First, I'd like to state that

5  in terms of our response to the motion, we'd basically like

6  to rest on our response to the motion. But there's been

7  absolutely no indication in any of the papers of Debtors that

8  the SEC has any, has any documents that have any relationship

9  to Debtors' claim. That's the first point. The second point

10  is in their reply in support of their motion, they state in

11  footnote 8 on page 14 that the SEC makes the internally

12  inconsistent objection that there is no basis to expect that

13  it possesses responsive documents and that Debtors' Rule 2004

14  discovery requests are nevertheless unduly burdensome. I

15  just wanted to point out that we do not believe that those

16  are internally inconsistent statements. We believe that we

17  do not have any documents that are responsive, and that are,

18  or that are relevant to their lawsuit, but at the same time,

19  their document request, or their proposed subpoena, would

20  request an unduly burdensome amount of documents from the

21  SEC. For example, it requests all documents that are related

22  to any type of regulatory action regarding Debtors,

23  Washington Mutual, or, and it could potentially request any

24  and all documents relating to any investigations we have

25  concerning Washington Mutual or JPMorgan as well. And at any

1   one time, we do always have many regulatory actions, and
2   there are always all types of investigatory actions we have
3   that have absolutely nothing to do with Debtors' potential
4   claims.  Then the third thing is that they request documents
5   concerning an order that we issued in 2008 banning the sale,
6   short sales in Washington Mutual.  And that had nothing to do
7   with, or as far as we can tell, their potential actions that
8   they have.  And in fact, they were just one bank of over 700
9   banks who here listed on that order.  And then they state,
10  Well, that, that we, that there's relevance because in an
11  earlier order they were excluded from that order.  And a few
12  months earlier, there was a ban also on short selling, an
13  order, emergency order issued against Fannie Mae, Freddie Mac
14  and 17 other institutions.  And Debtors state that, you know,
15  it's relevant that we get documents concerning that, because
16  they were left out of that order.  But that order was just
17  issued against the short sale of securities in particular
18  institutions.  And those institutions were the primary
19  dealers of US Treasuries.  And they didn't fall into that
20  category.  So there was no really relevance concerning
21  Washington Mutual in either the first or second order.  And
22  other than that, we'd like to rest on our papers.  Thank you.
23          THE COURT: Thank you.
24          MR. RILEY: Good evening, Your Honor.  Richard Riley
25  from Duane Morris on behalf of Toronto-Dominion Bank and TD

1   Bank.  I just wanted to clarify that we had reached an

2   agreement with the Debtors on the timing and the scope of a

3   subpoena to the banks.  So we no longer have an objection to

4   the motion, as long as the revised proposed form of order

5   which was handed up to you is the last order that I saw.

6          THE COURT:  Okay.  Anybody else?  Any reply by the

7   Debtors?

8          MS. TAGGART:  Yes.  I'll try to take it in order

9   briefly.  Mr. Clarke's first argument of the FDIC was that

10  the FDIC-Corporate is responding to the Tuey requests in that

11  they are speaking with Debtors.  Certainly we will continue

12  to speak with them to try to come up with the right scope

13  that fits FDIC-Corporate.  My point was that there isn't any

14  time that they say they're going to give some sort of

15  official either production or response, after which we should

16  come back and the motion becomes ripe.  They have had the

17  administrative requests and so far have not produced

18  documents.  And the fact that they are working with us is not

19  a reason not to issue the subpoena now.  Second, he says that

20  under the balancing test, the discovery is not proper against

21  the FDIC in particular, because we have so much other

22  discovery there.  But there is discovery that the FDIC, and

23  documents that the FDIC has that are not going to be

24  available for, through anyone else.  First of all, as a

25  matter of fact, JPMorgan is not yet producing the

1  correspondence that it has with FDIC.  It is making

2  confidentiality objections that I hope are going to be

3  resolved now that there's a confidentiality order.  But at

4  any rate, coming up with the FDIC's decision to be speaking

5  with JPMorgan, what confidential information it may or may

6  not have received, how that affected its decision, and why it

7  entered into that very strange change to its indemnification

8  are all – –

9          THE COURT:  Let me interrupt you here, because what

10 I authorized you to pursue are claims against JPMC on a

11 business tort.

12         MS. TAGGART:  Yes.

13         THE COURT:  What possible relevance is there of the

14 FDIC's actions taken, and what they were thinking?  I think

15 that's what you're suggesting is relevant here.

16         MS. TAGGART:  Yes.  Absolutely.  First, what did

17 JPMorgan tell the FDIC in its long discussions coming up to

18 the bid process?  For example – –

19         THE COURT:  That's not what you were suggesting, you

20 were asking for, as I read here.

21         MS. TAGGART:  You mean in the scope of the request?

22         THE COURT:  The scope of the requests and what you

23 just referred to as what you're looking for.

24         MS. TAGGART:  We are definitely, and to be clear,

25 looking for documents that relate to business tort claims

1  against JPMorgan. We - -

2       THE COURT: Well, you say that.

3       MS. TAGGART: We believe that JPMC might have that.
4  For example, FDIC may have documents and correspondence with
5  JPMorgan that JPMOrgan says, We, for example, We have given
6  away a lot of confidential information. And we think that we
7  are now having a tort maybe against Washington Mutual. Can
8  you please indemnify us for that. The fact that there is
9  that indemnification suggests there was some concern, and
10 that concern was shared with the FDIC. Also, the price that
11 was taken as part of the damages that we would be seeking in
12 any of our tort claims. How come that price was so much
13 lower than we believe Washington Mutual was worth. And how
14 much of that was affected by the fact that perhaps there
15 weren't other bidders, due to the fact that we believe
16 JPMorgan was speaking to other bidders to dissuade them. For
17 the fact that they have shared confidential information that
18 brought down the value. So we do want to find out how much
19 all of those factors went into the bid price that ultimately
20 became what JPMorgan paid, and we believe was what we've
21 described as a fire sale price. But you're right. We are
22 not looking, in this case, to any conduct about the FDIC or
23 tort claims against them. But they still may have relevant
24 evidence.

25       THE COURT: Really? Well, look at your request for

1    production of documents.  Other than paragraph 2, which I

2    think deal with communications with and among JPMC, the FDIC,

3    etcetera.  I mean, aren't all the rest of them relating to

4    potential claims you may have against the FDIC?

5            MS. TAGGART: I don't think that's the case.  I will

6    bring up the document request.  Its correspondence with

7    JPMorgan is, correspondence with JPMorgan is obviously going

8    to be relevant to what JPMorgan is communicating with them.

9    The setting of the price is going to be relevant to the

10   extent that JPMorgan's torts, either in disclosing

11   confidential information, driving down - -

12           THE COURT: Do you need that information now?

13           MS. TAGGART: I'm sorry.  Say that again?

14           THE COURT: In determining whether you have a claim

15   against JPMC.  That goes to damages.

16           MS. TAGGART: That goes, how they set the price

17   could go to damages.  But also could go to, and the fact that

18   they had a price that was so low that they let JPMorgan be

19   the first bidder, and arguably not the full public process.

20   What was the reason behind that?  And whether that was

21   because of torts that were committed by JPMorgan.  So those

22   documents would be relevant.  To the extent that Your Honor

23   looks at certain requests, as have most of the parties, and

24   said, Well, for us in particular we think that this is too

25   broad, we would be willing to work with the FDIC, as we have

1   with a number of entities, to more narrowly tailor it. But
2   we are seeking, we think that the FDIC has documents that are
3   going to be relevant to the business tort claims. I, if I
4   may turn now to the FDIC's argument again that this is, too,
5   related to the DC case, I think Your Honor has its order, and
6   it is true that in the text of the order, the first reason
7   that Your Honor said it did not overlap with DC was because
8   JPMC was not a party. But it clearly, in the footnote, you
9   do say with respect to those business tort claims, even if
10  JPM successfully intervened in the DC action, the requested
11  2004 examination does not seek to discover evidence related
12  to the DC action. And for the same reason I just explained,
13  the tort claims that we are looking to are against JPMorgan.
14  And those are in no way part of our DC case. In fact, the
15  part of the transcript that he read was more about what the
16  FDIC, and whether it, knowing that it was insulated by its
17  claims process, decided for whatever arbitrary reasons to set
18  the bid price, that is not the reason that we're seeking the
19  discovery, and that's not what we're going to be pursuing
20  with it. Not to mention that it's just, as a matter of law,
21  the pending proceeding doctrine is for pending proceedings
22  where you can have discovery. And the fact that discovery
23  could overlap in both of those claims is not a reason not to
24  issue the subpoena here. I think the FDIC is suggesting that
25  there was some improper motive that really we're trying to

1  have some affect on that stayed case by making an end run.
2  But there's really no evidence of that.  We are seeking
3  documents about JPMorgan.  And if the FDIC wants to talk
4  about those specific requests and say, Those aren't narrowly
5  tailored enough to JPMorgan, we'll work with them, or they
6  can file a motion.  But all that needs to be decided here is
7  that third parties, including the FDIC, have relevant
8  documents.  And that this is the proper way to explore these
9  claims.  But we will have to show that they are narrowly
10 tailored to these claims.  I'm just going to briefly address
11 the objections that were made by the other parties.  I
12 believe with FHLB San Francisco, again, as that attorney
13 said, this really only goes to the breadth of the request and
14 not to the fact that they would comply with a subpoena to the
15 extent that it was relevant to business claims.  And that was
16 the same agreement that we have reached with TD Bank.  As for
17 the SEC, again, if they do not have documents related to the
18 business tort claims that we're investigating here, such as
19 correspondence with JPMorgan or information taken from
20 JPMorgan that would have informed their decision to take, to
21 not list Washington Mutual in their first order that
22 prohibited short selling, but then added to their second
23 order, then we wouldn't be seeking documents about them.  I
24 think Your Honor's objection is well taken.  That we are
25 going to have to prove that any discovery that we seek is

1     tied to claims against JPMorgan. And to the extent that

2     there are, that there are requests that are in those

3     subpoenas that seem to go more broad, I'm sure that the FDIC

4     will be objecting to those very specifically, and we'll have

5     to narrow them. And if we don't - -

6     THE COURT: That's not the standard. You have to

7     prove to me before I issue the 2004 order that they're

8     related. You just can't come in and get authority to issue

9     subpoenas to anybody you want. You have to prove that it's,

10     it relates to a claim that you may have, and you have to

11     prove its necessary. Well the fact that if you file a

12     lawsuit against - - excuse me - - against JPMC, you can have

13     all the discovery you want against all the third parties you

14     want.

15     MS. TAGGART: I understand we have to show now. I

16     think the documents that we have now, even with the fact that

17     we have not had the correspondence with JPMorgan and the

18     FDIC, we know that they were speaking before and after about

19     Washington Mutual, before JPMorgan had negotiations. They

20     made their - -

21     THE COURT: It's not enough to show they may

22     possibly have relevant documents. That's not enough. You

23     have to show that the 2004 is necessary to get it. That you

24     can't simply get it through regular discovery once you file

25     your claim.

1      MS. TAGGART: We do have to show that the discovery
2  that we request relates to the Debtors and that it is
3  necessary for our investigation.

4      THE COURT: Right. Why is it necessary?

5      MS. TAGGART: It is possible - -

6      THE COURT: For an investigation?

7      MS. TAGGART: It is possible because we don't yet
8  have the third party documents that those may be sufficient
9  to determine that. What we know is that the FDIC has
10  relevant documents to determining whether there were claims
11  in a very material way. I know I go back to it, but for
12  example, that indemnification clause is really at the heart
13  of whether or not JPMorgan believed that it may be exposed to
14  the very tort claims we're pursuing. Without, right now,
15  because we still don't have the documents from third parties
16  or really correspondence with third parties, I can't tell you
17  whether once we get those, those will be sufficient. But I
18  know the FDIC has relevant documents that will be important
19  to evaluating the merits of these claims. And I believe that
20  meets the standard that's set out for Rule 2004 examinations
21  of third parties

22      THE COURT: Well, I'm going to deny the Debtors'
23  request, and here's why. I did grant the 2004 discovery.
24  Against JPMC. To allow the Debtor to explore whether the
25  Debtor did have any potential claims against it under a

1   business tort theory.  Despite the arguments that the Debtor
2   could get that information by other means.  I felt the 2004
3   did allow the Debtor to conduct that discovery.  But quite
4   frankly, I think issuing subpoenas against dozens of third
5   parties just goes too far.  I don't think that's an
6   appropriate use of Rule 2004.  I think the Debtor has a dual
7   burden in using 2004.  First that it's absolutely necessary
8   that we do an investigation, that we are unable, at this
9   point, to determine we have a claim, that under Rule 11 we
10  can file against JPMC.  Now the Debtor has done extensive
11  discovery and gotten extensive numbers of documents from
12  JPMC.  I'm not hearing that the Debtor does not believe it
13  has a claim against JPMC or cannot determine that it has a
14  claim against JPMC at this point.  But the second prong is
15  the Debtor has to prove that it is absolutely necessary to
16  use Rule 2004 because the Debtor cannot obtain these
17  documents any other way, and I'm not convinced at this point
18  that that's correct. The Debtor already has obtained some
19  voluntarily, the Debtor has obtained extensive discovery from
20  JPMC.  What I'm hearing with respect to the FDIC specifically
21  is that really, looking at the discovery request and
22  arguments of counsel, it's getting awfully close to claims
23  that they may have against the FDIC itself.  And I think that
24  fact leads me to believe that specifically asked of them,
25  this is really trying an end run against, around the rules

1    that would otherwise comply with the Federal Rules of Civil

2    Procedure regarding discovery of claims between parties that

3    are in a litigation posture.  Again, you're getting documents

4    voluntarily from the third parties.  You're getting responses

5    under Freedom of Information, and through other

6    administrative means.  I just do not see that the Debtor is

7    prejudiced at this point from not being allowed to issue

8    subpoenas against third parties that go on for paragraph

9    after paragraph, not narrowly tailored to specific claims of

10   a business tort against JPMC.  So I'm not prepared to enter

11   the order on the Debtors' motion.  Do we want to take another

12   short break?

13            MR. ROSEN: Well Your Honor, I just wanted to

14   apprise the Court as to where we are.  We have one additional

15   matter on the agenda, and I have been informed that all told,

16   it will probably take about an hour and a half to handle that

17   matter.

18            THE COURT: Okay.

19            MR. ROSEN: We had informed the Court of that

20   possibility and suggested that we have a Washington Mutual

21   calendar tomorrow at 10:30 on a discrete matter, but that

22   matter should take probably an hour and a half to two hours.

23   If the Court recalls, it's the continuation and hopefully

24   ending of the HF Almonton (phonetic) matter.  I don't, and we

25   had asked the Court at that time whether the Court would be

1 okay with, perhaps continuing this matter for prior to that,

2 because I think the Court had availability before the 10:30

3 calendar. I may be wrong but I thought we had heard that.

4 THE COURT: Well I have a, no, I have a 9:30, and

5 then I have 2 o'clock first days.

6 MR. ROSEN: Oh, okay.

7 MR. CLARKE: Your Honor, I hadn't heard about this

8 at all. I am aware that there's something on the calendar

9 tomorrow, but I'm not available. There's an omnibus hearing

10 next week. I'm available. I don't object to putting this

11 over to the omnibus hearing next week given the lateness of

12 the hour. Although our motion's been on since November, and

13 we've rolled it at several, at the Debtors' request. We're

14 happy to do it now, or we, we're happy to do it next week.

15 MR. ROSEN: Your Honor, it's Mr. Clarke's motion.

16 If the Court wants to go for another hour and a half, we're

17 here.

18 THE COURT: Yes.

19 MR. RILEY: Your Honor, Richard Riley from Duane

20 Morris for TD Bank. I just wanted to clarify your last

21 ruling. We had reached an agreement with the Debtor subject

22 to the, to them being able to issue the subpoena to us. So

23 if they were able to issue the subpoena to us, we had agreed

24 to scope and timing. So I, we'll continue to be in

25 discussions with the Debtor, but what I heard is not allowing

1 them to issue the subpoenas to any of the third parties.

2 THE COURT: Correct. Well let's take a break. I

3 mean, I'm willing to proceed if the parties are. But I'd be

4 happier if I could go home. But - -

5 UNIDENTIFIED SPEAKER: Do we get a vote, Your Honor?

6 THE COURT: Let's take five minutes, and the parties

7 can talk about which they prefer. I'm, I'll leave it to the

8 parties.

9 (Whereupon at 6:36 p.m. a recess was taken in the

10 hearing in this matter.)

11 (Whereupon at 6:49 p.m. the hearing in this matter

12 reconvened and the following proceedings were had:)

13 THE CLERK: All rise. You may be seated.

14 MR. ROSEN: Good evening.

15 THE COURT: Good evening.

16 MR. ROSEN: Your Honor, on February 5th, there is a

17 10:30 calendar already which deals with an omnibus objection

18 to claim, what we refer to as the wrong Debtor claims,

19 litigation related claims that we are seeking to have

20 dismissed. Your Honor, we believe that that presentation is

21 probably going to take about an hour and a half. It so

22 happens that the 11:30 calendar for that day is another case

23 that I'm aware of called Magna, and Mr. Cross and I are the

24 parties for hearing at that time. And we believe that we can

25 adjourn that hearing at 11:30. Which creates an opening,

1    Your Honor, from 10:30 until your next item, which would be

2    at 2 o'clock.  And so we would suggest, Your Honor, that we

3    move the item which is on now, which is, what we'll refer to

4    as the 9.5 motion, or the FDIC's motion for relief from

5    automatic stay, to add to that 10:30 calendar next Friday.

6    And I believe that that is acceptable to Mr. Clarke and to

7    the Debtors' counsel who are handling that matter.

8            MR. CLARKE:  I just want to thank Mr. Rosen for

9    moving the other hearing.  I do appreciate that.

10           MR. ROSEN:  Not a problem.

11           THE COURT:  Okay.

12           MR. ROSEN:  So we would see you then, Your Honor.

13   10:30 next Friday.

14           THE COURT:  Okay.  What item is that on the agenda,

15   just so I keep track?

16           MR. ROSEN:  Oh, I believe it was 15 or 14, actually.

17   Because we went out of order.  It was 15, Your Honor.

18           THE COURT:  No.  That was the omnibus objection.

19   Let's see.  13.

20           MR. ROSEN:  13.  Sorry.  13 will get moved to the

21   5th, Your Honor.

22           THE COURT:  All right.  Good.  Thank you - -

23           MR. ROSEN:  Thank you.

24           THE COURT:  - - for letting me go home.  All right.

25           MR. ROSEN:  Have a nice evening.

1          THE COURT: We'll stand adjourned.

2          (Whereupon at 6:51 p.m. the hearing in this matter was

3     concluded for this date.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          I, Jennifer Ryan Enslen, approved transcriber for

19     the United States Courts, certify that the foregoing is a

20     correct transcript from the electronic sound recording of the

21     proceedings in the above entitled matter.

22

23     _/s/Jennifer Ryan Enslen_                    February 1, 2010
       Jennifer Ryan Enslen
24     43 Bay Boulevard
       Newark, DE 19702
25     (302)836-1905